IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
JACKSON DIVISION


UNITED STATES OF AMERICA

VS.                          CRIMINAL NO. 3:09CR12HTW-JCS

STEVEN JOSEPH CHRISTOPHER




**COMPETENCY HEARING**




BEFORE THE HONORABLE HENRY T. WINGATE
UNITED STATES DISTRICT JUDGE
JULY 27TH AND 28TH, 2009
JACKSON, MISSISSIPPI



APPEARANCES:

FOR THE GOVERNMENT:   MS. MARY HELEN WALL

FOR THE DEFENDANT:    MR. OMODARE JUPITER




REPORTED BY:  MARY VIRGINIA "Gina" MORRIS, RMR, CRR
              Mississippi CSR #1253
_____

245 E. Capitol Street, Suite 103
Jackson, Mississippi  39201
(601) 965-4350

```
 1                         TABLE OF CONTENTS

 2

 3    WITNESSES FOR THE GOVERNMENT:

 4    RODOLFO BUIGAS
```

```
 5      Direct Examination By Ms. Wall:  .....................6

 6        Exhibit G-1  ...................................14

 7      Cross-Examination By Mr. Jupiter:  .................28

 8      Redirect Examination By Ms. Wall:  .................43
```

```
 9    WITNESSES FOR THE DEFENDANT:

10    STEVEN JOSEPH CHRISTOPHER
```

```
11      Direct Examination By Mr. Jupiter:  ................46

12      Cross-Examination By Ms. Wall:  ...................61

13      Redirect Examination By Mr. Jupiter:  .............102
```

```
14    Recessed 7/27/09; resumed 7/28/09  ...................105

15    STEVEN JOSEPH CHRISTOPHER
```

```
16      Direct Examination By Mr. Jupiter:  ...............123

17      Cross-Examination By Ms. Wall:  ...................134

18    Argument by Ms. Wall  ...............................143

19    Argument by Mr. Jupiter  ............................146

20    Continuing Argument by Ms. Wall  ....................151

21    Ruling  .............................................151
```

```
22

23

24

25
```

1           THE COURT:  Call your case.

2           MS. WALL:  Your Honor, this is *United States v. Steven*

3   *Joseph Christopher.*

4           THE COURT:  Hold it a second.  The defendant hasn't

5   come in yet.  I'm sorry.  I thought he was here.

6       (PAUSE)

7           THE COURT:  Now call your case.

8           MS. WALL:  Thank you, your Honor.  This is *United*

9   *States v. Steven Joseph Christopher.*  He is charged with

10  threats against the president of the United States under 18,

11  United States Code, Section 871.  We are present today, your

12  Honor, for a competency hearing.  The defendant is present with

13  his attorney, Mr. Omodare Jupiter.

14          And by -- briefly, your Honor, by way of background,

15  there was a court order signed by the magistrate judge in

16  January of this year where both parties agreed to have the

17  defendant evaluated.  The report has been sent to the court,

18  and it's filed under seal at this time.

19          And the issue of competency is contested by both

20  parties, a little bit of an unusual posture because at this

21  point the government is arguing that the defendant is not

22  competent to stand trial, and that is being contested by the

23  defendant and his counsel.

24          THE COURT:  All right.  You say he's not competent to

25  stand trial.

 1          MS. WALL:  Yes, your Honor.

 2          THE COURT:  The defense says that he is competent to

 3  stand trial.

 4          MS. WALL:  Yes, your Honor.

 5          THE COURT:  All right.  Now, was he tested only on

 6  competency to stand trial, or was he tested also on competency

 7  to appreciate the seriousness of this hearing, that is to know

 8  the difference between right and wrong?

 9          MS. WALL:  He was also tested, your Honor, under the

10  4242 section of Title 18 to determine whether he knew right or

11  wrong at the time of the crime.

12          THE COURT:  Okay.  We'll come back to that.  Thank

13  you.  Now, is the defense prepared to go forward?

14          MR. JUPITER:  We are, your Honor.  And, your Honor,

15  just briefly, last hearing counsel had not been able to

16  communicate with Mr. Christopher before that hearing and after

17  the evaluation was completed.  However, I have met with

18  Mr. Christopher, your Honor, met with him for a lengthy period

19  of time.  And I have been able to communicate with him.

20          He has been able to demonstrate an understanding of

21  the charges against him.  He has been able to communicate

22  that -- an understanding of defenses he may have, including an

23  insanity defense.  And he has been able to demonstrate his

24  ability to understand the nature and the consequences of the

25  judicial process that is going on.

1          So just by way of introduction today, your Honor, we

2    are going to be -- he is going to be contesting the finding

3    that he is incompetent and --

4          THE COURT:  In all respects?

5          MR. JUPITER:  Yes, your Honor.

6          THE COURT:  He contends he's competent under both

7    categories.

8          MR. JUPITER:  Yes, your Honor.  And we objected to the

9    report -- to the evaluation being done when Judge Sumner made

10   that ruling.  We particularly objected also to having both

11   findings being done at the same time because I think there has

12   to be a -- I think that is -- there's some problems in terms of

13   doing both findings at the same time.

14         But, at any rate, note that we did object to that.

15   And we object to there being a finding as to insanity before

16   there's -- the court has made a ruling on competency.

17         THE COURT:  Okay.  Thank you.  Now, then, the

18   government has one witness.  You may call your witness.

19         MS. WALL:  Your Honor, the government calls

20   Dr. Rodolfo Buigas.  And, for the record, that's B-U-I-G-A-S.

21         THE COURT:  Okay.

22         MS. WALL:  Your Honor, the witness has with him some

23   bottled water.  May he use that during his testimony?

24         THE COURT:  He may.

25         MS. WALL:  May I proceed, your Honor?

```
1              THE COURT:  You may.
2                      RODOLFO BUIGAS,
3   having first been duly sworn, testified as follows:
4                   DIRECT EXAMINATION
5   BY MS. WALL:
6   Q.  State your name for the record, please.
7   A.  Yes.  First name is Rodolfo, R-O-D-O-L-F-O.  Last name is
8   Buigas, B-U-I-G-A-S.
9   Q.  And what is your profession or occupation?
10  A.  I'm a psychologist for the Federal Bureau of Prisons.  I
11  conduct forensic evaluations.
12  Q.  Are you licensed to practice?
13  A.  Yes, in the state of Florida.
14  Q.  And how long have you been licensed?
15  A.  I was licensed in '99.
16  Q.  Is there an area in your profession that you specialize in?
17  A.  For the Department of Justice for the Federal Bureau of
18  Prisons I specialize in forensic psychology.  I also have a
19  private practice in neuropsychology.
20  Q.  Do you have specialty in the area of psychopharmacology?
21  A.  Yes.  I also received an additional degree after my
22  doctorate in psychology in psychiatric drugs,
23  psychopharmacology.
24  Q.  Would you please tell us about your educational background
25  that qualifies you for your profession, including colleges and
```

1   medical schools you attended and the degrees that you have

2   received?

3   A.  Yes.  I received my bachelors from Florida International

4   University in '90; my Ph.D., my doctorate, in clinical

5   psychology in '95.  And that includes for us -- we go through

6   graduate school, not medical school.  For us our degree is

7   awarded after internship.  So that included a one-year

8   internship at a joint federal medical prison and medical school

9   in Texas.

10      And after that I also completed an additional residency,

11  which is a postdoc, a year of specialized training in forensic

12  psychology.  And then I began working with -- well, for my

13  internship in postdoc I was working for the Federal Bureau of

14  Prisons as well.  Afterwards I was a full-fledged psychologist

15  working for the Federal Bureau of Prisons in another site, in a

16  third site in Miami, where I'm currently at.  I've been at this

17  site since '96.

18      And then along the way I also received a master's degree in

19  psychopharmacology from Nova Southeastern University.  I forgot

20  to mention my doctorate was from the University of Tulsa in

21  Oklahoma.

22  Q.  Have you been involved in teaching or writing other papers

23  in the field?

24  A.  Yes.  Earlier in my career I was involved in some research.

25  The latest thing I've written hasn't been published yet.  It's

1    on specialized testing issues on a series of books called

2    *Coping with Psychiatric and Psychological Testimony for the*

3    *Courts*.  I only wrote one chapter, though.  It hasn't been

4    published yet.

5        Earlier in my career I did work on validating instruments

6    for competency to stand trial, for -- looking at different

7    tests that look at malingering of psychiatric symptoms and

8    things of that nature.  But it's been a while since I've done

9    research.

10   Q.  And what --

11   A.  I'm sorry.  You also asked if I teach.  I teach

12   psychopharmacology at a local university, but I've taught just

13   about every class from forensic psychology, neuropsychology,

14   general psychological testing, research methods and things of

15   that nature, but last two years in psychopharmacology.

16   Q.  And is that in Miami?

17   A.  Yes.

18   Q.  And what courts or tribunals have you testified in and on

19   how many occasions?

20   A.  I -- please understand it's not an exact number.  I've

21   probably testified 200 times, all -- with the exception of two,

22   all of them in federal court.  Twice I've testified in civil

23   state court or county court in Miami.  And it's typically

24   ranged from issues of competency to stand trial, diminished

25   capacity, insanity, risk assessment, things of that nature.

1  Q.  And did you testify as an expert during those times?

2  A.  Yes, every one, every time.

3  Q.  Dr. Buigas, you've previously been requested by the court

4  to examine the defendant, Mr. Christopher, concerning his

5  competency and his sanity at the time of this offense.  Did you

6  form an opinion as to that question?

7  A.  As to each question, yes.

8      MS. WALL:  Your Honor, at this time the government

9  moves that Dr. Buigas be declared as an expert in the field of

10  forensic psychology.

11      THE COURT:  Any objection?

12      MR. JUPITER:  No objection.

13      THE COURT:  The witness will be allowed to state an

14  opinion.  Go right ahead.

15  BY MS. WALL:

16  Q.  Where did you have an opportunity to examine the defendant?

17  A.  As you said, the defendant was ordered to undergo an

18  evaluation.  Our central office designated him to our facility.

19  The Bureau of Prisons has approximately ten sites across the

20  country that do these evaluations.  He arrived on February 25th

21  to the federal detention center in Miami, and that's where the

22  evaluation commenced.

23  Q.  And do you recognize him in the courtroom today?

24  A.  Yes.

25  Q.  Could you identify him for the record, please?

1  A.  He's the only one wearing an orange jumpsuit.

2           MS. WALL:  Your Honor, may the record reflect that the

3  witness has identified the defendant?

4           THE COURT:  The record will reflect that.

5           MS. WALL:  Thank you.

6  BY MS. WALL:

7  Q.  Dr. Buigas, could you briefly describe your normal

8  procedure when you examine a subject?

9  A.  Yes.  I should tell you there's a little bit of variability

10  depending on the legal issue that's asked.  So, in other words,

11  there might be differences in tests utilized or greater

12  reliance on some collateral information.

13      So, for example, when it's a 4241 issue of competency to

14  stand trial, the mental status time frame that we're looking at

15  is a current time frame.  So I tend to rely less on collateral

16  information.  Whereas, for 4242, for criminal responsibility,

17  it's mental status at the time of the alleged offense.  So I

18  tend to utilize collateral information for those purposes.

19      But, anyway, the typical procedures are we will meet with

20  the individual.  I like to meet with them within 24 hours of

21  his arrival if possible.  There's some certain ethical

22  explanations that I have to go through, who the client is,

23  which in this case it's always the federal courts.  It's not

24  the defendant.  It's not the prosecutor.  It's not the defense

25  attorney.

1          I also like to go over the fact that nothing is kept

2    confidential.  And then even though that the -- under the

3    Federal Rules of Evidence the information can't be used

4    directly to find the person -- to convict a person, there

5    should still be some caution exercised in the level of

6    disclosure through the forensic evaluation.

7          We also -- so in addition to interviews, we also have

8    the defendant undergo psychological testing, subjective

9    psychological testing.  Typically, I rely on my graduate

10   students to do that.  And then a large part of the evaluation

11   really occurs behind the scenes, me not seeing the defendant --

12   or me or anybody from psychology seeing the defendant.  So the

13   person is housed in a federal prison.  He is observed 24 hours

14   a day by officers, by unit staff, by everybody that goes into

15   the unit.

16         Sometimes I listen to taped phone calls, social phone

17   calls I should say, not legal phone calls; anytime the

18   defendant has contacts with staff outside of the unit.  So,

19   for example, when he goes to medical for a different context, I

20   talk to the medical staff; just basically any contact that

21   anybody's had with the defendant over the course of a couple of

22   months that they are typically at our facility.

23         I also try to get collateral information when

24   relevant.  So, for example, for criminal responsibility, we're

25   talking about the person's mental status at the time of the

 1    alleged offense.  So I try to get discovery information that

 2    describes the person's behavior around that time.  In this case

 3    it involved some Secret Service documents.

 4    Q.  What other information did you gather specifically to this

 5    evaluation?

 6    A.  In addition to that, the defendant disclosed to me two

 7    facilities that he had received psychiatric treatment at.  It

 8    turns out he disclosed to Secret Service an additional one

 9    which he did not disclose to us.  So I sent consents for those

10    two facilities, and I received -- oh, I received replies from

11    both, but one of them refused to release the records.  So I

12    received medical records from one of the sites.  And I believe

13    that's about it.

14        (EXAMINED DOCUMENT)

15    A.  I'm referring now to my report at the end of page one and

16    the top of page two where I list all the information that I

17    utilized.  So we had some county -- local county sheriffs'

18    reports, some legal documents, Secret Service reports.

19        Oh, I also went onto Alien Earth, www.alien-earth.org,

20    where, supposedly, the threats had been made.  I also followed

21    a YouTube link or I think it may have been sent to me by either

22    the prosecutor's office or the Secret Service.  I mentioned the

23    psych records.  I pulled my own NCIC, so the criminal

24    background on him.

25    Q.  You're referring now to a report that you have in your hand

1  that you did in this particular evaluation.  Is that correct?

2  A.  That is correct.

3  Q.  And when was that report completed?  Do you know?

4  A.  I can tell you when it was dated.  The letter that was

5  written by the warden's office was May 21st.  The report is

6  dated May 22nd.

7          MS. WALL:  Your Honor, at this time we would like to

8  admit as an exhibit to this hearing the report that had already

9  been filed under seal in this case.

10          THE COURT:  Okay.  Let's have a number.  Do you want

11  G-1?

12          MS. WALL:  G-1, your Honor.

13          THE COURT:  G-1.  Counsel, any objection?

14          MR. JUPITER:  Your Honor, we would object to it being

15  filed not under seal.  But if it's going to be filed under

16  seal -- this is the mental health evaluation.  So I think it

17  shouldn't be made part of the public record.

18          THE COURT:  Should be what?

19          MR. JUPITER:  It should not be made part of the public

20  record, your Honor.  It's a mental health evaluation.

21          THE COURT:  Prosecution?

22          MS. WALL:  If the defendant is willing to not request

23  that it be under seal, the government has no objection, your

24  Honor.  Typically, I believe these are medical records that

25  would remain under seal.

1          MR. JUPITER:  That's what I'm saying.  It's already

2    filed under seal.  I thought she was saying to file it not

3    under seal.

4          MS. WALL:  Oh, no.

5          MR. JUPITER:  As long as it's filed under seal, that's

6    fine.

7          THE COURT:  Okay.  It will remain under seal.  G-1 is

8    admitted.  Go ahead.

9       (EXHIBIT G-1 MARKED)

10          MS. WALL:  Thank you, your Honor.

11   BY MS. WALL:

12   Q.  Based on your examination pursuant to orders of the court,

13   did you reach an opinion concerning the competency of the

14   defendant to stand trial?

15   A.  Yes.

16   Q.  And please share with the court that opinion.

17   A.  I believe that the defendant was not competent to stand

18   trial at the time of the evaluation.  And I don't know how much

19   detail you want me to go into the actual criteria.  While I do

20   believe that he had a factual understanding of the legal

21   process and some ability to verbalize factual understanding of

22   the charges, the consequences, things of that nature, I don't

23   necessarily believe that his true appreciation of rational

24   understanding, of case-specific -- in other words, not just

25   what types of guidelines does a conviction with this charge --

1   is possible, but when you talk about his individual case, I

2   don't believe he has a rational appreciation of his charges.

3   And based on that prong, I opined that he was not competent

4   during the time of the evaluation.

5   Q.  And that criteria is from the *United States v. Dusky* case?

6   A.  Right, *Dusky v. U.S.*, I think '60 or '61, which was

7   incorporated into the federal codes 4241.

8   Q.  I'd like to now ask you specific questions about this

9   defendant concerning your opinion.  Do you believe that he has

10  the ability to understand the nature and the extent of the

11  charges pending in this court against him?

12  A.  Yes.  Yes.  Again, he's an intelligent individual.  Again,

13  one of the tests that I gave him was -- I should say one of the

14  tests the graduate students gave him was an IQ test, and he --

15  he's a fairly intelligent individual, scoring in the high

16  average range.  So I think he has a very good factual

17  understanding of everything.  He understands, again, the

18  charge, the possible penalties, things of that nature.

19  Q.  And tell us what test that you did conduct.

20  A.  Okay.  And, by the way, I'm referring to page two where

21  they're listed on my report.  And, for the record, let me point

22  out an error in my report.  On the first real paragraph of page

23  two, I indicated that I spoke to an individual named Mr. Calvin

24  Butler.  That's an error.  In fact, I did speak to that

25  individual on numerous occasions; but it was on another

1  presidential case that I was evaluating at the same time.  So

2  -- anyway, so I gave --

3  Q.  And so that error should reflect the defendant, not

4  Mr. Butler.  Is that correct?

5  A.  Right.  It should reflect another case.  So, anyway, this

6  individual was given a number of tests.  And I'm going in order

7  of the list on page two of my report, not necessarily in the

8  order they were administered or in the order I necessarily even

9  want to talk about them.

10       One was a Rorschach inkblot.  That's the test that

11  everybody is aware of.  You're shown ambiguous inkblots and

12  you're supposed to say what -- what's given in this test.  And

13  I should say that since I left graduate school, I've probably

14  given that test maybe a handful of times; and it's only when

15  I'm really frustrated with all the other results of the test.

16       I also gave him the Personality Assessment Inventory, which

17  is a much more objective test of psychiatric symptoms.  I gave

18  him the Booklet Category Test, which is a test looking at

19  neuro-cognitive damage, so any type of brain damage or disease

20  states.  The Kaufman Brief Intelligent Test, which is just what

21  it says, a brief measure of intelligence.  One called the

22  Rogers Criminal Responsibility Assessment Scale, which is --

23  it's sort of a decision format in which the clinician comes to

24  conclusions of criminal responsibility.

25       And, finally, the MacArthur Competency Assessment Tool.

1   This is a test looking at competency to stand trial on the

2   criteria of the *Dusky*.  And this is perhaps the gold standard

3   in our field now.  It was -- the original validation was maybe

4   10,000 defendants undergoing these types of evaluations.  I

5   think the test does have some strengths and weaknesses, like

6   any other test; but if you're -- if you can be assured that the

7   defendant is not trying to exaggerate impairments -- and I

8   don't believe that was the case here -- then it's actually a

9   very good test.  So those are the tests I utilized.

10  Q.  All right.  Back to the specific criteria for the standard

11  of competency, do you believe that Mr. Christopher has the

12  ability to aid and assist his attorney in the preparation and

13  implementation of his defense in this case?

14  A.  It's a complex answer.  I think to a limited extent.  I

15  think this individual -- you can ask him, for example, *Here's*

16  *two defenses we can utilize.  These are the likelihood of being*

17  *convicted with one defense.  This is the likelihood of not*

18  *being convicted or being convicted with the other option*, I

19  think he can answer basic questions like that.

20     The problem is when you talk about case-specific questions,

21  I believe this individual at the time of the evaluation was

22  functioning under delusional processes.  So, for example, a lot

23  of his answers to the case-specific questions would be

24  characterized by, *Well, they're going to treat me the same*

25  *because they don't really know who I am.  They don't really*

1  *know about me and how I am this special person.  So without*

2  *knowing anything special about my case, I would be treated the*

3  *same.  This is what could happen.  However, if the courts*

4  *really understood my case, then I would be treated differently.*

5  So I think his rational ability to make decisions

6  about case-specific information was impaired at the time of the

7  evaluation.

8  Q.  Thank you.  Does he understand the nature and the purpose

9  of his court proceedings?

10  A.  I do.  I do.  I think he has a very decent factual

11  understanding.

12  Q.  And does he understand his own position in the proceedings

13  as the accused?

14  A.  I think he does.  Yes.

15  Q.  Does he understand the role of his attorney?

16  A.  Yes.

17  Q.  Does he understand the role of others such as the

18  prosecutor and the judge?

19  A.  Yes.

20  Q.  How about the jury and witnesses that he may call?

21  A.  Yes, I think so.

22  Q.  Does he have the ability to cooperate and advise his

23  attorney rationally?

24  A.  He has the ability to cooperate and advise.  I don't think

25  it's very rationally based.  So no.

```
 1   Q.  Does he have the capability to disclose to his attorney
 2   pertinent facts surrounding the case, including his mental
 3   state and actions at the time of this offense?
 4   A.  He has the ability to disclose pertinent facts.  I am
 5   concerned about how he weighs those facts, and I do not think
 6   that his insight into his mental illness is very good at all.
 7       In fact, on the psychological testing he was minimizing any
 8   mental illness.  So I do not believe he would present that as a
 9   possible -- he would give any kind of weight to that as a
10   possible offense, because that is a cornerstone of his type of
11   mental illness, that he has no insight.
12   Q.  Does he have the ability to help his attorney in the
13   presentation of a defense?
14   A.  Again, I think he could make decisions.  I'm concerned
15   about his rational ability to weigh the different options.  I
16   think there would be some impairment.
17   Q.  Does he have the ability to advise his attorney as well as
18   accept advice from his attorney?
19   A.  There would be some impairment there.  I don't think he
20   would consider with -- on a serious basis any type of mental
21   health defense because I don't believe he thinks he has mental
22   illness to any appreciable extent.
23   Q.  How about does he appreciate the gravity of the charges
24   against him?
25   A.  Yes.
```

```
 1   Q.  Does he understand the possible outcome or verdict in a
 2   case?
 3   A.  I think he does understand to some extent the -- again, he
 4   understands guidelines.  So if found guilty, the typical person
 5   would serve -- could serve this amount of time of
 6   incarceration.  I don't think he necessarily has weighed the
 7   possibility of an NGRI defense or outcome.
 8   Q.  In your opinion, doctor, is the defendant suffering from a
 9   mental illness or defect?
10   A.  Yes.
11   Q.  And what is that?
12   A.  What I diagnosed the defendant with was something called
13   schizo-affective disorder, bipolar type.  In the simplest
14   terms, that is a condition that comprises two types of
15   disturbances.  One is the schizo, which is the main criteria
16   from schizophrenia, so disturbances of thinking, so your
17   associations, your reasoning abilities, also your emotional
18   expression.
19       And then the other component is the affective is a
20   disturbance in -- a more serious disturbance in emotional
21   control and expression.  So, for example, with this individual
22   he -- not only does he have certain thought problems, such as
23   delusions, which are irrational beliefs -- and we can talk
24   about both what he showed to us and what he showed in the
25   previous records -- but he also has problems with his emotions.
```

1   In the past he's demonstrated depression, ability to control

2   his emotions, shifting from one to the other really quickly --

3   we call it lability -- sometimes in his records.

4       So, for example, in the one record I did have, it was a

5   four-week hospitalization on an involuntary basis for making

6   threats also.  The defendant was given an initial diagnosis of

7   bipolar disorder, but at the end of the -- the conclusion of

8   the monthlong hospitalization, he was actually diagnosed with

9   what I diagnosed him with, schizo-affective.

10      So, in other words, it's -- they're looking at these two

11  major domains of psychiatric symptoms, the thought processes

12  and the emotions; and they're thinking -- they're saying that

13  they're both on equal terms.  If we weighed one more heavily

14  than the other, that would be schizophrenia; if we weighed the

15  other one more heavily, that would be bipolar disorder.  So

16  that's the main diagnosis.

17      I gave him also an adult anti-social behavior, but that's

18  not even considered a mental illness.  So I'm not going to

19  address that one.

20  Q.  Is there a probability, in your opinion, that the defendant

21  will decompensate while awaiting trial?

22  A.  The one big caveat here is it depends on his compliance

23  with medication.

24  Q.  Do you know if he's on medication at this time?

25  A.  I do not know that.  I know that he was on it when he left

1    our facility.  But I should say he's got a history of -- which

2    is a cornerstone of this condition.  He's got a history of

3    variable compliance with medication.  So, for example,

4    according to the defendant, the records from the defendant

5    indicated that prior to his -- the one hospitalization that I

6    had, he had been off the medications for a few days.  I

7    probably would believe that it's longer than a few days because

8    the medications don't work exactly like that.

9        But, nevertheless, there's some sort of history of poor

10   compliance while in the community.  And, in fact, during that

11   one hospitalization that the defendant -- that the records I

12   did have, he was placed on a long-acting injectable form of an

13   anti-psychotic medication.  Essentially, that is reserved for

14   people who have -- there's some suspicion of their compliance

15   with medication.

16       So, in other words, you can give them a pill every day; but

17   unless you sit there and check their mouth afterwards, you

18   don't know if they're actually swallowing or what we call

19   they're cheeking it and they throw it out later.  And to be

20   given this long-acting injection automatically assumes that

21   there was an issue with compliance.  There was a suspicion of

22   compliance.  It's much easier to give a pill than an injection.

23   Q.  Do you know how many times the defendant has been committed

24   involuntarily?

25   A.  I only have an idea.  Again, he only mentioned two

1   facilities to us.  And one of them refused to provide records,

2   Aurora Psychiatric Hospital.  I had records from Eglin (sic)

3   Mental Health Center, and it appeared that this was either the

4   second or third hospitalization.  They referred to previous

5   hospitalizations, but I did not have those records directly.

6        And then, as I mentioned earlier, he also mentioned an

7   additional treatment facility to the Secret Service; but I

8   didn't -- I didn't have -- I found that out towards the end of

9   the evaluation, and I didn't even have a location of that

10  facility.

11  Q.  Okay.  Back to your diagnosis, in your opinion, does the

12  defendant suffer from delusional ideation or irrational belief?

13  A.  Yes, and it's actually of a variable nature.  I think it's

14  partly grandiose, partly religious, and also there's something

15  called delusions of reference.  So, in other words, you

16  watch -- this is an example.  I'm not saying this applies to

17  the defendant.  You're watching television and a commercial

18  comes on and you believe that the commercial is talking to you

19  directly.

20       I'll give you some examples of really the mix of the three

21  there.  The defendant believes he is some sort of prominent

22  religious figure.  In the past he has said he is God, or a god

23  I should say.  I can tell you that in our evaluation in one of

24  the forms that he filled out himself he signed it as "the

25  Messiah."  So I think there's some grandiose and religious

1    preoccupations there.

2        Oh, I'm sorry.  You also asked about other symptoms,

3    hallucinations maybe?

4    Q.  Yes.  Well, how would you classify the degree of this

5    condition?

6    A.  Schizo-affective disorder is a serious chronic mental

7    illness, period.  I mean, there's some fluctuations in mental

8    status, and I can only tell you how he was during the course of

9    the valuation.  But it's a serious chronic mental illness.  It

10   will not go away.  It, at best, partially responds to

11   medication.

12   Q.  Dr. Buigas, is this condition of such degree that it

13   interferes with the defendant's understanding and awareness of

14   these courtroom proceedings?

15   A.  I suppose it could get -- his mental status could

16   decompensate to the point that that is impaired.  However, when

17   I saw him, I thought it was more of the rational, being willing

18   to provide assistance towards his defense, that was affected.

19   Q.  The *Dusky* prong of whether he is able to advise and accept

20   advice from his attorney.

21   A.  Yes.

22   Q.  Dr. Buigas, is there a substantial probability that the

23   defendant will regain his competency in order to stand trial

24   within the foreseeable future?

25   A.  I think so, and I base that on a couple of reasons.  One

1    is, while this type of condition is never fully ameliorated

2    with medications, the symptoms do tend to respond to different

3    types of medications.  And we see that the majority of persons

4    with these conditions, schizophrenia, schizo-affective

5    disorder, tend to reach a sufficient level of stability that

6    they can go through legal processes.

7         There's no way to predict an individual reaction.  But I

8    can say that based on the one record I had, his mental status

9    was described considerably different, meaning improved, from

10   the initial period of treatment to the end of the treatment.

11   Q.  And what type of treatment would you recommend for this

12   defendant's condition?

13   A.  Well, the medications of choice in the last 10, 15 years,

14   have been a class of medications called atypical

15   anti-psychotics.  They're just essentially the newer

16   anti-psychotic medications.  They work very effectively on the

17   symptoms of psychosis or the thought process problems in most

18   cases not better than the older medications but at least as

19   good.  A couple of cases they do work a little bit better.

20        And they also have replaced the medications we used to use

21   to treat bipolar disorder, the mood stabilizers like lithium.

22   Everybody has heard of that one.  They are effective as model

23   therapy treatments.  In other words, you just give this one

24   medication and you don't have to add other medications.  You

25   can.  And in this case -- for example, the Eglin Mental Health

1  records that I received, the defendant was on as much as four

2  medications of high doses each at any -- at one given time.  So

3  you certainly can combine these medications if they don't

4  respond to a -- you know, the more conservative treatments.

5  Q.  Did you talk with the defendant about the beliefs that you

6  believed to be irrational; and if so, would you explain those

7  to the court?

8  A.  I'm not sure I follow the question.  I spoke to the

9  defendant about his beliefs.  If you're asking if I confronted

10  him about the beliefs, no.

11  Q.  You mentioned earlier that you would talk later about the

12  belief you found to be irrational.  If you would explain that

13  to the court.

14  A.  Yes.  Well, again, the test I did administer that directly

15  looked at the legal construct, the competency to stand trial,

16  is -- has three components in it.  One is this sort of factual

17  understanding of the legal process.  The second one is sort of

18  this ability to consult with his defense.

19     Now, I should say one thing -- and he scored in the

20  unimpaired range on both these or minimal impaired range on

21  both these.  So you might ask why would he -- you know, why am

22  I saying he's incompetent.  But, actually, both prongs talk

23  about a hypothetical scenario.  They give them a case about

24  this fight in a barroom and they ask the defendant to talk

25  about the fight in the barroom.  So should this person consider

1   this evidence, what's the charges, what are the possibilities

2   of being found guilty, what's the plea bargain, things of that

3   nature.

4        Now, the third prong, which really looks at this

5   appreciation, it's the only prong of this test that looks at

6   case-specific information.  So, now, forget about the scenario,

7   this hypothetical, now -- and ask questions, *What's the*

8   *likelihood of you being convicted of this offense?  What's the*

9   *likelihood of the justice system treating you fairly?* things of

10  that nature.

11       And, again, the underlying theme across those questions

12  were, *Well, they're going to treat me the same because they*

13  *don't really know how special I am.  If they knew how special I*

14  *am, then I would be treated differently.*  So if you ask him on

15  a superficial level *What are your options here?* he'll answer

16  it.

17       However, when you talk about -- on a much deeper level when

18  you talk to him about his case specific and why he did this and

19  why he thinks that he shouldn't go for this insanity defense

20  despite this mental illness, things of that nature, I think

21  that's where you see the impairment coming out.

22            And, by the way, the objective score was in the severe

23  impaired range on that prong.

24            THE COURT:  Severe what?

25            THE WITNESS:  Severe impaired range for this

1  case-specific appreciation.

2  A.  So you had two in fine ranges when you talk about somebody

3  else's case.

4  BY MS. WALL:

5  Q.  So cognitive reasoning is not the problem here with this

6  defendant.

7  A.  That's an artificial distinction.  I think intelligence is

8  not an issue.  I don't think he has any brain damage.  So in

9  that sense cognitive impairment is not the issue.  However,

10  when you're talking about rational understanding, that's still

11  part of cognition.

12          MS. WALL:  Your Honor, may I have just a moment?

13          THE COURT:  Okay.

14      (PAUSE)

15      (COUNSEL CONFERRED)

16          MS. WALL:  That's all I have, your Honor.

17          THE COURT:  All right.  Cross-examination.

18                       **CROSS-EXAMINATION**

19  BY MR. JUPITER:

20  Q.  Dr. Buigas, my name is Omodare Jupiter.  I think we spoke

21  on the phone.

22  A.  Yes, we did.

23  Q.  Okay.  And let me just try to sum up before I go into

24  individual questions.  You're saying the main problem you see

25  with this defendant is his ability to appreciate the defenses

1    that may be available to him based on the fact that he thinks

2    that the court and others are not going to be able to see how

3    special he is.

4    A.   That's the main issue, yes.

5    Q.   Okay.  And your opinion is that irrational belief affects

6    his ability to appreciate defenses that are available to him or

7    to assist in his defense?

8    A.   I think to some extent everything, but more the defenses

9    that are available.  But I think in his consultation, in his

10   assistance towards his defense, I think that he would not weigh

11   things properly.  So he may say you should look after -- you

12   should go after this fact versus this fact, and I don't think

13   he would give it the proper weight that it would -- that a

14   rational person would give it.

15   Q.   But, in your opinion, these beliefs that he has, he has --

16   he has communicated to you that others are not going to agree

17   with those beliefs.  Correct?

18   A.   That -- he didn't say that they wouldn't agree.  He said,

19   *They don't know how special I am.*  I guess if he were to -- in

20   his mind, if he were to enlighten them, maybe they would or

21   maybe they wouldn't agree.  I don't know.

22   Q.   But he hasn't indicated to you that he expects the court,

23   counsel or a jury to agree with his beliefs, has he?

24   A.   He hasn't expressed his opinion as to whether they'll agree

25   or disagree.

1    Q.  Did you ask him?

2    A.  No.

3    Q.  Okay.  So you --

4    A.  Well, actually, the questions are, *Are you going to be just*

5    *as likely, less likely to be found guilty?* things of that

6    nature.  So yes, indirectly.  And, again, his responses were

7    always, *They're going to treat me the same because they don't*

8    *know how special I am.*

9    Q.  And when you say treat him the same, they're going to treat

10   him as someone who does not have the special gift that he

11   believes he has.

12   A.  Right, who doesn't have a mental illness.

13   Q.  And that's a fairly rational conclusion, you would agree

14   with me, for him to draw, that --

15   A.  No.

16   Q.  Wait.  I'm not -- not what his beliefs are, sir, but that

17   others will not be able to see those things that he sees.

18   A.  No, because that makes the assumption that he doesn't have

19   a mental illness to see.  And, in fact, he does.

20   Q.  Okay.  But in terms of evaluating his ability to put on a

21   defense, in terms of evaluating his ability to assist in his

22   defense, how does that interfere with his ability to make a

23   decision about putting on a defense?

24   A.  Because I think the decision will be influenced by

25   irrational beliefs.

```
 1   Q.  Okay.  All right.  Now, let me go over a few things with

 2   you.  First of all, how many conversations have you directly

 3   had with Mr. Christopher?

 4   A.  I think we had four clinical conferences, two by --

 5               THE DEFENDANT:  What a joke.  You initially spoke with

 6   me for two minutes, sir.  Lie.  Perjury.  You're under oath.

 7               THE COURT:  Okay.  Mr. Christopher, we're going to

 8   talk in a few minutes.  All right?

 9               THE DEFENDANT:  Okay.

10               THE COURT:  Go ahead.  Next question.

11   BY MR. JUPITER:

12   Q.  Sir, you used the word "we" when I asked you about you.

13   A.  Right.  I was --

14   Q.  Okay.  How many conversations did you have with

15   Mr. Christopher?

16   A.  I was getting to that.

17   Q.  All right.

18   A.  Two from my grad student and two from me.

19   Q.  Okay.  In terms of the conversations that you had with him,

20   how long did they last?

21   A.  First one was half an hour.  The second one was an hour and

22   a half.

23               THE DEFENDANT:  Liar.

24   BY MR. JUPITER:

25   Q.  Okay.  And you mentioned that you had -- a grad student was
```

1  the one who worked on this case directly --

2  A.  Who did the testing, yes.

3  Q.  Okay.  Did she also get a lot of the information that

4  you've testified to in terms of information in this case?

5  A.  She did most of the testing, yes.  And, in fact, I put her

6  name in the report on page --

7  Q.  I saw it in there.

8  A.  -- page two.

9  Q.  It's Gillespie.  Correct?

10  A.  Stedding is her name.  Her last name is Stedding.

11       THE WITNESS:  I'll spell it for you.  S-T-E-D-D-I-N-G.

12  BY MR. JUPITER:

13  Q.  All right.  Now, in terms of -- you indicated that you

14  contacted myself.  Correct?

15  A.  Correct.

16  Q.  All right.  And do you have any information in the report

17  that I gave you?

18  A.  Do I have any information in the report?

19  Q.  Did I tell you --

20  A.  I'm not sure.

21  Q.  -- whether or not I had any problem communicating at that

22  time with Mr. Christopher as to the facts of the case?

23  A.  Let me -- I'm referring to our contact, our notes.

24  Q.  Right.

25       (WITNESS EXAMINED DOCUMENT)

1   A.  These are -- understand these are paraphrasing our

2   conversation.

3   Q.  Okay.

4   A.  Not any verbatim responses.  You said he's intelligent,

5   able to discuss facts of the case, evasive.  He says he --

6   it's -- he had some sort of history of psych meds.  Poss- --

7   possibly obstructing an ability for reasoning.  You said no

8   competency concerns.  You also mentioned a treatment center --

9   actually, you mentioned four treatment centers.  And that was

10  pretty much our conversation.

11  Q.  Okay.  But in terms of our conversation about whether or

12  not he's competent and his ability to communicate with counsel,

13  his counsel was able to tell you that he was able to

14  communicate with me about the facts of the case.  Correct?

15  A.  I don't know if I asked that question.  But, again, there

16  was two potentially conflicting issues.  You said no competency

17  concerns, but possibly of obstructing of ability to reason.  So

18  that is part of a construct of competency.

19  Q.  Okay.  In terms of ability to reason about what, though?

20  A.  I'm not sure I wrote that down.

21  Q.  Right.  You didn't write that down.  You didn't write

22  down -- you don't remember writing down my answers to you about

23  whether or not he was able to communicate with me?

24  A.  Again, it's not a verbatim note-taking.

25  Q.  Were the things that his counsel was telling you about him

```
 1  important to your evaluation, sir?

 2  A.  It is one component, yes.

 3  Q.  Okay.  Because, I mean, we talked for several minutes,

 4  didn't we?

 5  A.  Yes.

 6  Q.  Okay.  And if your conclusions were really about whether or

 7  not he'd be able to assist in his defense, certainly, what his

 8  defense counsel communicated to you would have been important

 9  in coming to that conclusion.  Right?

10  A.  It's one set of information.  What either attorney tells me

11  is not my opinion.

12  Q.  Okay.  But you would agree with me none of the things that

13  I told you are incorporated into this report.

14  A.  Yes, I did.

15  Q.  Any of the things that I told you are incorporated --

16  A.  Oh, I mean as a whole.  I don't tell -- I don't put, *The*

17  *defense attorney said this.  The prosecutor said this,* but I do

18  incorporate it into my opinions, yes.

19  Q.  Okay.  Now, I want to go to your conversations with

20  Mr. Christopher.  Now, Mr. Christopher, as you said, was able

21  to explain to you what the charges were against him.  Correct?

22  A.  Yes.

23  Q.  He was able to understand what a guilty plea is.  Right?

24  A.  Yes.

25  Q.  He was able to understand what are the consequences of
```

1  being found guilty.  Correct?

2  A.  Yes.

3  Q.  All right.  And he -- and you also discussed with him the

4  issue of whether or not -- what a not guilty by reason of

5  insanity defense is.  Correct?

6  A.  Yes.  In general terms, yes.

7  Q.  All right.  And did you talk to him about what a legal

8  defense other than the not guilty by reason of insanity defense

9  would be?

10  A.  I don't think directly.  We just talked about the

11  possibility of being convicted or not convicted.

12  Q.  All right.

13  A.  I mean, I'm not sure how specific your question is.

14  Q.  All right.  And you mentioned that you gave him an

15  inkblot -- there was an inkblot test that was administered.

16  Was that administered by you?

17  A.  No.  Most of the testing is done by the graduate students.

18  Q.  And you said that that test is usually done when you are

19  frustrated with the testing process, if it's done at all?

20  A.  Not the process, no, the results.  So, for example, I'll

21  tell you what led me to reach that conclusion.  Persons with

22  this type of mental illness, because of the lack of insight,

23  tend to invalidate more objective tests.  And that test in this

24  case was the Personality Assessment Inventory.  And this

25  defendant approached the test in a way that was minimizing any

1   mental illness.  We call that fake good.  So you're faking that

2   you're better off than you are.

3       Now, I should say one thing.  Even though he invalidated it

4   because of this tendency to fake good, there were still two

5   scale elevations, meaning elevations in a -- similar to

6   clinical populations, and that was paranoia and grandiosity.

7   So even the fact that he was suppressing symptoms, he had two

8   clinical elevations in those domains.

9   Q.  Okay.

10  A.  But because of that --

11  Q.  I was going to go ahead and let you answer.  I don't

12  understand what you're saying, but I wasn't concerned with

13  that.  But what I'm asking you is this inkblot test is not

14  something you would generally administer; it's something you

15  generally avoid.  Right?

16  A.  Yes.

17  Q.  Because it's very subjective on the examiner, isn't it?

18  A.  No.  In fact, I'm not a big fan of this test, let me tell

19  you.  In fact, there are some large scales studies -- they're

20  called meta-analysis -- where they combine thousands of studies

21  in a statistical manner.  And as much as I don't like saying

22  this, there are at least two such studies that show this test

23  has good what we call psychometric properties, validity and

24  reliability.

25      I think -- I still don't -- despite that, I still don't

1    like to use it in these forensic applications because I think

2    it's a lot more complicated to explain to laypersons than a

3    test such as PAI or an MPI.

4    Q.   Okay.   This is basically the test where he gives his

5    response to a visual inkblot.   Correct?

6    A.   The inkblot, yes.

7    Q.   And the examiner tries to determine what mental -- what

8    effects that has -- what conclusions they can reach about his

9    mental health status.

10   A.   I can define it pretty simply.   Essentially, you're given

11   this inkblot.   You're asked -- the defendant -- or the client

12   is asked to state what they see.   Then you look at the

13   individual different elements that led to that defendant's

14   conclusion.

15       And this test works similar to many other tests, and that

16   is -- let's say we validate it.   We determine that it's useful

17   on a sample of whatever, 5,000 people.   And in psychology when

18   you have -- when your responses are such a -- so much of an

19   outlier and you tend to do that over and over and over, this

20   suggests abnormality.

21       Then you come along and you couple that initial research to

22   different groups, so somebody with schizophrenia, somebody

23   without schizophrenia.   And you say, okay, where does -- what

24   key indicators, what indices tend to discriminate between

25   persons who have this condition and persons who do not have

1   this condition?  We call that construct alerting.  So that's

2   how the test is validated.  And that's how most tests are, but

3   most of them are a little bit more less ambiguous in terms of

4   their stimuli than the Rorschach.

5   Q.  Let me just ask you this.  This test is, as you stated

6   before, more subjective than the other test -- objective

7   testing.  You referred to the other testing as more objective

8   testing.

9   A.  I think you said it was more subjective.  No, I said

10  it's -- there is some good research suggesting the validity of

11  the test.  I think it's a lot more complicated to explain.

12  Q.  Okay.  All right.  You mentioned that you're concerned

13  about he evaluates his mental health -- his mental disease.

14  You mentioned that on direct examination.  Right?

15  A.  I'm sorry.  I didn't understand the question.  That he --

16  he's concerned about his mental health?

17  Q.  Yeah, moving onto another -- you testified on direct that

18  he's concerned about -- you're concerned about how

19  Mr. Christopher evaluates his mental disease.

20  A.  Right, whether he recognizes his mental illness.

21  Q.  Okay.  And you believe that his delusions are what keep him

22  from having insight into his mental health and mental disease.

23  Correct?

24  A.  Not necessarily.  Lack of insight and delusions are two

25  different symptoms of his condition.

1   Q.   Okay.  But what I'm saying is he's expressed some belief to

2   you that he has -- he has a special -- either a special

3   relationship to God or that he is, in fact, the Messiah

4   himself.  Correct?

5   A.   Yes.

6   Q.   All right.  And it is your belief that is what -- that is

7   his delusional belief.  Correct?

8   A.   Yes.

9   Q.   Now, that delusional belief, has he been able to

10  demonstrate that he's been able to set aside that delusional

11  belief in determining what is the likely outcome of what --

12  that would happen to him in court?

13  A.   I don't know.  He says that this is a likely outcome if the

14  decision-makers don't recognize his condition, but he didn't

15  tell me that he's able to set that aside.

16  Q.   Okay.  He didn't say whether or not the decision-makers --

17  you didn't ask him whether or not decision-makers are likely to

18  reach that same conclusion that he's reached.  You didn't ask

19  him that.

20  A.   No.

21  Q.   Okay.  You didn't ask him -- with regard to -- obviously,

22  you believe that he should take advantage of a not guilty by

23  reason of insanity defense.  Correct?

24  A.   Oh, I'm not giving any kind of legal opinion -- I mean,

25  legal advice.  I think the court asked me that question and I

```
 1  gave an opinion on whether he would meet that threshold.

 2  Q.  Okay.

 3  A.  But as far as legal advice, I don't know.

 4  Q.  Let me ask you this.  You've indicated that he understands

 5  what a not guilty by reason of insanity defense plea is.

 6  Right?

 7  A.  I think he has some level of awareness of what it is, yes.

 8  Q.  What has he said to you in that regard?

 9  A.  Well, that he -- that he doesn't meet the criteria.  He's

10  not mentally ill.

11  Q.  Okay.  But what did he say in terms of his understanding of

12  what a not guilty by reason of insanity defense is?

13  A.  That somebody with a mental illness could pursue this as a

14  defense.

15  Q.  Okay.

16  A.  And I'm paraphrasing.  Please understand.

17  Q.  Okay.  But a reasonable answer to that question.  Correct?

18  A.  Yes.

19  Q.  And he's indicated to you that he doesn't -- that he

20  doesn't want to go that way.  Correct?

21  A.  I don't think I necessarily asked him which way he's

22  leaning.  I mean, I could speculate based on what's going on

23  today, but I don't think I asked him that.

24  Q.  Okay.  And with regard to -- is it -- but you're saying

25  that he doesn't appreciate the value of that defense?
```

1   A.  I don't think he thinks he meets the criteria for that

2   defense.

3   Q.  Okay.  Well, pretty much -- pretty much anyone with a

4   mental -- any kind of a mental disease would have trouble

5   evaluating whether -- evaluating their mental competency, don't

6   you agree?

7   A.  No.  No, not at all.  In fact, it would take the more

8   serious conditions.  Somebody with depression will most likely

9   have no problems -- and that is a mental illness -- would have

10  no problems weighing different -- making reasonable decisions.

11  Q.  Okay.  You mentioned that he scored in unpaired (sic) -- in

12  the unpaired range on tests that were designed to assess his

13  ability to assist in his defense.  Is that correct?

14  A.  He scored unimpaired --

15  Q.  Right.

16  A.  -- in one of the tests that looks at ability to assist in

17  the defense, but not with his case-specific information, yes.

18  Q.  Okay.  So you're saying it's only when -- with regard to --

19  with regard to his case specifics in terms of evaluating who he

20  is.  That is what makes you reach the conclusion that he is --

21  he does not have a rational ability to assist in his defense.

22  A.  Correct.

23  Q.  Has he stated anything else to you that would indicate that

24  he does not understand -- that he does not understand what

25  defenses he would have in this case?

1   A.  No.

2   Q.  Okay.  And the last time you -- that you evaluated him was

3   when?

4   A.  He left our facility I believe in -- the last time direct

5   contact or since I talked to staff who monitored him?

6   Q.  Well, both.

7   A.  He left our facility I believe in -- I don't have the exact

8   date.  I believe in late March, but I don't have the exact

9   date.

10  Q.  What eval- -- when was the last time you made any type of

11  notations of any observations of him?

12  A.  Towards the end of March I talked to the unit staff that he

13  was -- he was housed in our -- it's not exactly a mental health

14  unit, but it's a pseudo mental health unit.  And I talked to

15  the staff there about how he's doing on the unit.

16  Q.  Okay.  With regard to competency, his awareness of the

17  legal process that is again --

18          MR. JUPITER:  Please sit down.

19  BY MR. JUPITER:

20  Q.  With regard to his competency, was there any information

21  that indicated that he doesn't understand these legal processes

22  against him?

23  A.  You mean from those context, from talking to unit staff?

24  Q.  Yes.

25  A.  No.  That's not directly relevant to the construct.  It's

1   just part that I incorporate in my opinion.

2   Q.  Okay.

3          MR. JUPITER:  No further questions, your Honor.

4          THE COURT:  Okay.  Any other questions?

5          MS. WALL:  Just a few, your Honor.  May I proceed?

6                    **REDIRECT EXAMINATION**

7   BY MS. WALL:

8   Q.  Dr. Buigas, you mentioned the term "fake good" in

9   cross-examination.  Could you tell the court what fake good is

10  as opposed to malingering.

11  A.  Right.  In simplest terms, you can approach a test three

12  ways.  You can be candid, you can exaggerate symptoms, and you

13  can minimize symptoms.  And it gets more complicated than that

14  for sure.  But when they fake bad, they try to -- the persons

15  taking the test, examinees, try to proclaim an unrealistic

16  level of symptoms and types of symptoms.  I won't necessarily

17  go into that because it's not relevant in this case, but that's

18  what -- that's what they attempt to do.

19      When they fake good, they try to say they're better -- they

20  are functioning better than even the average, the controls,

21  normal people are functioning.  And you see that -- it's quite

22  common, unfortunately -- with the really seriously mental ill.

23      Now, malingering -- you mentioned the term malingering.

24  Malingering is a whole different classification.  It's not just

25  how they approach the test.  A test doesn't make the diagnosis.

1   Malingering is, the way we define it, meaning our field, the

2   American Psychiatric Association in their *Diagnostic and*

3   *Statistical Manual of Mental Disorders,* called *DSM* -- this is

4   our Bible, essentially -- they define malingering as gross

5   exaggeration or fabrication of psychiatric or physical

6   problems.  And it's usually for a clearcut secondary gain, such

7   as to avoid legal repercussions, not work, get out of the

8   military service, get out of anything like that.

9   Q.  And what did you find in this case as far as the defendant

10  displaying the term "fake good"?

11  A.  No.  In fact, he was -- he -- in the PAI, the one test that

12  looked at psychiatric symptoms and all that, this is the one

13  that he filled in himself; and it's scored with different

14  objective criteria.  He -- and, by the way, it's comprised of

15  344 questions.  He faked good on it.

16      Despite the suppression of psychiatric symptoms, he still

17  achieved elevations in the clinically impaired ranges with

18  persons who were paranoid and grandiose.  So despite this level

19  of suppression, there was still clinical elevations.

20  Q.  And in layman's terms, this is pretending not to have a

21  mental illness.

22  A.  Right.

23          MS. WALL:  No further questions, your Honor.

24          THE COURT:  All right.  You may step down.  Well, hold

25  it one second.  I have just a summary question.  So, then, are

```
1    you opining that he is competent -- I mean -- excuse me -- not

2    competent to stand trial?

3              THE WITNESS:  Correct.

4              THE COURT:  And that he did not appreciate the

5    difference between right and wrong at the time of the alleged

6    threat.

7              THE WITNESS:  Yes, your Honor.

8              THE COURT:  All right.  Thank you.  Any other --

9              MS. WALL:  No other witnesses from the government,

10   your Honor.

11             THE COURT:  What says the defense?

12             MR. JUPITER:  Your Honor, Mr. Christopher is going to

13   testify.

14             THE COURT:  Mr. Christopher, come forward and be sworn

15   in again.  Mr. Christopher, you're going to testify up here.

16      (COMPLIED WITH REQUEST)

17             THE COURT:  Okay, Mr. Christopher.  Mr. Christopher.

18             THE DEFENDANT:  Yes.

19             THE COURT:  Face her.

20             THE DEFENDANT:  Sir?

21             THE COURT:  You need to face her.  She's going to

22   administer the oath.

23             THE DEFENDANT:  I have a problem with that.  Matthew,

24   chapter 5 --

25             THE COURT:  You can affirm.
```

1            THE DEFENDANT:  Matthew, chapter 5, versus 33-37 says

2    do not swear --

3            THE COURT:  You don't have to swear.  You can affirm.

4            THE DEFENDANT:  Okay.  I affirm I'll tell the truth.

5            THE COURT:  Okay.  Here it is --

6            COURT SECURITY OFFICER:  Put your hand on the Bible.

7            THE COURT:  -- over here.  Well, he doesn't have to

8    put his hand on the Bible then.  Then do you -- I'll administer

9    it.  Do you affirm --

10            THE DEFENDANT:  My yea will be yea and my nay will be

11   nay.

12            THE COURT:  Okay.  Do you affirm that your testimony

13   will be truthful?

14            THE DEFENDANT:  Yeah.

15            THE COURT:  Okay.

16                   **STEVEN JOSEPH CHRISTOPHER,**

17   having first affirmed to tell the truth, testified as follows:

18                      **DIRECT EXAMINATION**

19   BY MR. JUPITER:

20   Q.  Good morning, Mr. Christopher.

21   A.  Good morning.

22   Q.  Mr. Christopher, I want to just get right to it.  You

23   understand what you're here for today.

24   A.  Yeah.

25   Q.  The court is going to make a decision as to whether or not

1  you are mentally competent to even stand trial or to go forward

2  with these proceedings.

3  A.  Yes.

4  Q.  And you and I have met several times before you left to go

5  to Miami.  Is that correct?

6  A.  Yes.

7  Q.  And we've had long conversations over at the Madison County

8  jail.

9  A.  Uh-huh (indicating yes).

10  Q.  And we recently had a long conversation at the Madison

11  County jail last week.  Is that correct?

12  A.  Yes.

13  Q.  As well as a conversation in the lockup over here in the

14  courthouse in this building after the last hearing we had on

15  Monday.  Correct?

16  A.  Correct.

17  Q.  All right.  What is your understanding of the charges

18  against you?

19  A.  My understanding of the charges against me are -- from face

20  value is that I've made a threat, a death threat, against

21  the -- at the time the president-elect of the United States.

22  Q.  Okay.  Do you understand that that's against the -- it

23  would be against the law to do something like that?

24  A.  I understand that it is against the law of this country to

25  do something like that.  Yes.

1   Q.   Okay.  And I've talked to you about what the government

2   would have to do in order to have a conviction against you.

3   Correct?

4   A.   Uh-huh (indicating yes).

5   Q.   And you and I have talked about defenses in this case.

6   Correct?

7   A.   Correct.

8   Q.   What have we talked about and what is your understanding of

9   your -- of any available defenses that you may have in this

10  case?

11  A.   Well, we talked about the hypothetical conditions of

12  whether or not I should plead guilty or not guilty, if -- we

13  talked about, you know, the circumstances, what I would have to

14  prove to the court or to the judge if I were to plead not

15  guilty, whether it be by reason of insanity, which I refuse to

16  go that route because I do not believe I am insane or was I

17  insane at the time of the incident, of the alleged crime, of

18  the crime.

19  Q.   Okay.

20  A.   Or we also talked about pleading guilty as well.

21  Q.   All right.  And in terms of -- we also talked about

22  possible defenses in this case.  I talked to you about the

23  elements of the defense of what is a threat.  Correct?

24  A.   Correct.

25  Q.   And what is your understanding of what a threat is in a

1    legal sense?

2    A.   A threat is making a verbalized statement, whether it's

3    written or verbalized, against a person which -- which implies

4    that some form of harm is going to be done to that person.

5    Q.   Okay.   In regard to -- I think I talked to you also about

6    whether or not the government could prove that this was an

7    actual threat or that a person who had read this communication

8    would perceive it as a serious threat or not.   Do you remember

9    that conversation we had?

10   A.   Yes.

11   Q.   Did you have any problems understanding that

12   conversation --

13   A.   No.

14   Q.   -- or what the government would have to prove?

15   A.   No, I don't have a problem.

16   Q.   Did I talk to you about whether or not you would have to

17   take the stand or whether or not you could remain silent at

18   trial?

19   A.   We didn't really go over that that much, no.

20   Q.   Okay.   Well, what is your understanding of that?   I thought

21   we did go over that, but what is your understanding of that?

22   A.   Well, just from what I know from courts and defendants, I

23   believe the defendant does have a right not to testify at a

24   trial.

25   Q.   Okay.   And in terms of if you wanted to take the stand, did

1   I explain to you that no one could stop you from doing that?

2   A.   Yeah, I believe you did say that.  Yeah.

3   Q.   Okay.  And in terms of determining -- you understood also

4   that I would be able to cross-examine the witnesses for you --

5   A.   Yeah.

6   Q.   -- in your defense.  Correct?

7   A.   Yeah, I understand that.

8   Q.   You had -- at the last hearing we had you had mentioned

9   some things about maybe not wanting to have me represent you.

10  Have you changed your mind since then in terms of whether or

11  not you'd like to have the assistance of counsel?

12  A.   Well, yeah, I've changed my mind, considering that I

13  believe that I've been able to communicate to you and convince

14  you that I am fully competent mentally.  And I believe that you

15  can help me and assist me.

16  Q.   Okay.  I've talked to you about your -- and you

17  communicated to me about your beliefs about who you are.

18  Correct?

19  A.   Correct.

20  Q.   And I've explained to you that I don't agree with that.

21  Right?

22  A.   Correct.

23  Q.   And you weren't surprised that I didn't agree with those

24  beliefs, were you?

25  A.   No, I was not.

```
 1   Q.  Okay.  Would you be surprised, for instance, if your Honor

 2   doesn't -- you're not able to convince him to agree with those

 3   beliefs?  Would you be surprised about that?

 4   A.  No.

 5   Q.  Would you be surprised if 12 people from the community who

 6   we picked on a jury came to the conclusion that you were, in

 7   fact, not who you say you are and that you have a mental health

 8   disease?

 9   A.  I would not be surprised because, generally, people -- I

10   have a little bit of understanding of human nature, and it's

11   initially -- when something -- when somebody comes along onto

12   the scene and makes these shocking, you know, threats that I've

13   made and then goes on to profess who this -- who I think I am,

14   I mean, initially a public reaction, I mean, would be negative

15   and would be very skeptical.  And I understand that, and so I

16   take that into consideration.

17        And I also believe that, however, through time and through

18   processing, through research into -- anybody, a particular

19   individual.  It doesn't have to be me -- that I believe that

20   there can be a level of understanding achieved over time.

21   Q.  Okay.  But you understand that -- what do you think about

22   the likelihood of that happening during, for instance, a trial?

23   A.  I think it's possible.  I think that there's enough

24   information about what I believe, and what I profess to believe

25   is actually -- elements of what I profess to believe what will
```

1  happen in the near future is also backed by educated men.  So I

2  believe that -- not that people need to look for references

3  from other people, so to speak, because I'm claiming my claims

4  and beliefs are of a divine nature.  However, people need a

5  source of validity behind what I have to say; and so they look

6  for other sources of information that would either give me

7  credit or give me --

8  Q.  You mentioned that it's possible.

9  A.  Yes.

10  Q.  In terms of the probability of it happening, let me just

11  ask it to you this way:  You wouldn't be surprised if -- that

12  12 people did not reach that conclusion that you have reached

13  during the time period of a trial.  Correct?

14  A.  Well, I would have to answer that in two different ways.

15  On a faith-base level, I would have optimism and hope based in

16  understanding that the spirit, the Holy Spirit, would help

17  people understand during this time.  So -- but from just a

18  purely human, rational level, I would understand that no, it's

19  very probable that people would not believe me or understand

20  me, where I'm coming from.

21  Q.  That's what I was trying to get to.  And in terms of we

22  talked about the possibility of going to trial, what was your

23  final conclusion in terms of after we had a long conversation

24  of whether or not -- if the court were to find you competent,

25  as to what you would like to do?

1   A.  Well, obviously, I would like to be set free.  I mean,

2   that's -- I think that anybody in my position would not want to

3   be incarcerated.  However, my personal mission in which I

4   believe that I'm trying to get across to the world is that I

5   foresee an apocalyptic event happening and I need to get my

6   message across.

7       So if it means me being kept in incarceration, whether it's

8   in a jail or a prison or a mental facility, in order to help

9   promote my message, in order for people to believe in me, I

10  mean, I'm willing to sacrifice whatever I need to be --

11  whatever needs to be done.

12      I mean, basically, I'm kind of like a lamb to the slaughter

13  here.  I'm just -- you know, I sacrificed my freedoms.  I

14  intentionally made a threat knowing that I would probably be

15  arrested for it.  But I had ulterior motives, ulterior

16  reasoning in that I would hope that people would have the

17  understanding and would not be evasive and not be obtuse and

18  can see through what lies on the surface, because there's more

19  here than meets the eye.  I had no intentions whatsoever of

20  harming the president.

21  Q.  But in terms of whether or not you have determined that if

22  you were found competent whether or not you would like to go to

23  trial or whether or not you would --

24  A.  Right.  We talked about that and we decided -- or I decided

25  if I was to be found competent, that I would probably plead

1  guilty, because under this law, I mean, making threats, making

2  threats to the president is a crime.  And so I was willing to

3  accept that.  I'm not looking to, you know, be found not

4  guilty.  Under the law of the country -- under the law of the

5  land, I committed a crime by making a threat to the president.

6  So I'm fully aware of that.

7  Q.  Okay.  Mr. Christopher, you reached that decision without

8  me even mentioning to you --

9  A.  That's correct.

10  Q.  -- anything about entering a guilty plea.  All I talked to

11  you about was going -- what would happen at a trial.  Correct?

12  A.  Correct.

13  Q.  And you came to that conclusion on your own.

14  A.  That's correct.

15  Q.  Is that correct?

16  A.  That's right.  I'm not looking to draw this out any

17  further.  I'm not looking to justify my actions.  I'm looking

18  for people to understand me and to realize -- to take me

19  seriously.

20  Q.  You under --

21  A.  It's for the benefit of humanity.  It has nothing to do

22  with harming anybody, especially the president.

23  Q.  You understand that if you're found not guilty by reason of

24  insanity, the court is still going to continue to have you --

25  probably have you continue to be evaluated and detained in a

1   facility.  Correct?

2   A.  I understand that.

3   Q.  And you understand that if the court finds you incompetent,

4   same thing; you're in that same position.  Correct?

5   A.  Uh-huh (indicating yes).

6   Q.  And you also understand that if you're found guilty, if you

7   go to a trial and you're found guilty or if you enter a plea of

8   guilt, the court may very well -- may -- in terms of

9   confinement, it may be the same result.

10  A.  I understand.

11  Q.  Okay.  So in terms of this ulterior motive that you talked

12  about, under all of those scenarios, it's -- in some ways it's

13  the same thing --

14  A.  Basically.

15  Q.  -- for you.

16  A.  Basically, yeah.

17  Q.  Now, Dr. Buigas, have you ever -- did you talk with him?

18  Did you meet with him before?

19  A.  I met with him for less than five minutes.  It was after --

20  it was on the third day that I came to -- that I arrived in

21  Miami.  And it was just a general introductory meeting.  We

22  talked a little bit briefly about my crime, a little bit about

23  my mental history.

24      And then he asked me if I just got in yesterday.  And I

25  said, no, I was here -- I was here actually the day before

1  yesterday.  Actually, I arrived there on a Tuesday and we were

2  talking on Thursday.  And he seemed very surprised or,

3  actually, disappointed that he didn't meet with me the day

4  after I arrived.

5     And he just kind of -- he stopped talking; he looked down

6  at his notes.  He looked rather dumbfounded and confused.  And

7  then he said, *Okay.  Thank you.*  And he abruptly ended the

8  meeting and he left.  And that was the only time I personally

9  met with him, the only time.

10  Q.  After that you met with the female staff psychologist or

11  intern that was working there that he referred to.  Is that

12  correct?

13  A.  Yeah.  I met with a female grad student -- or, actually, it

14  was probably two different -- at two different times, two

15  different female grad students.  Yes.

16  Q.  And how long did those meetings last?

17  A.  The meetings took place all within one week.  They were on

18  a Tuesday and a Wednesday and a Thursday.  So I believe they

19  were on three days, three separate days.  And the meetings each

20  day was probably about 45 minutes to one hour worth of meeting

21  time.  So I would say a composite total of perhaps three hours,

22  two and a half to three hours total, maybe four if we're

23  pushing it, but that's it.

24  Q.  Okay.  But after that initial five-minute meeting with

25  Dr. Buigas you never met with him again.

```
 1   A.   That's correct.

 2   Q.   All right.

 3   A.   And I do want to clarify one thing that he mentioned, that

 4   he said I left the facility in late March.  That is incorrect.

 5   I left June 9th.  I initially met with him and his staff I

 6   believe it was the second week I arrived there, which was in --

 7   I arrived there in early February.  So after this initial

 8   meeting, after this weak, this of light psychological analysis

 9   of me, I was just detained there for the next three or four

10   months, whatever, doing nothing, just sitting around.

11   Q.   Now, there are a number of things that you and I talked

12   about that you wanted to do here, and I've advised you that

13   some of these things would not -- are not really at issue at

14   this time.  Correct?

15   A.   Correct.

16   Q.   All right.  And you understand that -- you understand my

17   advice to you.  Is that correct?

18   A.   Yes, I do.

19   Q.   And, now, what else would you like the court to know with

20   regard to your competency?

21   A.   With regard to my competency?

22   Q.   Yes.

23   A.   Well, one of the videos actually -- that I actually made

24   that is on my YouTube channel, I was wanting to demonstrate my

25   competency, because -- it's entitled "My Psychological Analysis
```

1   of Forum Naysayers Who Object to My Doctrine," and I list at

2   least 24 different points in which I can make rational

3   conclusions about different forum posters.  These are people

4   that post their opinions on Internet chat forums and conspiracy

5   boards.  And I was able to rationally deduct their behavior and

6   come to a very rational, competent conclusion of their

7   understanding -- of my understanding of their answers.

8        So I wanted to demonstrate that video by playing it here.

9   I also wanted to demonstrate to the court, as you can -- as you

10  are fully aware, that I am a highly intelligent individual.  I

11  communicate very welly -- very well.  And I also perceive -- I

12  perceive in -- Dr. Buigas is his name?

13  Q.  Yes.

14  A.  -- in his testimony, I perceive -- first of all, I perceive

15  a general evasive -- evasiveness to the whole idea behind

16  making these highly detailed conclusions about me and, yet,

17  he's only had less than five minutes to actually talk to me.

18  And his answers were secondhand and, you know, textbook

19  answers.  I'm sure he's done this before.

20       He doesn't even know me, and it's just -- it's rather

21  surprising, I mean, that he would make these -- a professional

22  licensed psychologist would actually make -- go into great

23  detail about a person without talking to him for more --

24  personally talking to him for more than five minutes.  That

25  just kind of blows my mind.

1   Q.  All right.  The --

2          THE DEFENDANT:  Shame on you.

3   BY MR. JUPITER:

4   Q.  The videos that you referred to, we're going to make those

5   available to the court.  They've been -- and they've been -- we

6   have them here.  We're going to make those available to the

7   court.  And other than that, is there anything else that you

8   would like to communicate to the court today?

9   A.  Yes, I would, actually.  I have a few things I would like

10  to communicate to the court today.

11  Q.  All right.

12  A.  Now, we've already discussed that I am fully aware that

13  most people from an initial contact or listening to what I

14  believe about myself, I'm fully aware that they probably would

15  not conclude the same conclusions that I would make about

16  myself, whether or not I profess to be the Messiah, the second

17  coming of Christ.

18      It takes -- it takes a high level of objectivity to

19  understand me.  And I think that, for the most part, the public

20  at large is severely skewed in this matter because they base a

21  lot of their opinions on what their neighbors say and public

22  opinion.  And it highly skews them and helps -- it prevents

23  them from making a rational decision about me.

24      Hypothetically -- you know, even Jesus Christ, a lot of

25  people here believe and are Christians and they believe Jesus

1    Christ walked this earth 2,000 years ago.  I believe that he

2    probably had some of the same problems communicating with

3    people.  And it really is not -- has to do with a heart issue.

4    It's where your heart stands and if you're open and you're

5    objective enough to consider the possibilities that -- what I

6    claim to be the second coming of Christ.

7        And I mentioned last week earlier to Mr. Wingate here, I

8    referenced some scripture, some passages in scripture, in which

9    I foresee myself as being a fulfillment of the second coming of

10   Christ.  And I have no problem conveying that to the courts.  I

11   have no problem -- I have no problem saying this and being --

12   and being fearful of the fact that -- of the possibility that

13   you think I'm insane, because what I speak is what I truly

14   believe.  And I hope that the people listening to me, the

15   court, the judge, can be objective enough and to not be obtuse

16   in this matter, because I have -- I have -- I have a few things

17   to say.

18       One is -- well, I would -- first of all, I would like to

19   play at least one of the videos before I expound further into

20   some of the topics that I wish to talk about.  Is that possible

21   to do right now or --

22           MR. JUPITER:  Your Honor, I would suggest that the

23   court would view those -- if the court wishes to view those,

24   the court could view those.  We have them available.

25   Mr. Christopher has asked for us to have those available, but I

1   would advise that they not be played.

2   A.  Well, I would object to that because I do want them to be

3   played.

4          THE COURT:  Let's move on for the time being,

5   Mr. Christopher.  If I have some questions about the tape, I'll

6   ask you later.  Okay?  Then I'll make the decision whether to

7   see it right then.

8   A.  Okay.

9          THE COURT:  All right.  Go ahead.  Next question.

10          MR. JUPITER:  I have no other questions, your Honor.

11          THE COURT:  All right.  Cross-examination.

12                    **CROSS-EXAMINATION**

13   BY MS. WALL:

14   Q.  Good morning, Mr. Christopher.

15   A.  Good morning.

16   Q.  And I believe you stated earlier that if the judge were to

17   find you competent today that you would enter a plea of guilty

18   in this case.

19   A.  I said that would probably be the case, yes.

20   Q.  And you have been advised that it is against your

21   constitutional rights, it is against your due process rights to

22   plead guilty if you are not competent.  Has that been explained

23   to you?

24   A.  Yes.

25   Q.  When we were here last Monday for the status hearing -- do

1  you remember that day?

2  A.  Yes.

3  Q.  And you did tell the court that you were looking forward to

4  getting your message out.

5  A.  Yes.

6  Q.  And do you feel like that you've been able to do that this

7  morning?

8  A.  No, not entirely.  I have more to say.

9  Q.  Well, tell us what your message is.

10  A.  Okay.  My message is based on -- first of all, I want to

11  base -- I want to present to you a foundational premise of the

12  physical structure of the universe.  What we have learned of --

13  almost all of us entirely what we've learned through our

14  educational institutions ever since we were in kindergarten was

15  that the earth spins, was that the earth is the third planet

16  from the sun, which the sun is this gigantic ball of hydrogen

17  and gas.

18      It is approximately 100 times as large as the earth and

19  it's approximately 93 million miles away from the earth, and

20  it's part of this solar system, which is part of this Milky Way

21  galaxy, which is many, many light years in diameter, which is

22  part of this vast universe, which is many, many hundreds of

23  billions of light years stretching out in all directions.

24      This understanding of the physical structure of the

25  universe is not correct.  It is not true.

1   Q.   How so?

2   A.   Because for every -- for everything there's an opposite.

3   There's an end -- for there to be an in, there's an out.  For

4   there to be an up, there's a down.  There's -- it's -- the same

5   corresponds with matter.  There's anti-matter as well.  Okay.

6        We have this understanding of the universe, okay, the earth

7   spinning around the sun and it spins every 24 hours.  There is

8   also an invert squared counterpart to this theory.  And it's

9   very unpopular, but it's very scientifically feasible and

10   provable, actually.  And what it says is, basically, that the

11   entire universe, the vast universe that we think is hugely,

12   immensely large, is actually turned inside out and it fits

13   within the confined structure of a hollow inverted earth.

14        Now, I say hollow earth.  There's a difference between the

15   hollow earth theory that maybe some people have heard about and

16   hollow inverted earth theory.  And what this theory basically

17   says is that the entire universe is inside.  If you imagine the

18   earth not as a solid ball anymore but as a hollow ball where

19   all life is in the inside surface of this earth.  Okay.

20        Now, this is not only scientifically provable, but it's

21   biblically accurate as well.  And what we have instead of the

22   earth spinning, we have the sun and the moon and the stars and

23   galaxies and all nebula are very, very tiny and they fit inside

24   this hollow structure, this earth being like a capacitor or

25   like a womb, like a shell.  And so it was actually the surface

1  of the ground as you look -- as you look across the horizon, it

2  actually curves upward as you traverse it; but it's optically

3  hidden.  It's an optical illusion.  It's only appearance that

4  it curves downward or convexly.  So, in a sense, we're all

5  inside the earth.

6      Now, this theory has been around for over 100 years.  It

7  was first proposed by a man named Cyrus Teed who actually was a

8  very religious man.  And he initially started this commune in

9  Chicago and later migrated to Florida.  And he actually went

10 out to scientifically prove the curvature of the earth.  The

11 concavity of the earth, that it actually curved upward as

12 opposed to downward.

13     And what he did is he devised this -- he made this

14 contraption of this series of perpendicular apparatuses that he

15 called rectilineator experiments, and there was about four or

16 five of these 12-foot long perpendicular apparatuses that he

17 went out on Naples beach in Florida and he aligned them

18 together and then he piggybacked them.  He took the one in the

19 rear and he put it in the front, and he continued that process

20 putting one in the rear, putting one in the front.  And he

21 created this virtual straight air line, because there were

22 hashmarks on this apparatus.

23     And so he was creating a straight line to juxtapose against

24 the curvature of the earth as he traversed along the -- on the

25 sandy beach.  And he had sea level to guide.

1  Q.  May I ask you another question, Mr. Christopher?  Would you

2  agree with the doctor that you are a highly intelligent

3  individual?

4  A.  Yes.  But would you please let me finish with my

5  explanation of this and any --

6  Q.  Well, if you'll do that, but tell the court how that also

7  relates to why you are the Messiah or you believe that you are

8  the Messiah.  How --

9  A.  Well, I'm getting to that.

10  Q.  Okay.  I'm sorry.

11  A.  If you would just let me continue, I'd appreciate that.

12  Thank you.

13  Q.  Okay.  Sure.

14  A.  So, basically, he invited scientific skeptics from all over

15  the country to view and make sure there was no cheating.  And

16  the tests proved positively that the earth actually curved

17  upward and not downward.  This was back in 1896.

18      There's another experiment that was done in Tamarack,

19  Michigan, in mineshafts in Michigan, where there were two

20  mineshafts approximately a mile apart and they hung plumb bobs

21  on piano wire approximately a mile deep.  And they wanted to

22  find out the center of gravity, because they assumed that these

23  plumb bobs would converge.  So there would be a shorter

24  distance at the bottom of the piano wire, the bobs, as opposed

25  to the distance from the top, from the surface.

1    So what they found out was that the plumb bobs actually

2   diverged instead of converging.  And so they made sure there

3   was no magnetic repulsion.  And they did the tests again; same

4   results.

5   Q.  And how does that relate to you believing that you are the

6   Messiah, Mr. Christopher?

7   A.  I'm getting to that.  Please be patient with me.  Thank

8   you.  So in a sense, in essence, the bobs actually converged.

9   So the center of gravity was actually upward as opposed to

10  downward, so proving that the center of gravity is up in the

11  middle of the earth.  The earth is actually inverted and the

12  center of the earth is upward.

13    Now, taking into account that -- this understanding of the

14  universe, it is the sun and the moon that are actually orbiting

15  around the inside of the earth and that is accurate -- that is

16  an accurate understanding of it.  Also, if you're in an

17  airplane and -- you take off from an airplane, the airplane has

18  some initial vertical thrust, but very soon after that it's at

19  a very high altitude without much effort whatsoever.  That's

20  another proof that you're actually -- that the airplane is

21  actually traversing.  It's actually traveling along the inside

22  of a curve.

23    Now, if the sun and the moon were the ones that were

24  orbiting instead of the earth spinning, the sun and the moon

25  can actually stop in the sky.  Now, that's exactly what

1   happened over 3,000 years ago.  There are legends across the

2   world in different countries and continents all over the world

3   of the sun actually stopping for a period of 24 hours.

4      This is also recorded in the Bible in Joshua, Chapter 10.

5   Joshua -- it said that Joshua commanded the sun and the moon to

6   stand still in the sky, which they did.  Now, if we have that

7   understanding of the cosmos --

8   Q.  And how does that relate to your belief that you're the

9   Messiah?

10  A.  I know you keep asking me that question.  And I'm just

11  asking you to have patience, that I will get to that if you

12  allow me.

13  Q.  I just don't have that much time, Mr. Christopher.  If you

14  would --

15  A.  Well, this is very important because it's -- you know, if

16  you really want to know, I'd really appreciate you having some

17  patience with me, because I will get to that.  Okay?

18  Q.  But could you also tell us how your belief in music

19  communicates to you concerning your belief that you are also

20  the Messiah?

21  A.  Okay.  Well, now you're asking me two questions.  We're

22  going to have to queue those, okay, because I'm still going on

23  what I'm describing to you.  Okay?  If you don't mind, I'd

24  appreciate that.  Thank you.

25          MS. WALL:  Your Honor, I have no further questions.

```
 1            THE DEFENDANT:  I'd like to continue if you don't
 2  mind.
 3            THE COURT:  Okay.  One second.  Here's what we're
 4  going to do, Mr. Christopher.  Remember the last time you were
 5  here you and I had a conversation.
 6            THE DEFENDANT:  Yes.
 7            THE COURT:  And what I said to you is that when you
 8  came back you would have an opportunity to explain your
 9  position to me and --
10            THE DEFENDANT:  Yes.
11            THE COURT:  -- and remember I also said something else
12  that delighted you.  I said there will probably be somebody
13  here from the press.
14            THE DEFENDANT:  Yes.
15            THE COURT:  I'd give you a chance to make your
16  declarations then, because you said that you wanted to warn the
17  world of various matters and that you had indulged this
18  misconduct in order to educate the public about your beliefs.
19            THE DEFENDANT:  Uh-huh (indicating yes).
20            THE COURT:  Correct?
21            THE DEFENDANT:  Yes.
22            THE COURT:  Okay.  Well, I was looking out in the
23  audience a few moments ago; and, Mr. Christopher, there is
24  someone here from the newspaper.
25            THE DEFENDANT:  Okay.
```

1          THE COURT:  All right.  Now -- in fact, that person,

2     just wave your hand so Mr. Christopher knows that they're here,

3     somebody from --

4          (COMPLIED WITH REQUEST)

5          THE COURT:  There you go.  You see their hand,

6     Mr. Christopher?

7          THE DEFENDANT:  Yes.

8          THE COURT:  Okay.  Now, he is here from the newspaper.

9     I don't know how he knew about the matter; but I knew that

10    since he covers this beat, that he would look at the cases that

11    were scheduled for trial and for hearing and would probably be

12    here.  So when we first started, he had not arrived.  And I

13    just thought that at some point he would probably come, because

14    he always comes by here for various cases.

15          So he is here.  And so when he came in, I thought I'd

16    let you know then that he was here.  And I wanted to make this

17    announcement because I hope he doesn't leave until he hears

18    you.

19          THE DEFENDANT:  Okay.

20          THE COURT:  Okay?

21          THE DEFENDANT:  Okay.

22          THE COURT:  Now, because there are other cases going

23    on around the courthouse and he goes from one proceeding to

24    another to determine if he's going to cover it.  So I have not

25    talked to him at all about this matter, but I just felt that he

1   would probably be here because this is his beat and --

2           THE DEFENDANT:  Okay.

3           THE COURT:  -- he's very conscientious about visiting

4   the courtroom to see what's going on.

5           THE DEFENDANT:  All right.

6           THE COURT:  Now, you had said that last time, just to

7   do some backdropping, that you have a college education.

8           THE DEFENDANT:  Yes.

9           THE COURT:  And where did you go to college?

10          THE DEFENDANT:  University of Illinois in Chicago.

11          THE COURT:  All right.  And could you tell us your

12  major?

13          THE DEFENDANT:  Graphic design.

14          THE COURT:  Graphic design.  You worked in the area

15  for a while?

16          THE DEFENDANT:  Yes.  I've been in advertising for

17  over 17 years.

18          THE COURT:  All right.  And did that school offer a

19  minor as well as a major?

20          THE DEFENDANT:  Yes.  I actually minored -- I don't

21  think it was an official minor, but I took extensive study in

22  film, animation and video production.

23          THE COURT:  All right.  And the employer for whom you

24  worked.

25          THE DEFENDANT:  Initially, I worked for a company

1    called UOP in Des Plaines, Illinois, from 1990 to 1995.  After,

2    I went full-time freelance working for different ad agencies

3    and production houses around the Chicago metropolitan area.

4          THE COURT:  And how did you come to our attention down

5    here?

6          THE DEFENDANT:  I met a woman who lives in

7    Mississippi.  We became very close and I started living down

8    here.

9          THE COURT:  And how long ago was that?

10         THE DEFENDANT:  I met her in October -- late -- either

11   early November or late October of last year.

12         THE COURT:  And at that time were you working?

13         THE DEFENDANT:  No.  I was not.

14         THE COURT:  Okay.  And how long had you been

15   unemployed at that time?

16         THE DEFENDANT:  Well, I had been working as a

17   freelance graphic designer for an ad agency up north in

18   Chicago, but it's -- it was at least eight months before I had

19   any work.  I mean -- so about eight months that I had been

20   unemployed, so to speak.

21         THE COURT:  All right.  And there is now the matter of

22   the alleged threat.

23         THE DEFENDANT:  Yes.

24         THE COURT:  Now, you said that you made a threat.

25         THE DEFENDANT:  Yes.

 1              THE COURT:  All right.  Could you tell us what that

 2    threat was?

 3              THE DEFENDANT:  My threat was a death threat to

 4    Mr. Barack Obama.

 5              THE COURT:  And what did you say specifically?

 6              THE DEFENDANT:  I said specifically in a threat -- I

 7    said -- I believe there was -- at the time of the threat it was

 8    eight days prior to the inauguration and I said --

 9              MR. JUPITER:  I'm not objecting, but I just want the

10    record to be clear that I have advised him several times not to

11    testify as to these matters, but he has decided to go forward.

12              THE COURT:  Okay.  Is that correct?

13              THE DEFENDANT:  I believe so.

14              THE COURT:  Okay.  Now, so do you have any objection

15    in continuing this discussion?

16              THE DEFENDANT:  No, I don't have any objection.

17              THE COURT:  Okay.  I didn't think you did, because the

18    last time you were here you mentioned most of what I've just

19    mentioned.

20              THE DEFENDANT:  Yeah.

21              THE COURT:  All right.  Now, then, this matter of the

22    threat, what did you say?

23              THE DEFENDANT:  I mentioned that there was now eight

24    days before my Presidential assassination.  That was the title

25    of the threat.  The title of the -- I made this threat on an

```
 1    Internet conspiracy chat board.  And it was done
 2    tongue-in-cheek.  It was done in a satirical way in order to
 3    shock people, in order to have people -- people's attention.
 4    And --
 5              THE COURT:  All right.  Hold on.  Before we get to
 6    that -- we're going to get to it in just a second.
 7              THE DEFENDANT:  Okay.
 8              THE COURT:  But what exactly did you say in your
 9    statement?
10              THE DEFENDANT:  It was concerning Mr. Obama being
11    merely a puppet of his controllers, his Jewish controllers.  I
12    think I mentioned how he just recently appointed a Jewish
13    controller to his cabinet, and I said he was -- I have no
14    problem with him, you know, as far as race goes or whatever,
15    and that I saw him more of as a sacrificial lamb.
16              And then I went on to say jokingly -- I mean, even
17    though this is -- these words are serious, I wasn't serious
18    with the threat.  But I was saying perhaps there might be a
19    leak in the Secret Service where a Secret Service agent can get
20    me a gun, because I've never fired a gun before in my life.
21    I've never owned a gun.  And I'm here in Mississippi and I have
22    no way of getting to Washington.  And perhaps I can get a real
23    close seat at the inauguration, because I wouldn't know how to
24    fire a gun.  So I'd probably have a terrible aim, stuff like
25    that.
```

```
 1              THE COURT:  Okay.  You said maybe a Secret Service
 2   agent could get you a gun so you could shoot the president.
 3              THE DEFENDANT:  Yes.
 4              THE COURT:  Okay.  Did you say anything else?
 5              THE DEFENDANT:  Yeah, I did.  I mean, but I'd have to
 6   reread it, what I said.  It's been over six months, but...
 7              THE COURT:  Okay.  Now let's go to the next matter you
 8   were about to discuss.  You told me last time that you really
 9   didn't mean that.
10              THE DEFENDANT:  That's correct.  I did not mean that.
11   Of course, I did not mean that.
12              THE COURT:  In fact, you said you have threatened
13   other people besides the president.
14              THE DEFENDANT:  That's correct.  I did say that.
15              THE COURT:  Said you threatened President Bush.
16              THE DEFENDANT:  Yes.
17              THE COURT:  Did anyone have you arrested for that?
18              THE DEFENDANT:  No.  But, actually, I was -- I was
19   questioned about that by an FBI agent.
20              THE COURT:  Okay.  And this statement you made at that
21   time, was that made over the Internet?
22              THE DEFENDANT:  Yes.
23              THE COURT:  Okay.  You said you threatened other
24   people besides President Bush.
25              THE DEFENDANT:  Yes.
```

```
 1            THE COURT:  Who are they?

 2            THE DEFENDANT:  Vladimir Putin of Russia.  The

 3   president of China.  I don't know his name.  I believe I

 4   threatened -- I don't know how to pronounce that man's name

 5   from Iran, Ahmadinejad, or whatever his name is, and I think

 6   the shah of Iran I believe.

 7            THE COURT:  Were you arrested on any of those

 8   occasions?

 9            THE DEFENDANT:  No.  No.

10            THE COURT:  Did anyone interview you on those

11   occasions?  Did any governmental official interview you

12   relative to the nature of the alleged threat?

13            THE DEFENDANT:  Just the FBI agent that I mentioned

14   when I -- after I threatened George W. Bush.

15            THE COURT:  Okay.

16            THE DEFENDANT:  It was him and his partner or

17   whatever.

18            THE COURT:  Okay.  You gave me an explanation as to

19   why you issued these various threats.

20            THE DEFENDANT:  Yes.

21            THE COURT:  What's that explanation?

22            THE DEFENDANT:  My explanation was that I had ulterior

23   motives, and it was a means to an end.  I'm a very gentle

24   person by nature, and I'm trying to generate attention from the

25   public.  And I realize, I'm fully aware that this kind of
```

 1    attention is very negative.  However, there's more to it than

 2    meets the eye.

 3            It was a means in which I can get my true message out,

 4    which is actually very positive; and it's to help save

 5    humanity.  And that's why I'm here.  That's why I'm testifying.

 6    That's why I'm being very open about this, because it's not a

 7    matter whether or not I'm found guilty or not guilty; it's a

 8    matter about getting my message across to save humanity.  And

 9    that's why I'm here.

10            THE COURT:  You've prophesied that the world will be

11    destroyed in three years.

12            THE DEFENDANT:  2012, the winter solstice, yes.

13            THE COURT:  All right.  And the world will be

14    destroyed by fire I think you said.

15            THE DEFENDANT:  I did say that, yes.

16            THE COURT:  Okay.  And this fire is to be generated by

17    some mishap with the sun or --

18            THE DEFENDANT:  Correct.  That's why I was explaining

19    about the structure of the universe when I was cut off.  But,

20    yeah, it has to do with the sun stopping in the sky, in the

21    inverted system in which we live in.  And, basically, if the

22    sun stops for a long enough period of time, it's like holding a

23    magnifying glass over something or it's like holding your

24    finger over a candle flame.  If you move your finger, your

25    finger's not going to get burned; but if you stop your finger

 1   over the flame, it's going to get burned.

 2          Well, that's the same analogy I'm trying to describe

 3   in this manner where the sun, if it stops for an indefinite

 4   period of time, it will begin to burn up the earth.  And this

 5   is backed by prophecy in the Bible, in many books of the Bible,

 6   Isaiah, Joel, 2 Peter, Revelation, Habakkuk, Jeremiah.  So this

 7   is a very valid, valid statement that I'm saying.  And people

 8   need to be aware of this, because there is hope.  I mean, it's

 9   not just we're all going to die; but there is a hopeful

10   scenario to this all.

11          THE COURT:  Now, you've said salvation lies in our

12   removing ourselves to Australia.

13          THE DEFENDANT:  Yes.  I've mentioned the continent of

14   Australia.

15          THE COURT:  Why Australia?

16          THE DEFENDANT:  Because Australia is in the southern

17   hemisphere, for one thing.  And according to the many different

18   people -- actually, no, not -- according to the Mayan

19   prophecies, the Mayan calendar, the Long Count, the winter

20   solstice, in this inverted system the sun will be traversing

21   across the Tropic of Capricorn, which is in the southern

22   hemisphere.

23          And in Australia -- in central Australia in the desert

24   in never never land there is a giant monolithic granite

25   plateau.  And the Aborigines call this rock -- they call it

1   Uluru.  And I make references to this rock actually fitting

2   prophetically the description of Mt. Zion, which is highly

3   sought after by many Jews and many Christians as well.

4   However, they think this Mt. Zion is in the land of the state

5   of Israel.  However, I go on to explain that, well, no.

6          I bring up a verse in Psalm 118, verse 22, that the

7   stone the builders rejected has become the head of the corner.

8   So I make mention of the fact that this land in Australia, that

9   there's many prophetic references to this land and to the

10  physical structure of this land fitting prophetically what it

11  says in the Book of Isaiah.  I have many different quotes here,

12  scripture quotes, that confirm that.

13         And so what I foresee happening is that all countries

14  becoming fully aware of this and the Spirit -- I believe that

15  the Spirit of the Lord, the Spirit of God, will convict people

16  and testify -- and show people, will reveal this to people, and

17  that countries -- countries that normally warred against each

18  other will lay down their weapons in an effort -- in an

19  enthusiastic effort to build this city upon this rock, which is

20  also prophesied.

21         I want to talk about prophecy -- I don't know how

22  familiar you are with Biblical prophecy.  You mentioned that

23  you read the Dead Sea Scrolls and Isaiah and so possibly you

24  can have some understanding of what I'm talking about.

25         THE COURT:  I also read the literature dealing with

```
 1    the Mayan calendar.  I didn't know that you incorporated that
 2    as part of your statement last time, because we didn't discuss
 3    that at all.
 4              THE DEFENDANT:  Right, we did not discuss --
 5              THE COURT:  But I'm quite familiar with this aspect of
 6    the Mayan calendar.
 7              THE DEFENDANT:  Right.
 8              THE COURT:  And, now, let's talk for a while about
 9    this whole theory --
10              THE DEFENDANT:  Yes.
11              THE COURT:  -- of the earth and the sun being
12    incorporated -- the sun and the -- the sun and the -- what, the
13    planets being incorporated within the confines of earth.
14              THE DEFENDANT:  Yes.
15              THE COURT:  Did you familiarize yourself with the
16    theories that were put forth by Ptolemy, P-T-O-L-E-M-Y?
17              THE DEFENDANT:  I believe that's the stationary earth
18    theory?
19              THE COURT:  That's right.
20              THE DEFENDANT:  Okay.
21              THE COURT:  How does -- well, how does that comport
22    with your theory about the sun being within the confines of the
23    earth?
24              THE DEFENDANT:  It only matches the aspect that the
25    earth is stationary.  His theory, along with Tyco Brahe's
```

1    theory which coincides with that same stationary -- they call

2    it geocentric theory where the earth is stationary, still

3    adheres to the idea that they are living on -- on a convex

4    sphere of the earth.

5           I'm saying that the entire earth is flipped inside out

6    almost like if I take an air-inflated ball and let's say you

7    paint the continents and the oceans on this ball and then you

8    poke a hole in it and you put your hand in and you pull the

9    whole inside and so you're turning it inside out so now the

10   continents and the oceans are on the inside surface of this

11   ball, but not only the earth, the entire universe is inside

12   this ball, inside this 8,000-mile wide ball.

13          THE COURT:  There's a philosopher by the name of

14   Berkeley -- it's spelled almost like Berkeley -- have you ever

15   read him?

16          THE DEFENDANT:  I don't believe so.  No.

17          THE COURT:  Like I said, it spells like Berkeley, but

18   it's pronounced "Barkley."

19          THE DEFENDANT:  Okay.

20          THE COURT:  And he has this theory that since all is

21   God there's no real distinctions, because in the beginning when

22   the world and the universe were created, that God created out

23   of his own fabric, in which case, then, everything is God.

24          THE DEFENDANT:  Yes.  I tend to believe a very similar

25   aspect of that.  I believe that -- in the essence that all is

1    one and one is all.

2            THE COURT:  I picked that up in your statements just

3    then.  And, again, it's not something you mentioned last time.

4            THE DEFENDANT:  Yeah.

5            THE COURT:  But this matter on -- that Berkeley

6    prophesied then or discusses in his philosophy of

7    metaphysics -- you've heard of metaphysics?

8            THE DEFENDANT:  Yes, I've heard of metaphysics.

9            THE COURT:  Okay.  So you never read any Berkeley or

10   anything that Annette Herron (phonetic) or a disciple of

11   Berkeley would have proclaimed?

12           THE DEFENDANT:  No.  I really have not read much

13   philosophy.  I've read about theories of the universe, but

14   Berkeley does not sound familiar to me.

15           THE COURT:  All right.  So, then, your present theory,

16   does the sun stand still?

17           THE DEFENDANT:  Does the sun stand still at this

18   current time?

19           THE COURT:  Yes.

20           THE DEFENDANT:  No.  I do not believe the sun stands

21   still.

22           THE COURT:  I heard you say that you have to stop the

23   motion of the sun.

24           THE DEFENDANT:  Right.

25           THE COURT:  And, now, what kind of motion?  Is that

1    revolving motion or is the sun on an orbit?

2          THE DEFENDANT:  The sun is inside the earth.  It

3    revolves in a cylindrical pattern, so to speak.  So it's -- in

4    essence, here's the -- let's say the earth are my hands here

5    and there's a central celestial sphere where all the stars are

6    embedded.

7          And then outside of this sphere there's a gap and we

8    would call this space or inner-space.  Normally, it would be

9    called outer space, but there's a gap or an expanse.  The Bible

10   calls this the firmament, a huge expanse.  And it's in this

11   gap, this vacuum, in which the sun and the moon are orbiting in

12   the circular, cylindrical array.  So every -- and it's

13   oscillating.

14         So what I mean by that is that every 24 hours -- let's

15   say it's June 21st, the summer solstice.  Every 24 hours it's

16   making one revolution, but it's slowly sinking south as it

17   continues to revolve.  And then once it gets to the winter

18   solstice, it oscillates back up to north.  So it's in the

19   cylindrical -- it's like a circuitry, like an -- a magnetic --

20   electromagnetic circuit.  Do you understand that?

21         THE COURT:  Yeah.  Did you ever see a diagram of the

22   Ptolemaic system that I mentioned a few minutes ago?

23         THE DEFENDANT:  Yeah, I think I have.

24         THE COURT:  Isn't it very, very similar to what you're

25   now telling me?  In the Ptolemaic system, you know, the earth

```
 1    is at the center.

 2            THE DEFENDANT:  Right.

 3            THE COURT:  And then there are the stars and moon and

 4    earth.

 5            THE DEFENDANT:  Right.

 6            THE COURT:  And Ptolemy, the astronomer who devised

 7    this system, you know, saw the stars and the sun and the moon

 8    all revolving --

 9            THE DEFENDANT:  Right.

10            THE COURT:  -- in a precise pattern around the earth

11    to explain the configurations and the movement of the stars and

12    also where the sun was, not taking into account that the

13    possibility that the sun was stationary and the earth revolved

14    around it instead.

15            THE DEFENDANT:  Right.

16            THE COURT:  What distinctions -- what major

17    distinctions do you have from the Ptolemaic system?

18            THE DEFENDANT:  Like I said before -- I'm not sure

19    that you grasped it, but that the main distinction is that the

20    inverted earth theory sets whatever, I mean whatever --

21    whatever movements that you believe move -- I mean, Galileo

22    talked about this.  Copernicus talked about this.  Copernicus

23    was the one who originally hypothesized the idea that the earth

24    spun.  Okay.  Prior to that time, you know, the church, the

25    Roman Catholic church always believed that the earth stood
```

1    still.

2         That aspect of what is in motion versus what is not in

3    motion is -- differs from inverting the earth and is where you

4    have these planetary -- planetary orbits orbiting inside.  So

5    the earth acts as the edge of the universe.  Does that make

6    sense?

7         THE COURT:  No, because I thought the universe was

8    infinite.

9         THE DEFENDANT:  No.  I'm saying that the universe is

10   actually finite.  Whatever's outside of the earth can be deemed

11   infinite.  But I'm saying all the stars and the planets and the

12   sun are inside a finite earth, an 8,000 wide diameter ball that

13   we call home.  It's -- essentially, when we call this earth a

14   planet, it's really not a planet, because the word planet means

15   wandering star.

16        The planets I foresee are very small and they're

17   inside the earth.  I mean, you've heard of the term "mother

18   earth."  Well, that term is derived from the understanding that

19   the legends -- in legends past they understood that earth was

20   our mother, was our womb in which we lived in.

21        So if you think of a uterus, you think of the egg on

22   the wall of a uterus, that's the same analogy we conclude about

23   ourselves, is that we are in the wall of this uterus that we

24   call earth.  And everything that we know about the universe is

25   also inside this uterus that we call earth.  Does that make

1   sense?

2          THE COURT:  I see what you're saying.  Now I'm going

3   to move to you personally.  You said that the world's

4   population should move to Australia.

5          THE DEFENDANT:  Yes.

6          THE COURT:  Which somehow if your message is absorbed

7   by the public --

8          THE DEFENDANT:  Yeah.

9          THE COURT:  -- that Australia would have to

10  accommodate --

11         THE DEFENDANT:  Yes.

12         THE COURT:  -- the world's population.

13         THE DEFENDANT:  Yes.  Yes.

14         THE COURT:  Do you think Australia is that big?

15         THE DEFENDANT:  No, I don't.  I don't think everybody

16  will make it.

17         THE COURT:  Okay.  That's what I thought you'd say.

18         THE DEFENDANT:  Yeah.

19         THE COURT:  That you don't think everyone would follow

20  your projections --

21         THE DEFENDANT:  Correct.

22         THE COURT:  -- and that only a few will and those

23  precious few then will be in Australia.

24         THE DEFENDANT:  Yeah.  Well, the Bible mentions that

25  one third of the population will be saved.  I mean, if

1    that's -- if that is the case -- I don't know if that is the

2    case or not.  We shall see.  But that would generally be about

3    2 billion to 2.5 billion people.

4           THE COURT:  And you will be there, and you said that

5    you at that time will be recognized as the king of kings.

6           THE DEFENDANT:  That's what I foresee happening.  I

7    can't say this is definitely going to happen, but that's what I

8    believe.

9           THE COURT:  And this concept that you'll be recognized

10   as the king of kings means what?

11          THE DEFENDANT:  It means --

12          THE COURT:  I've heard the term "Messiah."

13          THE DEFENDANT:  I also wanted to bring up another

14   term.  I'm sorry if I'm going off here; but, actually, I don't

15   think I am.  It's a term called "standard."  The Book of Isaiah

16   mentions the word "standard."  I don't know if you're familiar

17   with that word, but in chapter 59, it says, "When the enemy

18   shall come in like a flood, the Spirit of the Lord shall raise

19   up a standard against them."

20          Now, what I mean by standard and what the Bible means

21   by standard -- there's actually other verses in the Bible that

22   talk about a standard or an end sign for the nations.  This

23   standard concept is actually a person, a person in which people

24   determine their fate or their destiny, because the standard is

25   somebody that offers their life's -- offers public exposure of

1   their life.

2          And I actually made a YouTube video about this where I

3   said that I am the standard by which I judge your heart, by

4   which I judge somebody's heart.  So, in effect, once this

5   standard is raised in the general public, the public has the

6   choice whether or not to follow him or to not follow him, to

7   love him or to hate him, you know, to accept him or to reject

8   him.

9          And it doesn't mean that the standard has to be, you

10  know, in the world's understanding of things sinless or, you

11  know, without fault or without -- without -- the standard does

12  not have to be omniscient.  The standard does not have to be

13  all knowing.  This person can make mistakes.  This person can

14  predict wrong prophecies.  But it's how that person views that

15  person -- how the public views this standard person, you know.

16         I'm bearing my heart with the public.  I'm being open

17  and transparent to the public.  And that is what determines

18  whether one has access to the Promise Land or not.  It's how

19  they respond to the standard.  Does that make sense?

20         THE COURT:  So then the world's population, the

21  believers --

22         THE DEFENDANT:  Yes.

23         THE COURT:  -- will go to Australia.

24         THE DEFENDANT:  Yes.

25         THE COURT:  And there you will preside over the

1    kingdom in Australia.

2         THE DEFENDANT:  Yes.  I foresee building a city.  The

3    Bible in the Book of Isaiah, chapter 45, talks about King Cyrus

4    of Persia, actually.  They talk about Cyrus being the anointed

5    one who will build the city of Jerusalem.  It says, "He shall

6    build my city; he shall let go my captives, not for price nor

7    reward."

8         However, King Cyrus of Persia, who lived actually in

9    5- to 600 BC, he never -- he actually did commission for

10   rebuilding of the Jewish temple; however, he never talked about

11   or commissioned building the city of Jerusalem, because at the

12   time the city was already built.  It was just the temple that

13   was destroyed.  So I see prophecy having dual interpretations

14   and dual meanings and it happens in layers.  And I see myself

15   as fulfilling this Cyrus-type figure in which I will build this

16   city of God.

17        I have -- I'm an artist.  So I sketched out the plans.

18   I have the plans on paper.  And I want to flesh them out on

19   computer.  I'm a 3D graphic artist.  I've taught 3D animation

20   and modeling at the college level before.  So I have an

21   extensive knowledge in that realm.

22        And I want to be able to be freed today so I can go

23   home and I can flesh out this city of God.  I can make a

24   digitized 3D model of this city in which I can present to

25   builders of the world.  And this is a time of great enthusiasm

1    that needs to be generated from different countries and where

2    countries can lay down their weapons of war, where they can

3    understand, *Well, this guy, okay, he's not crazy.  He's*

4    *actually making sense here.  He's talking about world peace.*

5    *He's talking about building this magnificent city of God.*

6            In Isaiah, chapter 41, it says, So everyone said to

7    his neighbor, be of good courage.  So the carpenter encouraged

8    the goldsmith, and the goldsmith encouraged the welder.  And

9    they all contributed in building this magnificent structure

10   which will become the joy of the whole earth.

11           And what I foresee happening for Australia is a solar

12   eclipse happening, a stationary solar eclipse.  So the sun and

13   the moon are actually going to stop and form a stationary solar

14   eclipse.  So because the sun stops, like I've mentioned before,

15   it will burn up the rest the earth except for the umbra or the

16   penumbra of the eclipse, or the shaded area that it projects on

17   to the ground.  And this will be over central Australia.

18           And central Australia is on deserted land, and this is

19   the land that's prophesied to blossom as the rose.  There will

20   be streams in the desert.  Isaiah 51.  It says, shall be like

21   the gardens of Eden.  Isaiah 35.  So this is the time where,

22   basically, when you have shade in the desert, just like at

23   nighttime, condensation appears on the rocks and water appears.

24   And so if the -- if the shadow is continually over this area,

25   there will be a perpetual wellspring of water and streams.

1   There will be streams in the desert and there will be blossoms.

2   It will be just like the Garden of Eden.

3          And so that's what I'm trying to convey to people.

4   There's hope here and promise and there's vision.  I mean,

5   there's so much speculation about 2012, but nobody seems to

6   have an accurate vision of what to do about it, where to go.  I

7   have the vision.  The vision is here.  The vision is now.

8          THE COURT:  Then this whole area will be shaded.

9          THE DEFENDANT:  Shaded.

10          THE COURT:  And in a dim light the entire time.

11          THE DEFENDANT:  Not necessarily a dim light.

12          THE COURT:  But shaded.

13          THE DEFENDANT:  It will be shaded.  It will be as

14   bright as -- from scripture I understand there's -- Zechariah

15   talks about there being a day like no -- any other day and the

16   evening time will still be the daytime.  So it will be like

17   partially obscured sunlight.  We'll still be getting sunlight

18   from the ambient light that's being refracted from around the

19   moon.

20          So, yeah, we'll still have solar rays absorbing us,

21   but it will be shaded.  Yeah, it will be a comfortable

22   condition as opposed to being outside this circled area which

23   will be disastrous.

24          THE COURT:  All right.  Now, then, are there any other

25   points -- well, I have one other question before I just ask

```
 1   you --

 2          THE DEFENDANT:  Yeah.

 3          THE COURT:  -- for your thoughts.  You mentioned the

 4   Mayan calendar again.

 5          THE DEFENDANT:  Yes.

 6          THE COURT:  Why the Mayan calendar?  They just simply

 7   stopped at 2012.  Now, why the Mayan calendar?

 8          THE DEFENDANT:  Why the Mayan calendar?  That's a good

 9   question.

10          THE COURT:  I mean the Mayans were not religious --

11          THE DEFENDANT:  No, they were not.

12          THE COURT:  -- by a long stretch.

13          THE DEFENDANT:  That's correct.

14          THE COURT:  They believed in human sacrifice.

15          THE DEFENDANT:  Well, they -- actually, I would say

16   they actually -- they worshiped the god called Quetzalcoatl,

17   which was a feathered serpent.  So that was a form of religion

18   I would say.

19          THE COURT:  Well, but they said that that god came out

20   of the ocean and that he came out of the ocean wearing flowing

21   white robes and he came to bring enlightenment to the Mayan

22   civilization --

23          THE DEFENDANT:  Right.

24          THE COURT:  -- which was why he was their oldest god.

25          THE DEFENDANT:  Right.
```

1        THE COURT:  Okay.  Now -- and then thereafter they

2   worshiped him as their primary god.  And there's some

3   speculation, by the way, as to how the rest of him was

4   described.  Have you ever looked into that?

5        THE DEFENDANT:  Just briefly.  I mean, they talk about

6   being a feathered serpent, which comment is interesting because

7   the Aborigines in Australia, they -- they believe -- not

8   necessarily worship, but they believe that the creator of the

9   universe -- they call him the "rainbow serpent."

10       So it seems to be a connection there.  Seems to be

11  this connection of this serpentine god figure, god figure that

12  created things, that created the universe.  And so, yeah, I

13  mean, I see -- as far as them being a nonreligious culture, the

14  Mayans, I don't have a problem with that because their calendar

15  system was said to be even more accurate than today's calendar

16  system.

17       So, I mean -- and also it's based upon a 360-day year.

18  And if you look at scripture in the Old Testament, a prophetic

19  year was 360 days as opposed to 365.25 days.  So I see a

20  connection there as well.  And I also would like to tie in --

21  and I don't know if you're familiar with the 70 weeks of

22  Daniel, chapter 9.  Have you ever heard about that, the

23  prophetic --

24       THE COURT:  I have heard about it.

25       THE DEFENDANT:  I would like to --

```
 1              THE COURT:  Would you like to say more about that?
 2    What do you want to say?
 3              THE DEFENDANT:  Yes, I would like to say more about
 4    that.  Many Biblical Christian theologians and scholars and
 5    even Jewish scholars look to this one chapter in Daniel,
 6    chapter 9, and this one prophecy.  It's a prophecy about the
 7    end times and about the ushering in of the Messiah.  And it
 8    also corresponds with -- there's a link, actually, with chapter
 9    12, which is the last chapter of Daniel.
10              And, first, I want to talk about 12 briefly, chapter
11    12.  In Daniel, chapter 12, toward the end of the chapter it
12    says that from the time that the daily -- now, I use the word
13    "sacrifice" in English; however, the word "sacrifice" is not
14    included in the original Hebrew Messianic text.  It's just the
15    word "daily."  From the time that the daily is taken away until
16    the abomination that causes desolation, there shall be 1,290
17    days.  Okay.  So we have a time frame here.
18              Now, all modern English translations include the word
19    "sacrifice," but that term is also used in other parts of
20    Daniel.  The daily.  The daily, in chapter 8.  The daily, in
21    Chapter 11.  The daily.  They don't say "sacrifice."  They just
22    say "daily."
23              Now, if you connect that with the Mayan -- with the
24    Mayan understanding of the days being taken away after the
25    winter solstice of 2012, you can apply that to that verse in
```

```
 1   chapter 12 where the time that the days are taken away until
 2   the abomination that causes desolation there shall be 1,290
 3   days.  If you have that understanding -- see, this is prophecy
 4   that has been excluded, hidden and it's been hermetic --
 5   hermetically hidden from interpreters until now.  Things have
 6   been sealed until the end.  And now we're at the end where
 7   things are beginning to unfold and I'm here to show you this.
 8           Now we can understand that from the time of
 9   December 21st, 2012, or December 22nd in the eastern
10   hemisphere, until the abomination, well, if you understand that
11   the days are taken away, you cannot chronologically count
12   forward in time after that date.  Therefore, you have to count
13   backwards.  So you count backwards 1,290 days.  And that
14   actually already passed.  It passed last June, June 11th.  That
15   was the time when the abomination was set up.
16           Now, who was this or what is this abomination?  The
17   Bible talks about there being an abomination that causes
18   desolation.  Well, we talked a little bit about all is one and
19   one is all and everyone is God in entity.  To help you
20   understand the nature and -- of God and his thinking process,
21   God -- God views humanity creation as one, his one unit, good
22   and bad.  In Isaiah, chapter 45, he says that "I form light and
23   create darkness.  I make peace and I create evil.  I do all
24   these things."  And who is man to judge whether He's merciful
25   or not?  God creates all.  He's all.
```

1          And so what I did actually a couple of months ago

2     while I was in Miami -- I'm an artist.  So I sketched out many

3     different drawings and I mailed them to my friend here in

4     Mississippi and she posted them on the Internet.  And one of

5     the sketches I made, I introduced myself to the public as the

6     anti-Christ, as the abomination that causes desolation.

7          And what I mean by that is I'm abominable in the

8     public's eye initially.  I came in like this criminal or this

9     thief and -- or this person making threats to the president.

10    And I caused -- I'm going to cause desolation to the religious

11    systems of the world, our scientific -- our conventional

12    understanding of what science is, abomination to all warfare,

13    all manners of war and warfare.

14         So I created this antithesis of the Messiah or this

15    anti-Christ.  So I -- so in order from a God point of view,

16    who's all and one and one in all, I now, therefore, can create

17    the thesis or the good part or the Messiah-type aspect of this.

18    So I create this Messiah-type figure.

19         Now, going back to Daniel, it says there shall be a

20    time, times, and half a time.  That's interpreted to mean three

21    and a half years.  One time meaning one year.  Times meaning

22    two years.  Half a time meaning half a year.  So one plus two

23    plus a half is three and a half.  This also corresponds to the

24    Book of Revelation in chapter 12.  It says there shall be 1,260

25    days in verse 6.  It also says that there shall be a time,

1  times and half a time in Revelation 12.  And then in Revelation

2  13 it says there shall be 42 months.

3         So this is all the same time period.  It's 1,260

4  prophetic years, which are a 360-day year, the same as the

5  Mayan year.  They call -- in the Mayan year it's called a tun,

6  T-U-N.  So we have this prophetic years and we apply this.  So

7  1,260 days, counting backwards from the winter solstice date of

8  2012, leads us to July 11th, which was this month, just a few

9  weeks ago.

10        Now, if we take that -- that date, July 11th, and we

11 go back to Daniel, chapter 9, it says that the 70 weeks are

12 determined upon Thy holy people and upon Thy city to, number

13 one, finish transgression; number two, put an end to sin;

14 number three, bring reconciliation for inequity; number four,

15 bring in everlasting righteousness; number five, seal up the

16 vision of prophesy; and, number six, to anoint the Most Holy.

17 So these six points after this 70-week period will be

18 fulfilled.  Okay.

19        Now, most scholars do not interpret this verse, this

20 70 weeks, as literal weeks.  They interpret them as weeks of

21 years, meaning that one week is actually equivalent to seven

22 years.  And that, actually, is partially true in this prophecy,

23 because there was a decree -- there was exile from the Jews.

24 The Jews were actually exiled from Jerusalem.  They went into

25 Babylon in 586 BC.  King Cyrus of Persia made a decree in 539

1  BC and he decreed that the temple would be rebuilt, but he

2  didn't mention the city being rebuilt.  In Daniel, chapter 9,

3  it talks about the city being built, not rebuilt, but just

4  built.  Okay.

5        There was also two more decrees by Cyrus' successor

6  who was King Artaxerxes, and he made a decree -- his first

7  decree was in 458 BC.  And his second decree was in 444 BC.

8  Now, if you count these weeks of years that I talked about, the

9  prophecy goes on to say that note -- note from the time the

10 commandment goes forth unto Messiah, the prince, there shall be

11 seven weeks and then 62 weeks and the wall shall be built and

12 the street, even in troublesome times.  And after 62 weeks --

13 or, actually, after 69 weeks, because we have the 62 plus the

14 seven.  After 69 weeks, Messiah will be cut off but not for

15 himself.  Okay.

16       So if we apply these weeks of years scenario to the

17 decree that Artaxerxes made in 444, we can count the 69 weeks,

18 which is 69 times seven is 483.  However, they are prophetic

19 years of 360 days.  So it's actually less than 483.  It's 476.

20 That leads us to the AD 33.  That was the time that Jesus

21 Christ made his triumphal entry into Jerusalem.  That was the

22 time also shortly after that he was crucified.  So there we

23 have the cutting off spoken of in the prophecy, where he was

24 cut off, but it says, but not for himself.  So there is an

25 exemption there, meaning that he would come again.  He was cut

```
1   off initially but not for himself.  So there's a dual meaning

2   to the prophecy.  What I'm trying to explain is that there's

3   also a literal meaning to the prophecy, a literal --

4           THE COURT:  Now, when do you come in?

5           THE DEFENDANT:  I come in now, literal time period,

6   this 70 weeks, this commandment to build the city.  I ushered

7   this commandment.  I mean I wrote out this letter and I

8   dictated it to my friend on the phone, and she posted it on the

9   Internet.  And that's when I said -- I mentioned the date of

10  July 11th in which was commissioned to build the city of God.

11  I'd like to read this letter to you, if you don't mind.  It's

12  very short.

13          It says -- this was dated June 27th of 2009, and it

14  was two weeks before July 11th.  "Attention People of the

15  World:  I present to you the Promise Land which is located in

16  central Australia in the central Australian desert of Never

17  Never Land.  There a massive ancient monolithic granite plateau

18  known by the Aborigines as, quote, Uluru, U-L-U-R-U, end quote,

19  awaits her destined date of beautification.  Uluru, the sacred

20  hill, is none other than the foundational stone of the Mt. Zion

21  as prophesied in scripture.  This is the, quote, stone the

22  builders rejected, end quote, Psalm 118:22, and the tried stone

23  for a foundation, Isaiah 28:16.

24          "I have designed city schematics upon this structure

25  and will fulfill them shortly.  The city won't have but 144,000
```

1   orphans from around the world who knows as well.  Hundreds of
2   millions of meek people will also be permitted to visit the
3   city and dine at my festive banquet and tables and praise
4   gatherings.  Gold paved streets, precious gem decor throughout,
5   towers stretching miles into the air, this will be the, quote,
6   joy of the whole earth, end quote.
7          "This is the time to spread the good news of my
8   kingdom and to encourage participation from people worldwide.
9   Isaiah 41, verses 6 through 7.  On December 22 of 2012 time
10  will stop.  The winter solstice, this is having the sun orbit
11  over the Tropic of Capricorn in the south will align with the
12  moon to form a stationary solar eclipse over central Australia.
13  The moon's shade will cause the desert to, quote, sweat
14  condensation perpetually.  Streams and rivers will form in the
15  deserts.  It will blossom as a rose and be like the Garden of
16  Eden.  Isaiah 35, Isaiah 51:3, Isaiah 24:23, Isaiah 30:26,
17  Zechariah 14, 6 through 7.
18          "Only the meek shall inherit my kingdom.  Outside this
19  haven the earth as well as the inhabitants excluded will burn
20  from the concentrated heat of the sun.  People will also die
21  from hailstones.  On July 11th, 2009, my kingdom will commence;
22  and there will be exactly 1,260 days to, one, gather and mark
23  the chosen; and, two, build the city."  So there's the decree.
24  "So prepare your hearts for the kingdom.  No one who despises
25  me will be saved.  Steven Joseph Christopher, a/k/a Steven

1    Ciummo."

2           So I made this decree to build the city almost two

3    weeks ago.  And according to the prophecy in Daniel, now we

4    have a literal interpretation of the 70-week period.  According

5    to the interpretation, if there's a literal weeks from July

6    11 -- if there's a literal seven weeks from July 11th, we have

7    August 29th of this year.  And that is the time where the

8    Messiah, the prince, I believe will be publicly recognized,

9    myself being publicly recognized.

10          And then after this time there will be a 62-week

11   period where all nations -- or most nations will contribute in

12   enthusiastic manner to build this city of God and which I have

13   the plans for.  It's all based upon sacred geometry and the

14   number nine.  And I -- you know, I want to show those plans as

15   soon as possible, as soon as I can get to a computer and start

16   making a 3D model of these plans.

17          THE COURT:  Now, I have one last question for you.

18          THE DEFENDANT:  Yeah.

19          THE COURT:  This last question is, how did you learn

20   that you are this person?  Did God speak to you?  Did you read

21   it?  Did you divine it somehow?  How did you learn it?

22          THE DEFENDANT:  It was progressive understanding.  I

23   wouldn't say it all happened all at once.  I mean, I for the

24   most part lived a normal life up until about three years ago

25   where I, you know, just went about my job and my family and

1    didn't believe I was this special person.  And I've had

2    encounters since then, personal encounters, with people that

3    seemed to help convince me that I am this person, chatting with

4    people on the Internet, also people that would confirm things.

5           I do see signs.  I do see meaning into things.  And so

6    it was a combination of signs and personal testimony from

7    others, reading into lyrics and songs or scripture quotings and

8    seeing how scripture lines up with my life in a personal way.

9           My name Steven, it means "crowned one" in Greek.  And

10   it also mentions in the Book of Revelation that God will have a

11   new name, in chapter 3.  It says, "I will write on him My new

12   name and the city of My name."  And that coincides with Isaiah,

13   chapter 62, where it mentions God having a new name and there

14   shall be a crown of glory in the hand of the Lord.  So there's

15   that word "crown" again.  So the new name for Jesus is Steven,

16   and that's what I perceive.  And -- but, anyway, going back to

17   the 62, these literal weeks --

18           THE COURT:  You didn't answer my last question.

19           THE DEFENDANT:  I'm sorry?

20           THE COURT:  My last question.  You told me last time

21   that you were not and so I'll ask you again.  You know, are you

22   dangerous to anyone?

23           THE DEFENDANT:  No, I'm not dangerous to anybody.

24           THE COURT:  You said that you were the prince of peace

25   I believe.

1          THE DEFENDANT:  I'm sorry.  I didn't hear you.

2          THE COURT:  You said you were the prince of peace.

3          THE DEFENDANT:  The prince of peace.  Yes, I am the

4    prince of peace.  Yes.

5          THE COURT:  All right.

6          THE DEFENDANT:  I believe that.

7          THE COURT:  All right.  One second.  Any additional

8    questions by counsel over here?

9          MR. JUPITER:  Very briefly.

10                        **REDIRECT EXAMINATION**

11   BY MR. JUPITER:

12   Q.  Mr. Christopher, when I talk to you and I say that we're

13   not going to talk about all of these things and we're only

14   going to talk about your legal defense, are you able to follow

15   that with me?

16   A.  Yes.  I was under the understanding that when we talked we

17   would talk about that.  However, I did change my mind because I

18   believe this message needed to get out and it doesn't matter

19   whether or not I'm found guilty or not guilty.

20   Q.  I'm not talking about what you said here today.  I'm

21   talking about when I meet with you and I explain to you that we

22   need to talk about your case are you able to concentrate and

23   talk about the facts of your case without making references --

24   A.  Yes.

25   Q.  -- to the things that you just explained --

1  A.  Yes.

2  Q.  -- to Judge Wingate?

3  A.  Yes.

4  Q.  Okay.  When I say, "I understand all of those things

5  because you and I have had conversations about your beliefs,

6  but I just want to talk to you about your defense, any possible

7  defenses you might have in your case," we just talk about the

8  defenses in your case.  Is that correct?

9  A.  Yes.

10  Q.  And you're able to separate those things that you just

11  talked to Judge Wingate about with what you understand my job

12  is today.

13  A.  Yes.  I am able to separate those two things, yes.

14  Q.  All right.

15       THE COURT:  Prosecution.

16       MS. WALL:  No questions, your Honor.

17       THE COURT:  All right.  Mr. Christopher, that ends my

18  questions, but I do want to do this.  Mr. Christopher wants me

19  to see this tape.  Is that correct?

20       THE DEFENDANT:  Yeah.  I would like you to see the

21  tape.  Sure.

22       THE COURT:  Counsel, can you make that tape available

23  to me after this hearing?

24       MR. JUPITER:  It's available to you.  I can give it to

25  you right now, your Honor.  And we have an extra copy for the

```
 1   government counsel.
 2           THE COURT:  How long does it take?
 3           MR. JUPITER:  About five or seven minutes.
 4           THE DEFENDANT:  He doesn't have to see each one of
 5   them.  I would just like -- there's just three of them that I
 6   would like him to see, you know, if you don't have much time.
 7           THE COURT:  Well, no, they have seven.  So I'm going
 8   to look at all seven of them.
 9           THE DEFENDANT:  Okay.
10           MR. JUPITER:  No, it's five.
11           THE COURT:  Five?  There are five of them seven
12   minutes apiece.  So I'm going to look at them later on today.
13           MS. WALL:  If we could make those a part of the
14   record, as well, your Honor.
15           THE COURT:  Part of the record?
16           MR. JUPITER:  Yeah.  They're on the Internet.  So
17   sure.
18           THE COURT:  Okay.  Then I will review all these tapes
19   and I will look at them later on today.
20           THE DEFENDANT:  Okay.
21           THE COURT:  You can step down.
22           THE DEFENDANT:  Thank you.
23           THE COURT:  Other than the tapes, is there anything
24   else from the defense?
25           MR. JUPITER:  No, your Honor.
```

```
 1              THE COURT:  And the prosecution?

 2              MS. WALL:  Would the court like to hear argument, your

 3    Honor, concerning competency?

 4              THE COURT:  I'm going to look at tapes first, and I'll

 5    probably get back to you tomorrow and hear the closing

 6    summations on this matter.  But I just want to look at the

 7    tapes before I hear what you have to say.

 8              MR. JUPITER:  Very well, your Honor.  Whenever you

 9    want us to come back for argument, we do have brief argument.

10              THE COURT:  Okay.  I will hear you all tomorrow.

11    Counsel, what about a quarter to nine tomorrow?

12              MR. JUPITER:  That's fine with me.

13              THE COURT:  Quarter to nine for closing summations.

14              MS. WALL:  Thank you, your Honor.

15              MR. JUPITER:  Thank you.

16              THE COURT:  I'll see you all then.  Now, those tapes,

17    I have them?  All right.  Thank you.  Quarter to nine tomorrow.

18              MS. WALL:  Thank you, your Honor.  May we be excused?

19              THE COURT:  You may be.

20        (HEARING RECESSED 7/27/09 AND RESUMED 7/28/09)

21        (REMAINDER OF PAGE INTENTIONALLY LEFT BLANK)

22

23

24

25
```

```
 1        (7/28/2009)

 2            THE COURT:  You may be seated.  I'll start with the

 3    prosecution.  Did you see the tapes that were put in evidence?

 4            MS. WALL:  Yes, your Honor.  I did view the tapes

 5    yesterday.

 6            THE COURT:  Okay.  And how would you summarize those

 7    tapes?

 8            MS. WALL:  I would summarize the tapes as similar to

 9    the testimony that the defendant gave yesterday with his

10    prophecies on the world and similar to what he did tell the

11    court yesterday during the hearing.

12            THE COURT:  Okay.  I saw a bit more than that.  So I

13    turn to the defense.  Mr. Jupiter, how would you summarize the

14    tapes?

15            MR. JUPITER:  Your Honor, I think that the tapes are

16    really about a message.  In terms of -- I guess I'm wondering

17    what in particular you want me to hone in on.

18            THE COURT:  Well --

19            MR. JUPITER:  In terms of whether or not he's

20    competent today?

21            THE COURT:  -- anti-Semitism.  Anti-Semitism.

22            MR. JUPITER:  I didn't really -- I think that he uses

23    different things that get people's attention.

24            THE COURT:  No, no.  But I'm asking now about what's

25    on the tape itself, not the intention in cutting the tape.  Did
```

1   you see any anti-Semitic declarations?

2           MR. JUPITER:  It's actually been a little while; but,

3   yes, I have in those tapes and other tapes and things.  I have

4   seen some messages that would -- I would consider to be

5   anti-Semitic.  Yes.

6           THE COURT:  Well, you all gave me the tapes to review

7   and so I reviewed the tapes.  I was under the impression when

8   the tapes were provided to me that I would see more of your

9   client's apocalyptic message and perhaps an explanation for

10  that position.

11          The tapes I reviewed primarily show anti-Semitism

12  wherein your client rails against the Jews contending that the

13  Jews are responsible for the plights of history; that he feels

14  that they should be dealt with; that they're responsible for

15  the African slave trade, because he admonishes

16  African-Americans, whom he called "homeys," to be aware that

17  it's Jews who commenced that activity.  He further contends in

18  those messages that Jews are responsible for the holocausts of

19  history; again, that they should be dealt with.

20          And then he parodies a Jewish woman.  And I'm not

21  quite sure exactly -- I'm trying to give him the benefit of the

22  doubt why he presented that parody, but one can draw one's own

23  interpretation as to what that parody allegedly was about.

24          MR. JUPITER:  And as I stated yesterday, your Honor, I

25  certainly advised against submitting any videotapes.  I don't

1  think that they really address the issue of his present

2  competency.  And, certainly, I don't see where they benefit him

3  in terms of -- in terms of, ultimately, his trial.  But

4  Mr. Christopher, I knew he was going to ask the court -- as he

5  was going to have a right to testify and he should have that

6  right to testify, I knew that he was going to ask the court;

7  and that's why I had that available.

8          And that's what I had stated yesterday, that we were

9  going to make them available, because I knew he was going to

10 ask to have that placed in evidence.  But, certainly, I advised

11 that he not present that.  But I don't think it really hits the

12 issue of his -- of whether or not he's able to assist counsel.

13         THE COURT:  I understand that, but -- I understand

14 that, but I'm still just talking about the tapes right now.

15         MR. JUPITER:  Yes, sir.

16         THE COURT:  Then on the first tape your client appears

17 to be high.  Now, again, it's an interpretation that maybe

18 persons can disagree -- with which persons can disagree, but he

19 appears to be high on the first tape.  I, you know, listened to

20 his voice and watching his mannerisms.  Of course, I don't know

21 whether that's a regular mannerism, but he appears to be.

22         So -- and then, of course, he flashes a derogatory

23 finger sign at times.  And for some reason he chose to cut the

24 tape without a shirt on.  And so I don't understand certain

25 aspects of it as to how it would have anything to do with an

1   apocalyptic message.

2          The tapes I reviewed didn't say very much about

3   repairing to -- not repairing, but retreating to Australia

4   because of his apocalyptic message.  And, certainly, some of

5   the choice language he was using, I just don't think that

6   someone who truly believes that he's the Messiah would resort

7   to the type of language which is apparent there in the tape.  I

8   just didn't -- it's just hard to imagine that someone who

9   believes he's the Messiah would be flashing what we call the

10  bird on a screen, using curse words and, meanwhile, threatening

11  a class of people.

12         I was somewhat surprised after having the conversation

13  with your client on yesterday that he would resort to such foul

14  conduct and put it on the tapes.  I don't quite understand

15  that, and it's kind of difficult to comport that with what he

16  was talking about yesterday.

17             MR. JUPITER:  Yes.

18             THE COURT:  Now, that's what I saw on the tapes.  Now,

19  if I have misinterpreted what's on the tapes, then I will

20  certainly stand correction now if you have some other theory

21  about what those tapes showed, if you're contending that those

22  tapes showed anything other than what I've just said.

23             MR. JUPITER:  One second, your Honor.

24      (COUNSEL AND DEFENDANT CONFERRED)

25             THE COURT:  Now, before you respond, the tapes say

1  they're going down, quote, unquote, going down.  They even

2  indicate some violent propensity in your client, if one so

3  interprets, now, along with the other declarations I've made

4  concerning the tape.  So when you make your response, you may

5  take that into account as a concern of the court as well.

6       MR. JUPITER:  I'm not going to make any response, your

7  Honor, to the -- because based on -- I'm not going to make any

8  response to the court's -- I'm going to leave the record to

9  stand as it is.

10      THE COURT:  Okay.  So are there any other tapes that

11  you'd like me to play that you think ameliorate those

12  particular ones I saw?

13      MR. JUPITER:  Yes, your Honor.

14      THE COURT:  Which tapes are they?

15      MR. JUPITER:  I'll need to -- I'm going to need to go

16  back and review -- review other tapes that are on the Internet

17  that he is -- I think there was some miscommunication.  He had

18  indicated some specific tapes.  The ones that I wrote down were

19  the ones that I taped from him.  So I want to go over those

20  with him.

21      THE COURT:  How much time do you think it will take?

22      MR. JUPITER:  What I would suggest, your Honor, is --

23      THE COURT:  As soon as you bring them back,

24  Mr. Jupiter, I want to see the tapes --

25      MR. JUPITER:  Say that again?

 1           THE COURT:  As soon as you bring the tapes over, I'm

 2    going to review them.  And then I would like to hear the

 3    closing summations, you know, of the parties.

 4           MR. JUPITER:  Okay, your Honor.

 5           THE COURT:  So I want to do it today so we can finish.

 6           MR. JUPITER:  Yes, sir.

 7           THE COURT:  And I can see these tapes and --

 8           MR. JUPITER:  I can do that --

 9           THE COURT:  -- compare them to the others.

10           MR. JUPITER:  I can do that within an hour and a half

11    I believe, your Honor.

12           THE COURT:  Okay.  Then if you'd bring the tapes back,

13    then I'll review those tapes.  And then I will thereafter hear

14    closing summation of the parties and we'll move from there.

15           Now, let me advise the parties what I'm looking for in

16    closing summations.  Of course, I want a reiteration of the

17    standards involved in both matters, that is, the ability to

18    appreciate the seriousness of this hearing and to understand

19    the gravity of a trial should that occur, and then whether the

20    defendant was competent at the time that he made the statements

21    that bring us here.

22           And then, Mr. Jupiter, you made a statement that if

23    your client is held to be competent, then he expects then to go

24    to trial.  Is that correct?  Your client wants a trial.  Am I

25    correct?

```
 1              MR. JUPITER:  No, your Honor.  My understanding is

 2    that my client wants to enter a plea of guilty.

 3              THE COURT:  But.

 4              MR. JUPITER:  If he's --

 5              THE COURT:  Okay.  So, then, he wants to be found

 6    competent --

 7              MR. JUPITER:  Yes.

 8              THE COURT:  -- in all respects.

 9              MR. JUPITER:  Yes, your Honor.

10              THE COURT:  And then thereafter, if he is so, then he

11    wishes to enter a plea of guilty.

12              MR. JUPITER:  Yes, sir.

13              THE COURT:  All right.

14              MR. JUPITER:  However, your Honor, I think that we

15    should -- I just brought that up to show his understanding of

16    the process.  My position is that the court should take the

17    issue of competency separately.  I still object to this idea of

18    looking at the issue of -- because I think the court is going

19    to have to determine -- one thing the court has to determine is

20    whether or not it should impose -- if it were to find

21    Mr. Christopher competent, whether or not the court has a duty

22    to impose a not guilty by reason of insanity defense.  That's

23    not our position, but I think the court has a duty to make that

24    determination, considering what's been presented on its own.

25    But I think that is a separate question that the court needs to
```

```
 1   take into account after the competency -- after finding

 2   Mr. Christopher competent.

 3              So I don't -- if the court wishes me to address the

 4   issue of insanity at the time of the offense at this time, then

 5   I can quickly try to prepare to do that; but my understanding

 6   is that this hearing just was going to deal with whether or not

 7   he is presently competent, which is why I really do not

 8   believe -- whether he's presently competent, I really do not

 9   believe these videos and tapes really have any bearing --

10              THE DEFENDANT:  I object.

11              MR. JUPITER:  -- on his present --

12              THE DEFENDANT:  I object.  There's the -- can I say

13   something?

14              MR. JUPITER:  No.

15              THE DEFENDANT:  There was a list of videotapes --

16              MR. JUPITER:  Be quiet.

17              THE COURT:  Wait one second.  Hold it.

18              THE DEFENDANT:  There was a list of videotapes that --

19              THE COURT:  Mr. Christopher --

20              THE DEFENDANT:  -- I wanted you to see.  Those were

21   not the ones I wanted you to see.

22              THE COURT:  Mr. Christopher, if you want me to see

23   some additional tapes, then talk to your attorney about it.

24   And then he can provide those tapes to me if that's what the

25   defense decides over here.  Now, he's advising you at this
```

1    point as to what he thinks is appropriate for your defense.  So

2    listen carefully to what he's saying on it.

3              But, still, I have not made a determination on the

4    matter of competency yet and so leave heed to what he has to

5    say and then factor all that in as to what your ultimate

6    desires are concerning these proceedings.  So listen carefully

7    and then we'll go from there.  But you heard what I had to say

8    about what I've seen thus far, and what I've seen thus far is

9    not what I expected from someone who claims to be the

10   Messiah --

11             THE DEFENDANT:  I understand.

12             THE COURT:  -- the chosen one.

13             THE DEFENDANT:  I understand.

14             THE COURT:  And I can just say it's at odds -- the

15   conduct is at odds.  I had not seen that type of conduct from

16   you and I'm surprised.

17             THE DEFENDANT:  I understand.

18             THE COURT:  You know, I was surprised.

19             THE DEFENDANT:  I wish I could explain that further to

20   you, my reasoning behind it.

21             THE COURT:  Well, talk to your lawyer about it and see

22   how you want to proceed on that.  But as I just summed up a few

23   moments ago, in one of the tapes it appears that you are

24   high --

25             THE DEFENDANT:  No.

```
 1          THE COURT:  -- and the next -- maybe you're not, but

 2    that's the way it appeared.

 3          THE DEFENDANT:  No.

 4          THE COURT:  In the tapes you rail mightily against

 5    Jews, and you make a comment that they're going down.  You

 6    blame them for what has transpired in -- disastrously in

 7    history.  You make a personal message to African Americans,

 8    although you start off your address on that tape as though

 9    you're addressing Hispanics, because you use the term "homeys,"

10    which is normally an address among some people for Hispanics

11    and Latinos.  But then the message is that African Americans

12    should be upset at Jews who caused the enslavement of that

13    race.

14          And then you go further and ridicule a Jewish woman

15    and you raise your voice to approximate that of which you

16    contend to be this Jewish voice and the context of which could

17    be interpreted in different ways as to what is transpiring

18    while you are -- while the lady is allegedly exclaiming.

19          And so, thus, the context of the tapes that I saw have

20    very little to do with the apocalyptic message that we were

21    talking about yesterday.  And then, in addition, you addressed

22    the Jews in such a hostile manner, and at one point you flash

23    your fingers indicating a derogatory symbol that's -- or aspect

24    that's usually referred to as "the bird."

25          And then you use some choice epithets during those
```

1   tapes which, you know, I find surprising, again, as coming from

2   someone who just sat up here yesterday and said that you are

3   the Messiah and that you're going to lead people to the right

4   and that you are the Prince of Peace --

5           THE DEFENDANT:  Correct.

6           THE COURT:  -- and your aim here is to advise --

7           THE DEFENDANT:  Right.

8           THE COURT:  -- that you want to save all mankind,

9   where that tape certainly did not say that.

10           THE DEFENDANT:  No.  No, sir.

11           THE COURT:  And not only that, but it specifically

12   condemns Jews.

13           THE DEFENDANT:  Right.

14           THE COURT:  And, in fact, even the -- even the topic

15   of the tapes called it a "Jewish Alert," and it had the Star of

16   David there at the beginning of each tape.

17           THE DEFENDANT:  Yes, sir.

18           THE COURT:  And then it was called, as I said, a

19   "Jewish Alert."  So each one had that.

20           THE DEFENDANT:  Jewish Censor Alert, yes.

21           THE COURT:  Yeah.  Each one of those had that "Jewish

22   Alert," you know, at the beginning of it.

23           THE DEFENDANT:  I understand that.

24           THE COURT:  So if y'all have any more tapes that you

25   want me to consider --

1          THE DEFENDANT:  Yes, there are more tapes I want you

2   to consider.  Yes.

3          THE COURT:  -- then I will do that.  You don't have to

4   produce any.  I mean, it's up to you all what you want to do,

5   but --

6          THE DEFENDANT:  But I also would like to explain my --

7          THE COURT:  Well, then talk to your lawyer about that.

8   Okay, Mr. Christopher?

9          THE DEFENDANT:  Okay.

10         THE COURT:  Talk to him.  If you say you want to

11   explain that, then talk to him and we'll -- counsel says he can

12   get -- well, he'll make a decision as to what he wants to do

13   after he talks to you, whether you want to produce the tapes or

14   testify or what, in about an hour and a half.

15         MR. JUPITER:  Yes, sir.

16         THE COURT:  It's about 9:30.  That would be about

17   11:00.  So sometime around noon, I'll -- well, you've got to

18   bring the tapes over here.  So let's just look at sometime

19   after noon, around 2, 2:30, you know, for this matter.  Okay?

20         MR. JUPITER:  Yes, sir.

21         THE COURT:  All right.  I'll see you all then.

22         MS. WALL:  Your Honor, would the government be

23   provided a copy of the new tapes as well?

24         MR. JUPITER:  Yes.

25         THE COURT:  Yes.  He'll provide you --

1          MS. WALL:  We would also like to make those a part of

2    the record.

3          THE COURT:  Okay.  All right, then.  Let's see.  Let

4    me just set a firm date this afternoon, because I have a jury

5    right now.  So let's make it at 3:00.  I usually take a break

6    around 3, 3:15.  So we'll resume at 3:00.  All right?

7          MR. JUPITER:  Yes, sir.

8          THE COURT:  All right.  I'll see you all then.

9      (RECESS)

10         THE COURT:  Good afternoon.

11         MS. WALL:  Good afternoon.

12         MR. JUPITER:  Good afternoon, your Honor.

13         THE COURT:  First of all, I received the tape and I've

14   gone through it.  Did the prosecution receive a copy?

15         MS. WALL:  We had the copy yesterday, your Honor.

16         THE COURT:  Okay.

17         MR. JUPITER:  Can I address that, your Honor?

18         THE COURT:  You may.

19         MR. JUPITER:  Your Honor, the copy that the court has

20   is the copy we submitted yesterday.  I wanted to make sure

21   after hearing your summation about what was on the tape that I

22   was not -- that what you had seen, apparently, were -- you saw

23   things that were on the YouTube videos I believe that you

24   referred to.

25         Those were not things that Mr. Christopher had

1   requested that we submit to you.  The -- because that copy that

2   you saw and the government had that we -- the only ones that we

3   put on the disk had none of the materials that you made

4   reference to this morning.

5           I'm not trying to suggest that those videos that you

6   probably did see were not made by Mr. Christopher, but just to

7   make -- I think we do need to clear up the record that the

8   actual CD that was submitted in evidence by the defense -- and,

9   certainly, the court is -- it's not a trial.  So the court can

10  look at whatever materials the court wishes to look at.

11          But just to make the record clear, if the court went

12  on YouTube and viewed other videos, which I believe the court

13  made reference to videos of anti-Semitic nature and things like

14  that, those are videos that were not submitted by

15  Mr. Christopher in evidence for this hearing.

16          I'm not trying to suggest that whatever you -- I would

17  inquire into the court as to which videos the court actually

18  reviewed and it was making reference to this morning because

19  upon looking back at those videos that we submitted for the

20  court to review, those were not -- that material was not on the

21  CD that we submitted.  So if the court went -- and which the

22  court is well -- obviously, well within its power to do, if the

23  court went on YouTube and reviewed other videos, I would ask

24  that the court make that as part of the record, because the

25  five videos we submitted for the court to review do not contain

1   those materials.

2          THE COURT:  I reviewed some videos, but I was under

3   the impression when I reviewed them they had been submitted by

4   the parties.  I will make an inquiry in a few moments when my

5   courtroom deputy comes in as to where they came from.

6          MR. JUPITER:  Yes, sir.  And we would like to -- since

7   Mr. Christopher is here, we would -- there -- they total

8   approximately 35 minutes.  So --

9          THE COURT:  You mean the ones that I addressed the

10  other day?

11         MR. JUPITER:  The ones that we submitted that I

12  believe the court reviewed now, I would suggest that they -- at

13  least parts of them be played in open court since the court has

14  placed a great deal of significance on them.  If the court is

15  going to place a great deal of significance not only with

16  respect to what's on them but Mr. Christopher's decision to

17  submit material -- to pick material that supports him I think

18  is consistent with what he said.

19         As counsel, your Honor, I still maintain that what's

20  most important is what he testified to and what I believe we

21  demonstrated during his direct examination, which I would like

22  the court to focus on, is that he was able to separate all of

23  that and to talk with me about the facts and legal defenses of

24  his case and the consequences of a trial, pleading guilty and

25  then not guilty by reason of insanity defense.

1          But if the court is placing significance not only on

2     the content of the video, the videos that were submitted, as

3     well as his decision of which videos he wanted the court to

4     see, then I think then we need to -- we need to make sure that

5     the ones the court -- the court sees which ones he wanted you

6     to see and he -- and that he -- if needed, he can explain why

7     he thinks that supports his --

8          THE DEFENDANT:  Yes.

9          MR. JUPITER:  -- his position.

10         THE COURT:  Okay.  One second.

11    (COURT AND COURTROOM DEPUTY CONFERRED)

12         THE COURT:  Mr. Jupiter --

13         MR. JUPITER:  And also we make a request that

14    Mr. Christopher be allowed to -- in light of what the court

15    indicated, that Mr. Christopher be allowed to retake the stand.

16         THE COURT:  Okay.  Now, before that let me just

17    straighten up this matter about the videos.

18         MR. JUPITER:  Yes, sir.

19         THE COURT:  My courtroom deputy pulled from the

20    YouTube the ones that I saw yesterday.

21         MR. JUPITER:  Yes.

22         THE COURT:  They were not the ones that have been

23    admitted.

24         MR. JUPITER:  Right.

25         THE COURT:  I was under the impression when I saw them

1  that they were the ones that had been admitted.  But during the

2  course of the hearing yesterday, there was a reference to other

3  videos on the YouTube.  So my deputy had gone to the YouTube,

4  pulled those and told me that there were some tapes, but I

5  thought they were the ones that had been admitted.

6        MR. JUPITER:  Yes, sir.

7        THE COURT:  And so I looked at them.  So up until this

8  point I thought they were the ones that you all had submitted,

9  which is why I made the comment that I was surprised that

10  Mr. Christopher would have submitted them, because, apparently,

11  he did not submit them.  They were on YouTube and my courtroom

12  deputy had pulled them up and simply told me there were some

13  tapes there and I went and looked at them.

14        MR. JUPITER:  Yes, sir.

15        THE COURT:  Now, with regard to the tape that you

16  brought over yesterday, I have reviewed those.  I have listened

17  to -- I have seen all of those.

18        MR. JUPITER:  Yes, sir.

19        THE COURT:  All right.  Now, so that should clear up

20  how I came to see what I saw.  So, Mr. Christopher, it appears

21  you did not submit that tape to me for me to look at.

22        THE DEFENDANT:  Correct.  I did not.

23        THE COURT:  Okay.  All right.  Now, then, how do you

24  want to -- you want to call your client?

25        MR. JUPITER:  Yes, sir.

1          THE COURT:  All right.  Come forward and be sworn

2     again -- or come and testify again.  You don't have to be sworn

3     because you're already under oath.

4        (COMPLIED WITH REQUEST)

5          THE COURT:  Mr. Christopher, this is the same

6     proceeding as yesterday, and in that proceeding you affirmed to

7     tell the truth.

8          THE DEFENDANT:  Yes.

9          THE COURT:  Do you understand you're under that same

10    obligation?

11         THE DEFENDANT:  Yes, I do.

12         THE COURT:  Counsel.

13                    **STEVEN JOSEPH CHRISTOPHER,**

14    having previously affirmed to tell the truth, testified as

15    follows:

16                         **DIRECT EXAMINATION**

17    BY MR. JUPITER:

18    Q.  Mr. Christopher, now that that's been cleared up, I want to

19    go ahead and play -- listen to me.

20    A.  Okay.  Will it be viewed up here as well?

21         THE COURT:  It should be in just a moment.  If it's

22    not, we'll cut it on for you.

23         MR. JUPITER:  Can we play the first video?

24         THE COURT:  Okay.  Which one is this?

25         MR. JUPITER:  The first one is a minute and 33

1    seconds.

2        (DVD PLAYED)

3    BY MR. JUPITER:

4    Q.  Mr. Christopher, was that consistent with what you

5    testified to yesterday about -- when your Honor asked you

6    questions about this vision that you have in terms of this

7    apocalypse that's imminent upon the earth?

8    A.  Almost entirely except for the final destination of the

9    eclipse. I've changed it, as you know from yesterday.

10   Previously, I believed that it would land over Florida and --

11   however, through progressive understanding of future events in

12   alignment with the 2012 prophecies and also with meeting people

13   along the way from the time that that video was recorded who've

14   enlightened me into areas concerning Australia, I changed the

15   destination to Australia.  So, yes, it -- but besides that, it

16   is very accurate from what I testified yesterday concerning my

17   apocalyptic view.

18   Q.  Okay.  I want to just play -- your Honor has already viewed

19   this -- all of these videos.  So I'm not -- we don't need to

20   play the whole of the next one, being The Truth; but I wanted

21   to play the first part of that, The Truth.

22   A.  Well, I'd like you to play it -- most of it, because I do

23   talk about my explanation of why I've made some of these

24   anti-Semitic statements.  And I don't know if he's viewed that,

25   but I actually would like the court to view that.  So it's kind

1   of like -- probably --

2   Q.  Well, let's play it.

3   A.  All right.  Let just play it.

4       (DVD PLAYED)

5   Q.  So over here you're explaining why you've made a lot of

6   these videos that -- you said a lot of things that have caused

7   fear amongst people.  Is that -- does that relate to the videos

8   that you made that, obviously, the court viewed that were on

9   YouTube?

10  A.  Yeah, it does, but it also -- it also -- I guess the videos

11  that the court viewed outside of what I requested for them to

12  view were actually -- I'm kind of surprised that they were -- I

13  heard that they were taken from my YouTube channel.

14      I believe the judge actually described at least five of the

15  videos this morning that he viewed; and, to me, only -- I can

16  only recall only two of them still being up, because I took --

17  I've taken at least three of those videos down from the YouTube

18  channel because they were actually in -- they were in

19  response -- or in a reaction response that I was making as I

20  was communicating with people on a conspiracy web forum.  It's

21  actually a very popular web page.  It's called "Godlike

22  Productions."

23      And there's a higher level of dynamics going on here that I

24  don't think the court has knowledge of, and these videos that I

25  made were in response.  A lot of them were anti-Semitic, as you

1  say.  The --

2  Q.  Are you anti-Semitic?

3  A.  No, I am not.  I'm actually Jewish.  I am Jewish.  I'm a

4  descendant of Christ.  Christ was Jewish.  So it's not -- I do

5  not hate Jews.  I do not hate anybody.  Actually, the Jews

6  are -- you know, many people consider the Jews as God's chosen

7  people.  And they are.  That's what the Bible says.

8      However, the Bible also says in Isaiah 63, verse 10,

9  concerning the Jewish people, it says, "But they rebelled and

10  they vexed My Holy Spirit.  Therefore, I have turned to be

11  their enemy and I fought against them."  This is in line with

12  scripture.

13      And I also make mention of Jesus in my video, how he turned

14  the tables of the moneychangers and how he spoke openly and

15  vehemently against the Jewish people.  And if you understand,

16  it's not out of hate, but it's out of actually tough love.

17  It's out of parental love of rebellious children.

18      The Jews are stiff -- you know, according to the Bible,

19  they were stiff-necked people and they were rebellious against

20  God and they did not listen to God, if you understand the whole

21  Exodus story where they just refused to take instruction from

22  God and, you know, he ended up having to destroy many of them.

23      That's not my intentions whatsoever is to harm anybody,

24  especially Jewish people, but it is to convey -- 2000 years ago

25  many of the Jewish people were opposed to Jesus Christ, and

1    Jesus Christ was the Messiah.  He came to save the Jewish

2    people.  And he said, "Oh, Jerusalem, I've come to you as a

3    hen.  I wish to come to you to gather you as a hen gathers her

4    chicks under her wings."  And that's the same concept here and

5    that's I am here again as the second Messiah, and I'm being

6    consistent with that attitude toward the Jewish people.

7        And that's why I am conveying myself as very -- or

8    portraying myself as very harsh toward them.  And that's what I

9    wish to convey.  And a lot of these videos -- not a lot, but

10   the majority of the videos that the judge described were only

11   meant to be up there for a short while in response to some of

12   the Jewish posters, people -- I call them posters -- on the web

13   forum Godlike Productions, which actually is Jewish

14   administered -- the administration of the forum is

15   Jewish-owned.

16       And so what -- and what it is, basically, from a global --

17   from a higher conscious level of understanding and how I relate

18   to these certain people is that -- one of them is named Jason

19   Lucas.  He's, apparently, the owner of Godlike Productions.

20   He's Jewish.  And, however, I see him more as a friend than as

21   an enemy.  And, basically, he's even referred to that, because

22   the way I see these people are that they are actually helping

23   me.  They're part of a coaching or conditioning experiment on

24   me where I'm strengthening my courage, my boldness, my audacity

25   to just be very open and forthright in saying these statements.

1    Q.   These were responses to --

2    A.   These were --

3    Q.   -- things that people like this --

4    A.   Yes.

5    Q.   -- person said.

6    A.   They were going in the forums.  One was -- I believe the

7    judge mentioned a video where I was poking fun at a -- you

8    know, that I was photo-manipulating an image of a woman.  That

9    was -- actually, that woman is 100 percent Jewish.

10   Q.   Right.

11   A.   And she's one of the posters on the forum.  And it was a --

12   it was a -- done in response where she actually notified

13   YouTube -- because I had a previous YouTube channel, and she

14   was influential in taking down that channel.  And so --

15   Q.   While you're saying that, in the Psychoanalysis,

16   Psychoanalysis of Naysayers --

17   A.   Yes.

18   Q.   -- those were the ones that you did, Psychoanalysis 1 and

19   2 --

20   A.   Yes.

21   Q.   -- those were the ones where you did the PowerPoint

22   presentation.  Was that in response to people who had -- who

23   you were in dialogue with over the Internet?

24   A.   Yeah.  Yeah.  And that was not necessarily just Jewish

25   people.  That was just people in general --

1   Q.  Right.

2   A.  -- that I've had dialogue with over -- in the forum -- in

3   forum activity in which I endeavored in.  And, yeah, I would

4   like the court to play that.  But if you could just finish this

5   video up, there's a little bit more information where I explain

6   where I'm coming from.  It has nothing to do with hating

7   anybody.  And, like I said, I am Jewish.  I am the descendant

8   of Christ.

9       (DVD PLAYED)

10  A.  I'd like to make a few more comments about this before we

11  move on.

12  Q.  I didn't hear you.

13  A.  I'd like to make a couple more comments about this before

14  we move on to something else.

15  Q.  Okay.  Remember that you spent a lot of time explaining all

16  of this yesterday.  So I would ask you to summarize --

17  A.  Okay.

18  Q.  -- very briefly.

19  A.  Essentially, I back that god's heart is -- if you think of

20  the analogy of a shepherd and the shepherd's sheep, the

21  shepherd sometimes has to use exertion to get the sheep to be

22  motivated to go in a certain direction and to be together, you

23  know, not to be spread apart.

24      He also has a dog that runs around and, you know, nips the

25  sheep on the legs to get them, or he also carries a big staff.

1    You know, sometimes he has to, you know, swing it.  You know,

2    it's -- but it's all done out of concern for the sheep, out of

3    their well-being, and it's out of love.  And so that's what I

4    wish to convey.

5    Q.  Okay.  Do you want to go to The Standard now?

6    A.  Yes, The Standard, yes.

7    Q.  What is The Standard?

8    A.  I mentioned -- I talked about The Standard yesterday.  I

9    believe you recall me talking about The Standard.  And this is

10   actually describing it, bringing a Bible passage back in Isaiah

11   59 and conveying to you that I am the standard-bearer where,

12   you know, I -- how one reacts to me reveals to me their heart,

13   whether it's for me or whether it's against me, whether they

14   hate me or whether they love me.

15       And, you know, there's leeway for me to understand that,

16   well, you know, initially, some of my statements have been very

17   shocking and I could see why the public would negatively view

18   me.  But through time, through understanding, through process,

19   through talking, through dialogue, you know, now is the time

20   where the Spirit of the Lord allows us to have revelation in

21   this matter, to understand where my heart is coming from.

22   Q.  Let's see it.  It's five minutes.

23       (DVD PLAYED)

24   Q.  Now, Mr. Christopher, Psycho 1 and 2 just basically is the

25   video presentation with the PowerPoint --

1   A.   Yes.

2   Q.   -- where you basically address people.  And it's kind of

3   like a debate where you're trying to break down the people who

4   oppose you.

5   A.   Yeah.

6   Q.   You mentioned that their methods of globalizing, bandwagon,

7   quoting other scholars to try to psychoanalyze you, to try to

8   take -- to try to turn people against your -- what you consider

9   to be your doctrine.   Correct?

10  A.   Well, essentially, what I'm trying to do -- and I believe I

11  was successful at that -- was I've actually included -- I've

12  come up with 24 different methods that these naysayers use or

13  strategies that they use when they're against me negatively.

14       So, basically, what I'm trying to demonstrate to the court

15  here by viewing those videos is my mental soundness, my ability

16  to make these psychological decisions and this behavioral

17  decisions of -- or just of -- over these people.  And so, you

18  know, this -- to me this demonstrates that I'm very logical and

19  very sound and I'm able to make deductions and classify --

20  classifications over people's behaviors.

21       And I think that for somebody who's mentally incompetent --

22  I believe it would be impossible for a person who is mentally

23  incompetent to make these deductions.  So that's why I would

24  like the court to view this.

25  Q.   Okay.  And the court has viewed those --

A.   Okay.

Q.   -- those are the two.  Okay?

A.   Okay.  I would also like to point out an explanation of a couple of more videos that the judge mentioned that he saw this morning.  One, he talked about he saw a video where it appeared that I was high.  And that -- to me, I remember recording a video sitting in a car and I was smoking a cigarette.  And I was actually -- it was -- my eyes were actually watery because I was crying right before I recorded that video.  And I was crying over the people -- the rebellious people who would not listen to me.

    And I'm not sure if the judge heard my words because they were very quiet in that video.  But it's all about the Father's heart, the Father's heart toward his children, the Father's heart -- my heart toward my children.  And me carrying the Father's heart toward the people that would not listen to me.  And it all has to do with discipline, disciplining.  God disciplines those he loves.  And that's out of Hebrews, chapter 12.

    And so I was not high at the time.  And that is -- and if you want to look at that video again, maybe sometime later and relook at it and re-listen to the words that I was saying, it has nothing to do with -- at all with me being high.  It's about expressing my heart, which I was very sad.  I was in a very somber mood.

1    Another video was one where I was standing in my friend's

2  living room with a leather jacket and I was talking using a

3  dialect of the African-American race.  And, actually, my -- you

4  know, my knowledge of words that are slang -- you know, I

5  believe he used the word "homey" that I said initially.  I had

6  no idea that it was not used by the African Americans, but it

7  was used -- I guess it was used by the Mexicans.  I had no idea

8  that was the case.

9    But that was a response to one of -- of a YouTube video

10  that was made by somebody on Godlike Productions which was

11  actually accusing me of being racial.  And so I was trying to

12  show, no, no, I'm not racial.  I do not hate blacks whatsoever.

13  And so I was -- but I was blaming -- you know, I was blaming

14  the Jews for their slave trade and stuff like that.

15    That was -- it was more of a reactionary video that I took

16  down probably within one hour after I posted that.  So I'm not

17  really sure how the judge or how the person that gave it to the

18  judge downloaded it from an active YouTube page.  So...

19  Q.  It's been a while since I've used that term myself,

20  Mr. Christopher, but we used to use it and Latinos do too.

21  A.  Okay.

22        MR. JUPITER:  But, anyway, I have no further

23  questions, your Honor.

24        THE COURT:  Okay.  Cross-examination.

25                    **CROSS-EXAMINATION**

BY MS. WALL:

Q.  Mr. Christopher, when should we purchase our ticket to Australia?  What's our deadline on that?

A.  You know what, that's a good question.  I really think it is a good question, because, to me, from an objective viewpoint, as the audience listening to me I would think that you would need more proof, not just my words.  I would think that you would need some -- maybe some educated scholar or maybe some -- maybe some sign from the heavens, you know.  I would say just wait, wait for a little bit.  Give it some time. Think about it.  You know, I would not say today, no.

Q.  Have you purchased your ticket?

A.  No.  I don't have any money.  So -- but as far as -- as far as my level in which I'm convinced that it is the Promised Land, I would say it is in the upper 90 percentile.

Q.  But it's Australia, not Florida, now.

A.  That is correct.  Yes.

Q.  I want to talk a little bit about your psychiatric history.

A.  Okay.

Q.  And I think that when you were in Florida at the facility there after you were arrested for this case, you cooperated and spoke openly with the doctors there.  Is that right?

A.  Yes, I did.

Q.  And you told them a little bit about your psychiatric history, and I think that started at 10 years old.  Is that

1  right?

2  A.  No, I don't believe I mentioned 10 years old, but -- it's

3  possible.  But I did -- as far as what I -- what they could be

4  referring to that is that there was a time in my childhood

5  where I felt time --

6  Q.  Special.  Out of the ordinary.

7  A.  Not -- no, I'll answer that.

8  Q.  Those aren't your words?

9  A.  Please don't -- please don't put words into my mouth.  I

10  might have felt special and I might have felt out of the

11  ordinary, but --

12  Q.  Did you tell the doctors --

13  A.  -- I would like it -- I would like it for you not to finish

14  my sentences.

15  Q.  Okay.

16  A.  I would appreciate that.  Okay.

17  Q.  Did you tell the doctors that you felt special and out of

18  the ordinary?

19  A.  I -- at this time -- I'm going to go back to what I was

20  talking about before I answer your question.

21  Q.  Okay.

22  A.  At this time, whatever age it was, whether it was 10 or 12,

23  I felt alienated from my dad.  To this -- at this present time

24  I don't believe he was my biological father, but at the time I

25  did.  And I couldn't really pinpoint why there was this

1    breakdown in communication with him.

2    Q.  Did you tell the doctors that you felt special and out of

3    the ordinary?

4    A.  I probably did.  Yeah.

5    Q.  And at age 40 I believe you had a manic episode where you

6    thought your mother was God.  Is that correct?

7    A.  That is correct.

8    Q.  And then you admitted yourself to the emergency room and

9    you left the same day.  But you were later involuntary

10   hospitalized a week later.

11   A.  That's correct.

12   Q.  You've been -- or you recalled to the doctors in Florida

13   that you were diagnosed with bipolar disorder and you were

14   prescribed anti-psychotic medication.  Isn't that right?

15   A.  Uh-huh (indicating yes).  Yes.

16   Q.  You recalled that you were hospitalized at least for one

17   week on that occasion.  Is that correct?

18   A.  I believe so.

19   Q.  And then on your second hospitalization, that occurred

20   approximately three months later at the Aurora Mental

21   Hospital --

22   A.  Can I --

23   Q.  -- and you had beliefs that music was speaking to you.  Is

24   that right?

25   A.  Yes.  Can we -- I think I may -- we have a

1    misunderstanding.  When you mentioned my mother was God, I do

2    not -- I did not mean my biological --

3    Q.  I don't think your mother was God, but you thought your

4    mother was God.

5    A.  Well, no, no, not my biological mother.  That's not what I

6    was trying to imply.  I was trying to imply the female deity

7    mother God, not my biological mother.  So, okay, we can move

8    on.

9    Q.  You see a distinction there.

10   A.  I'm sorry?

11   Q.  You see the distinction there.

12   A.  Yes.

13   Q.  And did you tell the doctors that?

14   A.  I believe so, yeah.

15   Q.  I think after your second hospitalization and after you

16   thought that music was speaking to you your wife called the

17   police and you were again hospitalized under emergency

18   detention.  Is that right?

19   A.  That's right.

20   Q.  And at that point you had a diagnosis of schizophrenia or

21   bipolar disorder, and you were once again treated with

22   anti-psychotic medication.  Is that right?

23   A.  That's right.  I believe so.

24   Q.  You reported another hospitalization lasting about 28 days

25   in 2008.  Is that correct?

1   A.   Yes.

2   Q.   You remembered another involuntary hospitalization at Elgin

3   Mental Health Center?

4          MR. JUPITER:  Your Honor, I'm going to object.  First

5   of all, this is outside the scope of cross -- outside the scope

6   of direct.  Second of all, your Honor, I think it's really just

7   getting in mental health history from some time ago.  The issue

8   before the court is his present competency.  So I don't think

9   it's relevant either.

10          And the court has the report, and I think she's

11   revealing a lot of this information that really does not need

12   to be revealed, that has been placed under seal.  So those are

13   my three objections.

14          MS. WALL:  May I respond, your Honor?

15          THE COURT:  Okay.

16          MS. WALL:  His message is not at issue today.  What's

17   at issue is his competency, and the history of his mental

18   condition can be considered by the court.

19          THE COURT:  Well, all that you're reading from is in

20   the report that was generated by the, oh, psychiatrist,

21   psychologist who testified earlier.

22          MS. WALL:  Yes, sir.

23          THE COURT:  I've read all that.

24          MS. WALL:  Yes, sir.

25          THE COURT:  So I'm familiar with the answers that were

1    provided.  So I need not hear any more about it.  I mean, as I

2    said, I'm familiar with it.

3            MS. WALL:  I'll move on, your Honor.

4            THE COURT:  Okay.

5    BY MS. WALL:

6    Q.  One last thing, Mr. Christopher.  You disagree with several

7    diagnoses of your mental illness.  Is that right?

8    A.  That's correct, yes.

9            MS. WALL:  That's all, your Honor.

10           THE COURT:  What is this female deity?

11           THE DEFENDANT:  Well, I didn't associate a name with

12   the female deity.  I just felt that the divine -- or the divine

13   one was female at the time.  So I didn't ascribe a name to her.

14   You know, I know there's -- you know, some people think that

15   the female deity -- there are certain female deities in

16   antiquity.  I mean, there's Isis.  There's Ishtar.  I believe

17   Ishtar is female.

18           But I just -- I just felt like this deity was a

19   female.  And I felt as if this deity was rather helpless, like

20   a female mother deity, and I was like the son of this deity

21   where I needed to, you know, take bold courageous steps in

22   order to help humanity for the good of humanity.  So --

23           THE COURT:  The report read that she was referring to,

24   the report read that you at one point thought your mother was

25   God.  That's what she was reading from.

```
 1              THE DEFENDANT:  Right.

 2              THE COURT:  So, then, if -- well, that's what it

 3    states there, but you're saying is that that's not what you

 4    were saying.

 5              THE DEFENDANT:  Right.  That's not what I was trying

 6    to convey.  Whether or not I mentioned that to the doctors in

 7    Miami, you know, it's hard to say -- for me to remember and

 8    recollect.  But I think I did describe in -- more in detail

 9    that it was not my biological mother that I viewed as God.

10              THE COURT:  Okay.  Then you mentioned Isis just then.

11              THE DEFENDANT:  Yes.

12              THE COURT:  That's Egyptian.

13              THE DEFENDANT:  Yes.

14              THE COURT:  Horus.

15              THE DEFENDANT:  Horus's mother was Isis, yes.

16              THE COURT:  Horus is the --

17              THE DEFENDANT:  So Horus -- you know, in a sense,

18    Horus was looked at as the forerunner of Christ where he was,

19    you know -- you know, Isis and Horus are like a forerunner of

20    the Madonna and the child, you know, the Virgin Mary and the

21    baby Jesus.  So there's -- I viewed that connection there.

22              THE COURT:  Now where did you read all this?

23              THE DEFENDANT:  Mostly on the Internet.

24              THE COURT:  On the Internet?

25              THE DEFENDANT:  Yes.
```

1          THE COURT:  How long ago?

2          THE DEFENDANT:  Well, I've endeavored into studying

3     about spiritual matters for the past probably five years, you

4     know.  So...

5          THE COURT:  Okay.  I just asked out of curiosity.

6     That's all.

7          THE DEFENDANT:  Okay.

8          THE COURT:  I'm fully familiar with the Isis-Horus

9     mythology and the whole relationship of what comparison it has

10    to the Christian faith.

11         THE DEFENDANT:  Okay.

12         THE COURT:  That whole mythology precedes Christianity

13    by probably about 2000 years.

14         THE DEFENDANT:  Correct.

15         THE COURT:  And a lot of comparisons have been drawn

16    to it.

17         THE DEFENDANT:  Right.

18         THE COURT:  I see you've read all that.

19         THE DEFENDANT:  Yes.  I've read -- I'm very familiar

20    with Horus, Isis, Osiris, Osiris' brother Set and how there was

21    a -- you know, how there was a battle between Osiris and Set

22    and Thoth and Anubis.  So, yes, I'm very familiar with Egyptian

23    mythology.

24         THE COURT:  Okay.  Any other mythologies you're

25    familiar with?

```
 1              THE DEFENDANT:  Any other mythologies?
 2              THE COURT:  Other mythologies.  Are you familiar with
 3    any others?
 4              THE DEFENDANT:  I really just focus a lot on the
 5    Egyptians.
 6              THE COURT:  What about Greek?
 7              THE DEFENDANT:  I really haven't studied much about
 8    the Greek.
 9              THE COURT:  Roman?
10              THE DEFENDANT:  Not too much.  No.  I mean, I can
11    vaguely tell you, you know, Romulus and Remus and Cicero, but
12    not much -- I don't have an extensive study in that.  So...
13              THE COURT:  Why did you pick Egypt?
14              THE DEFENDANT:  Because I felt like there was a
15    connection with my life and Osiris -- the Osiris-Horus aspect
16    of things.  I read a lot -- you know, there's a lot in our
17    culture -- in our modern culture that I can tune into and pick
18    up from like a higher level of consciousness.  You know, I can
19    see -- read into signs or images, you know, or modern music or
20    whatever.  And I can associate how this relates to the
21    Osiris-Horus legends and myths.  So that fascinated me.
22              You know, it fascinated me about -- reading up about
23    the prayers to Osiris and how it was mentioned that he was the
24    king of kings.  And so I was interested, very fascinated by
25    that.  So I studied up on that.  And so...
```

1         THE COURT:  Okay.  Any other questions?

2         MR. JUPITER:  No, your Honor.

3         THE COURT:  Questions?

4         MS. WALL:  No, your Honor.

5         THE COURT:  Okay.  You can step down.  Argument.  Are

6    you ready?

7         MS. WALL:  Yes, your Honor.

8         THE COURT:  Okay.

9         MS. WALL:  The issue before the court is the

10   defendant's competence to stand trial under 18 U.S.C. 4241.  A

11   preponderance of the evidence standard is what the government

12   is required to show that he is presently suffering from a

13   mental disease or defect rendering him mentally incompetent to

14   the extent that he is unable to understand the nature and

15   consequences of the proceedings against him or to assist

16   properly in his defense.

17        The test of competency is whether a defendant has a

18   sufficient present ability to consult with his attorney with a

19   reasonable degree of rational understanding and whether he has

20   a rational as well as a factual understanding of the

21   proceedings against him under *Dusky v. The United States*.

22        To adequately apply the legal standard, a court must

23   thoroughly acquaint itself with the defendant's mental

24   condition, the medical description or classification of the

25   defendant's illness.  However, this does not end the inquiry.

1   The court is faced with the difficult task of analyzing the

2   medical and/or other evidence to arrive at a legal conclusion.

3       The government has put forth the expert testimony of a

4   licensed psychologist that says this defendant is mentally ill

5   and has schizo-affective disorder.  Through the examination and

6   as noted in the report, page 11, the defendant was administered

7   the MacCAT, which is to show his abilities related to trial

8   competency.

9       He scored in the minimal or no impairment range for

10   two of the three domains.  It was the third domain that he

11   scored low on, and that is his rational understandings of the

12   proceedings against him.  That is where the doctor says he

13   failed and is why he is not competent to stand trial, because

14   of his irrational beliefs and his delusions.

15       Says, "While the defendant does maintain an adequate

16   factual understanding of the legal process, his rational

17   understanding is influenced by delusional belief.  Further, his

18   rational beliefs are likely to influence his motivation and/or

19   ability to assist in his defense by focusing on irrelevant

20   beliefs."

21       It has been suggested with questioning of the

22   defendant during this hearing that we just entertain a guilty

23   plea and all go home.  And the government will entertain that

24   information or that process when it becomes proper.  And until

25   this defendant is competent, until he can be restored to

competency, the government does not entertain a guilty plea

because he cannot waive a right to trial if he's not competent.

Public justice is not served by trial of a defendant

or conviction of a defendant for an alleged defense when that

individual is mentally unable to reasonably comprehend the

action being taken against him or to assist in his defense.

And that is a Fifth Circuit *Featherston v. Mitchell* case.

Your Honor, we believe that the credible evidence

presented at the hearing from an expert witness that the

defendant is mentally incompetent has been shown by a

preponderance standard, which is what the government was

required to do.  That's all.

THE COURT:  Well, let's see.  Let's talk about some

specifics, one, ability to speak to and to understand his

counsel.  You don't quarrel with the finding that he can do

that, or do you?

MS. WALL:  As to specifics, Judge, I believe some of

the questions were put to the doctor and I believe his opinion

was that he could communicate, but that he doesn't think that

the input by the defendant would be rational.

THE COURT:  What about his testimony here in the

courtroom?  Do you think his testimony thus far has been

rational?

MS. WALL:  In no way, shape or form, your Honor.

THE COURT:  Okay.  And about what do you complain?

1          MS. WALL:  His message and his beliefs of the end of

2     the world.  You know, Judge, we had him evaluated.  It's what

3     the doctor from Florida said, and those are the facts that I'm

4     duty bound to present to the court.

5          And my personal opinion is that I agree with the

6     doctor.  I just think that as a psychologist he is qualified

7     better than I am to make that decision.  And the court is

8     certainly the final decision-maker on this legal issue.  But I

9     do not think that his testimony, as the record is thorough from

10    two days of him testifying, from all the videos, that someone

11    could find him to be competent at this point.

12          THE COURT:  To stand trial?

13          MS. WALL:  Yes, sir.

14          THE COURT:  Okay.  Thank you.  Mr. Jupiter.

15          MR. JUPITER:  We don't take issue with the

16    government's statement regarding the standard.  It's very

17    clear.  The court has to determine whether he has a sufficient

18    present ability to consult with his lawyer with a reasonable

19    degree of rationalness, understanding, whether he has a

20    rational as well as a factual understanding of the proceedings

21    against him.

22          The court -- the record speaks for itself, your Honor.

23    I believe all of us, most of us in court disagree with

24    Mr. Christopher's beliefs, his theories.  But there's just no

25    debate about whether or not when I go and talk with him or when

1   he's in court and I discuss the legal proceedings against him

2   whether or not he understands what's going on and what he needs

3   to convey with me.

4           When I ask him a fact about where were you on

5   October 8th, 2008, he can clearly and cogently explain that to

6   me.  When he wants to talk to me about his theories about why

7   he is the Messiah and I tell him, *Mr. Christopher, I need for*

8   *us to talk about the case,* that there's no problem in doing

9   that.

10          And when he is asked about *Why do you think he's --*

11  *you are the Messiah?* he will talk as long as you're willing to

12  listen to him as to why he thinks he's the Messiah.  There's no

13  issue as to that.

14          The question is whether or not he meets this standard

15  and whether or not the government has made a -- met their

16  burden, which it's their burden -- although it's not a

17  reasonable doubt standard, it's a preponderance of the evidence

18  standard -- to prove that he presently does not have this

19  ability to assist counsel in his defense.

20          Now, what are they talking about in terms of rational

21  understanding?  What does *Dusky* standard say of rational

22  understanding?  I have many clients, your Honor, who I can say

23  rationally should not have gone to trial.  I'm certain their

24  office will attest to that and maybe even, your Honor, might be

25  able to attest to that.  I have many clients who I can say it

1  was an irrational decision for them to take the stand when they

2  had numerous convictions that were going to come out against

3  them.  I have many clients who make irrational decisions, in my

4  opinion.  That does not make them incompetent.

5          Now, for us to sit here and say, for instance, someone

6  who has a political or religious cause that is far from our

7  beliefs, that contradicts our beliefs, is -- does not meet this

8  standard of competency is basically putting a standard on

9  someone's constitutional right to testify, constitutional right

10 to go to trial, constitutional right to put on a defense.

11         It was in -- there was a case that I was able to pull,

12 *United States v. Birdsell*.  It's a Fifth Circuit case,

13 775 F.2d 645.  It's a 1985 case.  It's still -- I believe it's

14 still good law for the proposition that Mr. Birdsell was

15 someone who asserted that he was the reincarnation of

16 Confederate General Nathan Bedford Forrest born in 1821, First

17 Imperial Wizard of the Ku Klux Klan.  Birdsell allegedly

18 commits his criminal activity because he is under the

19 instruction to forge for the cause and that he would return to

20 earth after he died as someone else.

21         The court found that Mr. Birdsell was mentally

22 competent.  I don't think that was an endorsement of any of his

23 ideas.  The court found, even though psychologists on both

24 sides had found that Mr. Birdsell was suffering from a

25 personality disorder of a paranoid type, that he was

1 incompetent.

2       Dr. Buigas testified, basically, that he's reached his
3 conclusion because of Mr. -- the way that Mr. Christopher has
4 looked at whether or not he should raise a defense and how he
5 should weigh that, his conclusions about Mr. -- how
6 Mr. Christopher has taken into account, for instance, that he
7 thinks that he's special and that he might be able to convince
8 others that he's special.  Well, that's part of his faith.
9 That's part of his belief.  That's certainly not something that
10 I don't think you or I or Ms. Wall would agree with.  It
11 certainly doesn't seem to be a good decision.

12       But he's also testified extensively that he
13 understands in the secular world that people are not going to
14 accept this message, very few people are going to accept this
15 message, or that he has to hope that they will, but he knows
16 that there's a likelihood that they won't.

17       In fact, it was brought out that Mr. Christopher
18 himself indicated to counsel that he did not think that he
19 understood what the government had to prove and he understood
20 what a legal defense would be -- what his legal defenses were
21 available at trial and that he did not think that those would
22 work.  He did not in any way say *We want to entertain a -- the*
23 *court to entertain a guilty plea and go home,* that he was going
24 to go home.  In fact, he volunteered himself on the stand in
25 his testimony, *I would like to go home, but*, and then he went

on to explain what his cause was and that weighing the
consequences and weighing what was at stake with his beliefs
and getting this message out, that he has weighed it and he has
found that he still wants to go forward and say these things,
but that he would enter a guilty plea.  If he had a choice, he
probably would enter a guilty plea.

I don't bring that up to suggest to the court that
that issue is before the court.  I bring it up to show that
Mr. Christopher, obviously, has the ability to weigh these
options.  He's articulated better than many clients I've had
who have entered guilty pleas and who have gone to trial.  He
knows the gravity of a trial.  He understands what he -- what
his motives are.  He understands what the court's business is.
He understands that there's rules and if he breaks those rules,
there are consequences.

Consequently, your Honor, I just think that the
government has failed in this aspect to show this.  I don't
know that he -- he doesn't have any expectations that he is --
that any of these decisions are going to allow him to go home.
He knows also that if he were to be found not guilty by reason
of insanity, although that may look better on his record, that
doesn't mean that he goes home either.

So, you know, your Honor, I think despite a finding
that he has a -- he may be -- he's suffering from a mental
health defect, that the court has ample evidence from this

1   doctor's report to make that finding, with regard to whether or

2   not he's able to assist counsel, with regard to whether or not

3   he knows what's going on here, he knows what the court is

4   about, that's been established.

5          THE COURT:  Okay.  Rebuttal.

6          MS. WALL:  Judge, I think the government's position

7   would be different today if we had a doctor that said he was

8   competent, but we don't.  The expert witness said that he's not

9   competent to stand trial, and we feel like that the safest way

10  to proceed in this prosecution of the defendant for threats

11  made against the president is to restore him to competency and

12  then take up the issue of his prosecution at trial or the entry

13  of a guilty plea.  And that's the government's position.

14         THE COURT:  Okay.  I'll be in recess for about six

15  minutes.

16    (RECESS)

17         THE COURT:  You may be seated.  All right.  Before

18  this court is the issue of competency to stand trial.  The

19  government contends that the defendant is not competent to

20  stand trial and relies upon the testimony of a psychiatrist who

21  has examined the defendant and who has opined that the

22  defendant cannot understand the nature of these proceedings

23  sufficiently for the court to proceed to trial with the

24  defendant.  The defendant, through his counsel, quarrels with

25  this assessment.

 1          The examining psychiatrist acknowledges in his report

 2     that the defendant is capable of appreciating the procedural

 3     aspects of these proceedings; yet, the psychiatrist questions

 4     whether the defendant, because of his unusual religious views,

 5     will be able to assist his counsel at trial.

 6          Defendant proclaims that he is the Messiah, that God

 7     will destroy most of the earth in approximately three years and

 8     that all will perish except those who seek refuge in Australia

 9     under his godly rule.  So, then, one recognizes immediately

10     that the defendant's views are certainly astonishing.

11          He has offered testimony to support his beliefs by

12     resorting to historical references and also Biblical

13     references.  He seeks to persuade the court that his beliefs

14     are honestly felt.  The question here, though, is whether he is

15     competent to stand trial, to understand the charges against him

16     and the perils of punishment that could accompany a conviction

17     of the charges, to be able to assist his counsel at trial, that

18     is, to understand his counsel's advice and measure that advice

19     in the context of the potential consequences, to understand his

20     defense options.

21          The defendant has been to court before and has

22     suffered a conviction in a misdemeanor context.  He then has

23     some experience in court proceedings.  I have reviewed his

24     history in the judicial process and I do not see anywhere at

25     any point he has been held to be incompetent.  Instead, he

1    seems to have been adjudicated competent.

2         I have reviewed the facts of this matter, I have heard

3    from the defendant, both on direct examination and

4    cross-examination, I have asked a number of questions

5    concerning the defendant's belief, his notion that the world

6    would be destroyed, that most of it will; and while I have

7    noticed what I would perceive some inconsistencies in the

8    presentation, still, the court can't say that he doesn't

9    honestly hold these beliefs and the court certainly can't say

10   that he does not understand these proceedings.

11        He might not -- he might choose not to accept his

12   counsel's advice, but this court is persuaded that he

13   understands it.  He might risk penalty upon conviction, but

14   he's prepared to undergo that risk.  So then this court is

15   persuaded in the context of all that it's heard that the

16   defendant is competent to stand trial.  So then the court then

17   holds that he is competent to stand trial, and the court will

18   set a date for the trial.

19        Now, counsel, let's talk about a date for trial.  How

20   far in advance do you need to go to trial in this matter?  Or,

21   Mr. Jupiter, as you have indicated on more than one occasion,

22   will your client enter a plea of guilty?

23        MR. JUPITER:  Your Honor, in terms of setting a trial

24   date, I would ask for a trial date in September right after

25   Labor Day.  And that's simply because August is just a very

1  full month for me.  As far as I'm concerned, I'm ready to go to

2  trial at any time in this case.  Pretty much what we would

3  probably present at trial has already been presented.

4         If Mr. Christopher were to decide to go to trial, I

5  think he would probably want to waive the jury; but I can't --

6  I want to talk with him more about that.  And I want to talk to

7  him more about his present intent, which is to enter a plea of

8  guilty.  But, at any rate, the answer to your question is that

9  I would ask for a trial date in September, early -- close after

10  Labor Day break.

11         THE COURT:  Okay.

12         MR. JUPITER:  There was another question you had, your

13  Honor?

14         THE COURT:  No, that was it.

15         MR. JUPITER:  Okay.  Obviously, your Honor, I --

16         THE COURT:  So, then, Mr. Jupiter, should your client

17  elect to go to trial --

18         MR. JUPITER:  Yes, sir.

19         THE COURT:  -- then you would file the proper defense

20  motions with the court, that is, if he were to rely upon any

21  defense of insanity.

22         MR. JUPITER:  If he were, I certainly would do that.

23  As an officer of the court, I could probably provide something

24  to the court that states the court has to -- the court may make

25  that decision even without the defense filing that.  But I will

1   talk with him about that once more, as I have before.  But I

2   will talk with him about that once more if we intend to file.

3          And then if we do that, of course, then the

4   government -- I don't know if the government would seek another

5   evaluation and whether we would seek an independent evaluation.

6   So those things are not our present intent, your Honor.  I will

7   talk with Mr. Christopher again.  I do not anticipate that

8   happening.

9          But if the government wanted to ask the court to

10  consider doing it without our consent, then I suppose they

11  would just rely on Dr. Buigas' assessment unless the defense

12  tried to get another one.  We presently don't have the intent

13  to get another psychiatric evaluation, psychological

14  evaluation.

15         THE COURT:  Okay.  What says the government on the

16  trial date?

17         MS. WALL:  Your Honor, I do have a trial scheduled

18  September 3rd that's going to last about three weeks.  And

19  other than that, perhaps we should get with Mr. Jupiter and

20  consult with the court on a date agreeable in late September

21  perhaps or before that in August.

22         THE COURT:  Well, then, why don't you all confer and

23  then get back to me on a proposed trial date?

24         MR. JUPITER:  Yes, sir.

25         MS. WALL:  Yes, sir.

1          THE COURT:  All right.

2          MR. JUPITER:  Your Honor, can I raise the issue of

3    release?  Mr. Christopher, I think based on the testimony, his

4    demeanor and the initial detention decision was based on the

5    fact that the court was -- the magistrate judge was concerned

6    with his mental health assessment.  The court has seen that

7    report.  The court has --

8          THE COURT:  Well, Mr. Jupiter, let me stop you here,

9    Mr. Jupiter.

10          MR. JUPITER:  Yes, sir.

11          THE COURT:  You'll have to file that motion.

12          MR. JUPITER:  Okay.

13          THE COURT:  Give the government a fair chance to brief

14    the entire issue, because this presents other legal questions.

15          MR. JUPITER:  Okay.

16          THE COURT:  So, then, go ahead and file your motion.

17          MR. JUPITER:  Yes.

18          THE COURT:  And then when the motion is ripe, I will

19    schedule a hearing --

20          MR. JUPITER:  Okay.

21          THE COURT:  -- on release pending trial.

22          MR. JUPITER:  Okay.

23          THE COURT:  But I would take that up once the

24    government has made its response, because I would expect that

25    the government would have some different proof on that

```
 1   particular issue.

 2              MR. JUPITER:  Yes, sir.

 3              THE COURT:  So, then, I will wait and take that up

 4   once the record is completely framed.

 5              MR. JUPITER:  Yes, sir.

 6              THE COURT:  Okay.

 7              MR. JUPITER:  I'll do that.

 8              THE COURT:  And, Mr. Jupiter, submit to me a short

 9   order just indicating that the court denied the government's

10   motion.

11              MR. JUPITER:  Yes, sir.

12              THE COURT:  All right.  Anything else I need to take

13   up at this time?

14              MS. WALL:  Nothing from the government, your Honor.

15              THE COURT:  Mr. Jupiter?

16              MR. JUPITER:  No, your Honor.

17              THE COURT:  All right, then.  Then I will be back in

18   contact with you later on a trial date and/or a plea date, if

19   your client still wishes to enter a plea.

20              MR. JUPITER:  Yes, sir.

21              THE COURT:  I mean, I'm just repeating what you had

22   said earlier.  It's not binding upon you, by any stretch; but

23   if your client is going to plead, then we need not wait until

24   September.

25              MR. JUPITER:  Exactly.
```

1          THE COURT:  Okay.  All right.  Then you all can be

2    excused.

3        (HEARING ADJOURNED)

1                    CERTIFICATE OF REPORTER

2

3          I, MARY VIRGINIA "Gina" MORRIS, Official Court

4    Reporter, United States District Court, Southern District of

5    Mississippi, do hereby certify that the above and foregoing

6    pages contain a full, true and correct transcript of the

7    proceedings had in the aforenamed case at the time and

8    place indicated, which proceedings were recorded by me to

9    the best of my skill and ability.

10         I certify that the transcript fees and format

11   comply with those prescribed by the Court and Judicial

12   Conference of the United States.

13         This the 22nd day of January, 2010.

14

15                         s/ Gina Morris
                           _____
16                         U.S. DISTRICT COURT REPORTER

17

18

19

20

21

22

23

24

25