IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
JACKSON DIVISION


UNITED STATES OF AMERICA

VS.                          CRIMINAL NO. 3:09CR12HTW-JCS

STEVEN JOSEPH CHRISTOPHER




**SENTENCING HEARING**
***REDACTED TRANSCRIPT***




BEFORE THE HONORABLE HENRY T. WINGATE
UNITED STATES DISTRICT JUDGE
NOVEMBER 6TH, 2009
JACKSON, MISSISSIPPI



APPEARANCES:

FOR THE GOVERNMENT:   MS. MARY HELEN WALL

FOR THE DEFENDANT:   MR. OMODARE JUPITER




REPORTED BY:  MARY VIRGINIA "Gina" MORRIS, RMR, CRR
              Mississippi CSR #1253
_____

245 E. Capitol Street, Suite 103
Jackson, Mississippi  39201
(601) 965-4350

1                              TABLE OF CONTENTS

2

3     SHEILA E. ENRIGHT

4        Direct Examination By The Defendant:  ...............64

5     Sentencing  ........................................70

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              THE COURT:  You may be seated.  Call your case.
 2              MS. WALL:  Your Honor, this is United States of
 3   America v. Steven Joseph Christopher.  He is present today with
 4   his counsel for sentencing after having previously entered a
 5   plea of guilty.  It's docket number 3:09cr12.
 6              THE COURT:  All right.  First I need to address the
 7   officer of probation.  Have you met with the defendant?
 8              PROBATION OFFICER:  No, sir, your Honor, I have not.
 9   I had an interview scheduled and I went to the Madison County
10   jail and I was met by his attorney.  His attorney informed me
11   that he did not wish to speak to either his attorney or myself.
12              THE COURT:  All right.  Now, you said "he."  So are
13   you speaking of the attorney or Mr. Christopher who did not
14   want to speak with you?
15              PROBATION OFFICER:  When I say "he," the attorney.
16   The attorney informed me that Mr. Christopher would not --
17              THE COURT:  That's Mr. Jupiter?
18              PROBATION OFFICER:  Yes, sir, Mr. Jupiter.
19              THE COURT:  He told you that his client did not wish
20   to speak with you?
21              PROBATION OFFICER:  Or himself.  The client would not
22   speak with Mr. Jupiter or myself that day.
23              THE COURT:  Okay.  So with regard to the presentence
24   investigation report then, you, obviously, do not feel that
25   it's complete.
```

1          PROBATION OFFICER:  Well, I proceeded with -- in the

2     past, we've prepared the presentence report without the benefit

3     of an interview.  So that's the way I proceeded.

4          THE COURT:  Okay.

5          PROBATION OFFICER:  And I recommended no acceptance of

6     responsibility because I had not had an opportunity to speak

7     with the defendant.

8          THE COURT:  Okay.  And what about the other questions

9     that normally you ask a defendant, questions about finance,

10    family, those type questions?

11         PROBATION OFFICER:  Yes, sir.  I obtained information

12    that was included in the pretrial bond report and I also

13    reviewed medical history on the defendant to gain that

14    information.

15         THE COURT:  All right.  Now, I have read what you

16    submitted.

17         PROBATION OFFICER:  Yes, sir.

18         THE COURT:  But my question then is, were there other

19    matters that you needed to investigate?

20         PROBATION OFFICER:  There could be additional

21    information that could be included in the presentence report,

22    but I felt that I had enough to proceed.

23         THE COURT:  Okay.  And on his prior record.

24         PROBATION OFFICER:  Yes, sir.

25         THE COURT:  State to the record then what you found on

1    his prior record.

2            PROBATION OFFICER:  Yes, sir.  And that -- on the

3    prior record -- we don't need the defendant's input on prior

4    record.  I mean, we were able to gain that information from

5    probation offices in Wisconsin and in Illinois, and I'll refer

6    to that now.

7            THE COURT:  Just his convictions.

8            PROBATION OFFICER:  Yes, sir.  Your Honor, adult

9    criminal convictions, beginning in paragraph 31, the defendant

10   pled guilty, no contest, on July 7th, 2005, in Richland County,

11   Wisconsin, Circuit Court; and that was to knowingly violate a

12   domestic abuse order.  He was assigned one criminal history

13   point for that conviction.  Do you need me to go through the

14   details of the offense or just cite the convictions?

15           THE COURT:  I remember that.  I believe that matter

16   involved an altercation between him and his wife?

17           PROBATION OFFICER:  Yes, sir.

18           THE COURT:  Okay.

19           PROBATION OFFICER:  Paragraph 33 of the presentence

20   report, the defendant on July 7th, 2005, in the same court,

21   Richland County, Wisconsin, Circuit Court, he also pled guilt

22   to knowingly violate a domestic abuse order.  He was not

23   assigned a criminal history point for that.  It was not

24   separated by another arrest.  So he's only assigned one

25   criminal history point for the two convictions.

1              Paragraph 35, he was convicted of criminal trespass to

2      dwelling in Walworth County, Wisconsin, court.  He was

3      convicted on July 12th, 2005.  He was sentenced to one year

4      probation, 45 days jail, which was state, and a $250 fine plus

5      court costs.

6              Paragraph 37, one count of criminal damage to property

7      over $300.  Count 2, aggravated battery on a police officer.

8      That was in McHenry County, Illinois, Circuit Court.  And he

9      pled guilty on November 19th, 2007, to Counts 1 and 2, 24

10     months additional discharge, sentence of 100 days imprisonment,

11     $2,243 in restitution, and mental/medical treatment.  Also

12     Counts 3 through 8 were null prosed.  He was assigned two

13     criminal history points for those convictions.

14             Paragraph 39, that was operating an uninsured motor

15     vehicle, Count 1.  Count 2, improper turn at intersection.

16     That was in Circuit Court of McHenry County, Illinois.  Those

17     were traffic offenses without jail time and not more than a

18     year probation.  So he was not assigned any criminal history

19     point for that.

20             Paragraph 41, Count 1, mufflers.  And that was in

21     Second Circuit Court of Lake County, Illinois.  He pled guilty,

22     a sentence of 30 days supervision, a fine --

23             THE COURT:  Now, what was that again?

24             PROBATION OFFICER:  Sentence of 30 days supervision.

25             THE COURT:  And what was the crime?

1          PROBATION OFFICER:  Mufflers.  I have no details.

2    Maybe the muffler was too loud, like a noise ordinance.

3          THE COURT:  Okay.

4          PROBATION OFFICER:  No criminal history points were

5    assigned to that.  And that concludes his convictions.  So he

6    has a total of four criminal history points, which puts him in

7    category III.

8          THE COURT:  Okay.  Thank you very much.

9          PROBATION OFFICER:  Yes, sir.

10         THE COURT:  Mr. Jupiter, would you approach the

11   podium.

12         MR. JUPITER:  Yes, sir.

13      (COMPLIED WITH REQUEST)

14         THE COURT:  Mr. Jupiter, you are here with your

15   client?

16         MR. JUPITER:  I am, your Honor.

17         THE COURT:  All right.  And your client,

18   Mr. Christopher, is seated.  Good morning, Mr. Christopher.

19   But you can remain seated until I come back to you.  I'll come

20   back in just a few moments.  Okay.  Now, Mr. Jupiter, the

21   probation officer says that he was unable to meet with the

22   client.

23         MR. JUPITER:  That's correct.

24         THE COURT:  Because what you advised the probation

25   officer, that your client was not prepared to meet with either

1   you nor with the probation officer?

2          MR. JUPITER:  That was information that was given to

3   me by the personnel at Madison County jail on that date and

4   several days afterwards, several visits afterwards.

5          THE COURT:  So how many times did you go to the jail

6   to meet with your client?

7          MR. JUPITER:  Your Honor, I would have to say at

8   least -- you mean prior to that visit?  I believe that visit

9   was the first time he refused.

10         THE COURT:  Okay.

11         MR. JUPITER:  Or after that visit?

12         THE COURT:  After that.

13         MR. JUPITER:  I would say after that visit at least

14  five times, your Honor.

15         THE COURT:  And did he meet with you?

16         MR. JUPITER:  The only -- just previously, two days

17  ago, he met with me briefly just for the purpose of giving me

18  a -- two more drawings.

19         THE COURT:  Okay.

20         MR. JUPITER:  But he did not wish to discuss the

21  presentence report.  He did not wish to discuss any of these

22  matters.  He didn't want to talk with counsel other than to --

23  other to give that to me and to tell -- to give me some other

24  information that really was not relevant to sentencing.

25         THE COURT:  Okay.  But on this matter of sentencing

```
 1   and the presentence investigation report, you are aware that
 2   since the probation officer did not meet with your client, that
 3   the probation officer now has not recommended any points for
 4   acceptance of responsibility.
 5            MR. JUPITER:  I am aware of that.
 6            THE COURT:  And you have communicated that to your
 7   client.
 8            MR. JUPITER:  Your Honor, I did send a letter to my
 9   client advising that -- before the presentence report was
10   issued I sent him a letter advising that this is a possible
11   consequence.  But I don't know whether he received that letter
12   or not.
13            THE COURT:  Okay.  And on -- well, let's see.  I'll
14   address this later.  Mr. Christopher, can you join us now at
15   the podium?
16            THE DEFENDANT:  Sure.
17            THE COURT:  Yeah.  Go ahead.
18            THE DEFENDANT:  What would you like to know,
19   Mr. Wingate?  Is this on?
20            THE COURT:  I want you to join us at the podium first,
21   Mr. Christopher.
22            THE DEFENDANT:  I don't think this is on.  Can
23   somebody turn this microphone on, please?
24            THE COURT:  No, no.  I need you at the podium.
25            THE DEFENDANT:  No, I'll sit here.  I'm fine.
```

1              THE COURT:  No, I want you at the podium.

2              THE DEFENDANT:  But I want to sit here.

3              THE COURT:  Guards, put him at the podium.

4       (COMPLIED WITH REQUEST)

5              DEPUTY MARSHAL:  Stand up at the podium.

6              THE DEFENDANT:  First -- okay.  I will stand up at the

7    podium.  However, I would like to get my drawings and bring

8    them back to the podium if you don't mind.

9              THE COURT:  You need your drawings?

10      (DOCUMENTS TENDERED TO DEFENDANT)

11             THE DEFENDANT:  Thank you.  Appreciate that.  Thank

12   you very much.  You're very strong.

13             What would you like to know, Mr. Wingate?

14             THE COURT:  First of all, did you refuse to meet with

15   the probation officer?

16             THE DEFENDANT:  I refused to meet with the probation

17   officer and I refused to meet with Mr. Jupiter.  Yes.

18             THE COURT:  Okay.  And do you understand the

19   consequences of such?

20             THE DEFENDANT:  I understand within your jurisdiction

21   the consequences of not accepting responsibility.  However, I

22   have a -- I verbally accept responsibility right now, that I

23   did commit a -- this frivolous crime of an empty-worded threat

24   against the president of the United States.  And, to me, it's

25   just utterly ridiculous to the extent that you want to carry

1   this out to.

2          Actually, this is a prophetic fulfillment if you don't

3   realize that.  You're aware of the Book of Isaiah, aren't you,

4   Mr. Wingate?  You told me that you read the Essene Scrolls.

5          THE COURT:  Well, you know, you lost last time we were

6   discussing these matters.

7          THE DEFENDANT:  I'm sorry?

8          THE COURT:  I had hoped you had educated yourself

9   since then.

10          THE DEFENDANT:  What?

11          THE COURT:  But we'll discuss these matters in turn

12   that I wish to discuss.

13          THE DEFENDANT:  Okay.

14          THE COURT:  And so then you answer my questions.  And

15   later on if you wish to get into another theological

16   discussion, maybe we'll do that.

17          THE DEFENDANT:  Sure.  No problem.

18          THE COURT:  But let's start off with the matters that

19   concern me.

20          THE DEFENDANT:  Okay.

21          THE COURT:  First of all, you understand, then, the

22   gravity of not meeting with the probation officer.  And I'm

23   asking if you do and if you wish to meet with the probation

24   officer, then I'll consider that.  Do you wish to meet with the

25   probation officer?

1          THE DEFENDANT:  I don't mind meeting with him.  That's

2     fine.  I can meet with him.

3          THE COURT:  Okay.  And do you understand, then, the

4     probation will have questions for you that will be important on

5     this presentence report?

6          THE DEFENDANT:  To you maybe and to him it's

7     important.  To me it doesn't seem that important.  But, yeah, I

8     understand from your viewpoint it seems important.

9          THE COURT:  You don't care about the potential

10    sentence?

11         THE DEFENDANT:  I care about bringing peace to the

12    earth.  I care about bringing -- freeing the oppressed.  I care

13    about children of the world that are dying of hunger.  And I

14    care enough to rise above and do what it takes to sacrifice my

15    life and my freedom to bring them to justice.

16         THE COURT:  So back to meeting with the probation

17    officer, would you like to meet with the probation officer this

18    morning?

19         THE DEFENDANT:  Sure.

20         THE COURT:  Okay.  Then, Mr. Christopher, I'm going to

21    allow you to meet with the probation officer with the presence

22    of guards.  And the probation officer will have questions for

23    you.  You have a right to have your attorney present with you

24    during this session.  And if your lawyer feels that any

25    question asked of you would incriminate you on some other

```
 1   matters, then he can appropriately object to the question and
 2   then advise you whether you should answer the question or not.
 3           So I'm going to allow you to have that session with
 4   the probation officer.  And then once that's finished, then
 5   I'll resume this sentencing hearing.  And at that point I will
 6   be in the position to know whether you have accepted
 7   responsibility and whether there are any other matters of which
 8   I need be aware.  Now, I have received the letters,
 9   Mr. Christopher --
10           THE DEFENDANT:  I'm glad.
11           THE COURT:  -- and we're going to discuss your letters
12   later on.
13           THE DEFENDANT:  Okay.
14           THE COURT:  And in one of those letters you state that
15   at some point that everyone, including the court, then should
16   recognize the legitimacy of your claim that you are who you say
17   you are and accord you the respect and prayerful adoration that
18   you say you deserve.
19           But in conducting yourself this morning,
20   Mr. Christopher, I would hope that your conduct does not
21   approach the same conduct I saw on the YouTube, which you
22   admitted last time would not have been appropriate for someone
23   who is laying claim to a godhood nature.
24           THE DEFENDANT:  I want to caution you to just use a
25   lot of discernment with what you saw on YouTube, because I was
```

```
 1    speaking to a specific audience.

 2              THE COURT:  Oh, I understand.

 3              THE DEFENDANT:  And I would not speak to you the same

 4    way I spoke to some of these people that I've been speaking to

 5    on the Internet.  So I hope that you have enough discernment

 6    and understanding, enough intuition to see that I am actually a

 7    very gentle person.  I'm a gentle man.

 8              You saw me testify here back in July, and I told

 9    you -- I've told you my viewpoint, my cosmological viewpoints.

10    I told you my eschatological viewpoints of the end of the

11    world.  And I made sense.  I was lucid.  I wasn't crazy.  To

12    me, it seems like people who want to label me crazy, that just

13    shows me their lack of intellect, their lack of intuition --

14              THE COURT:  You forget, Mr. --

15              THE DEFENDANT:  -- their lack of perception.

16              THE COURT:  Mr. Christopher, you forget I denied the

17    government's motion.

18              THE DEFENDANT:  I'm sorry?

19              THE COURT:  You forget I denied the government's

20    motion where the government was asking for that and I found

21    that you were competent to go forward.

22              THE DEFENDANT:  I understand that.  But I'm just

23    saying -- you're pointing out that my YouTube videos show maybe

24    a derogatory act of conduct, and I agree with you.  However,

25    I'm trying to explain to you that my target audience -- maybe
```

```
 1   you're not too aware of what goes on in Internet forums, but
 2   there's a lot of bickering, a lot of backstabbing, a lot of
 3   back and forth and a lot of derogative conduct.  And a lot of
 4   those YouTube videos were an answer -- were in answer to some
 5   of these questions, some of these negative questions I had --
 6   that I had to -- I felt I had to retaliate toward.  And it does
 7   not reflect upon my true character, which is kind and gentle
 8   and compassionate.
 9           THE COURT:  Okay.  Well, then, I'm asking that you
10   exhibit that true character of kindness and gentleness when you
11   talk to the probation officer and afford the probation officer
12   the background information I need to complete --
13           THE DEFENDANT:  That's fine.
14           THE COURT:  -- your record in the presentence
15   investigation report.
16           THE DEFENDANT:  That's fine.
17           MR. JUPITER:  Your Honor --
18           THE COURT:  Yes.
19           MR. JUPITER:  -- I would object to that going forward.
20   Your Honor, I did file a motion.
21           THE COURT:  I saw your motion, but I'm going to
22   overrule the motion and --
23           THE DEFENDANT:  Can I be told what motion?  What was
24   that?
25           THE COURT:  You didn't show him the motion?
```

```
 1              THE DEFENDANT:  No.

 2              MR. JUPITER:  No, your Honor.

 3              THE COURT:  Okay.  He filed a motion to continue these

 4   proceedings.

 5              THE DEFENDANT:  To continue these proceedings?

 6              THE COURT:  Right, and to reopen proceedings.

 7              THE DEFENDANT:  Why?

 8              MR. JUPITER:  Your Honor, the motion was to review --

 9              THE COURT:  I know.

10              MR. JUPITER:  -- competency.

11              THE DEFENDANT:  Oh, review -- oh, he thinks I'm crazy.

12   Hey, Mr. Jupiter thinks I'm crazy.

13              THE COURT:  Well, hold it, Mr. Christopher.

14   Mr. Christopher.  That was just a motion to file.  Counsel has

15   to --

16              THE DEFENDANT:  See, I have two battles here.  I'm

17   battling against my attorney and I'm battling against the

18   prosecution.  This is really great here.

19              THE COURT:  Okay.  I have denied the motion.

20              THE DEFENDANT:  Thank you.  I appreciate that.

21              THE COURT:  And, Mr. Christopher, I'm going to now

22   allow you to talk to the probation officer.  My marshals, find

23   an appropriate space for the interview whereby you all will

24   also be present.  All right.  You can take him now.

25   Mr. Christopher, go with them.  And do you have all your
```

1  belongings?

2          THE DEFENDANT:  I have to get a few.  Can somebody

3  please pick up my papers and put a paperweight on them so they

4  don't blow away?

5     (RECESS)

6          THE COURT:  All right.  We're back on record.  The

7  defendant and his counsel are present in court as well as the

8  prosecution.  So now we'll proceed.  I turn first to the

9  probation officer.

10          PROBATION OFFICER:  Yes, sir.

11          THE COURT:  And, good sir, did you interview the

12  defendant?

13          PROBATION OFFICER:  Yes, sir.  I was able to interview

14  Mr. Christopher.

15          THE COURT:  And did you gain any information from him

16  which you have determined to include in the presentence

17  investigation report?

18          PROBATION OFFICER:  Yes, sir, I would.  I reviewed

19  section C of the presentence report, which is his personal

20  information.  We added very little to that, but I did verify

21  the information that I had already included in the presentence

22  report for Mr. Christopher.  And then we also went over

23  acceptance of responsibility, and I feel I can make a

24  recommendation to the court that he has accepted

25  responsibility.

1          THE COURT:  Okay.  Now, before we get to that, let's
2    go back to this matter on personal information.
3          PROBATION OFFICER:  Yes, sir.
4          THE COURT:  Now, later I want you to retype the
5    information that's contained in the presentence investigation
6    report, supplemented by your interview with him.  But you may
7    tell me orally now what new information that you have gleaned
8    from the defendant.
9          PROBATION OFFICER:  Yes, sir.
10          THE COURT:  Go ahead.  Just tell it to me.  Read it.
11          PROBATION OFFICER:  Just a few changes.  Paragraph 51
12    of the report, I verified that his wife that he married, maiden
13    name Janice Fagan, F-A-G-A-N, was her maiden name.  Verified
14    the ages of his children.  The only changes I made, his son
15    ████Christopher is age ██ and ██████ Christopher is age ██.
16          In paragraph 52 of the presentence report, there's
17    discussed the girlfriend Lena Lock that he was living with in
18    Brookhaven, Mississippi.  Discussed that they met online.
19    That's what brought him from Illinois to Mississippi.  He had
20    been living with her since approximately November 6th, 2008.
21    Mr. Christopher also advised me that Sheila Enright is also his
22    girlfriend.  She's from Arcadia, California.  He also met her
23    online.
24          And under Physical Condition, paragraph 54,
25    Mr. Christopher advised he was six foot one, and in the report

1   it states he weighed 250 pounds.  He said he had lost a lot of

2   weight being in the Madison County jail.  Said he weighed

3   approximately 220 pounds at this time.

4        I asked on his health condition.  He said he was

5   healthy except that he has a sore shoulder and sore neck.  He

6   described an incident to me that he had at the Madison County

7   jail approximately three weeks ago with the guards.  He advised

8   me that he had been -- during an altercation had been tasered

9   and pepper-sprayed.  I have no information to verify that.

10  That was the first that I had heard of that.

11       Under Mental and Emotional Health, which consists of

12  paragraphs 55, 56 and 57, he confirmed the information that was

13  in the report.  He disagrees with the diagnosis that he's

14  received from the various mental health institutions.  And he

15  advised me -- he disagrees with the diagnosis; therefore, he

16  doesn't take the medication.  That's why he is not taking his

17  medication.  He had no additional information to add to that

18  section of the report.

19       There was a change in paragraph 59 under Education and

20  Vocational Skills.  He verified the information in paragraph

21  59.  He added that he also took general courses at Harper

22  Community College prior to attending the University of Illinois

23  in Chicago.

24       Under paragraph 60, Employment Record, he added -- he

25  has been hired as a freelance artist for various businesses,

1    and he added a couple of more businesses that I could try to

2    verify that employment.  He added Legend Creative out of Lake

3    Zurich, Illinois.  He had worked there 2006, 2007.  The owner

4    was David Voitik, V-O-I-T-I-K.  And he also did freelance work

5    for Tukaiz Communications.  And that's spelled T-U-K-A-I-Z

6    Communications out of Franklin Park, Illinois.  Franklin Park

7    and Lake Zurich are both suburbs of Chicago.

8            I asked him to describe what kind of work he did as a

9    freelance artist.  He said he would do commercials, websites,

10   interactive media and CD-ROM-type work, but that's his

11   specialty as a graphic designer.  And those are the only

12   changes that I would make to the presentence report in that

13   section.

14           After we concluded that section we went to acceptance

15   of responsibility and talked about that.

16           THE COURT:  Okay.  Let's go to acceptance of

17   responsibility.

18           PROBATION OFFICER:  Mr. Christopher pled guilty to the

19   indictment.  He advised me that he had no intention to harm the

20   president; that it was -- he wanted to gain attention for his

21   cause and that's why he made the threat to the president.

22           He wasn't sure if the first threat which is named in

23   the indictment was January 11th.  He thought it may have been

24   the 12th, because there was a countdown to the inauguration.

25   So he thought that was eight days prior to the inauguration.

1    So he thought that would occur on the 20th.  So he actually

2    thought maybe this began on the 12th.  The indictment states

3    the 11th.

4           I asked him about the video that he posted on YouTube

5    entitled The Truth.  In that video there was also a threat made

6    to President Obama.  He advised me that that was posted to

7    YouTube before the threat in the chat room on alien-earth.org.

8    He advised that he made that threat on YouTube while he was in

9    Mississippi.  There was another threat.  There was a threat

10   again on the 15th in the chat room.  And then he was arrested

11   on the 16th by Secret Service.

12          I asked if there was a comment that he made in the

13   chat room asking other posters if someone could either

14   borrow -- if he could either borrow a gun or if they could

15   provide him a gun or give him a gun.  He said the gun comment

16   was an empty threat but his threat had to be believable to help

17   his cause, and that's why he made mention of a gun.

18          And, your Honor, he did not have an attorney during

19   the interview.  He refused to have his attorney present.  So I

20   proceeded without an attorney being there.  I asked him if

21   there were any threats against a female that appeared to be the

22   webmaster of alien-earth.org, and he did not want to make a

23   comment in regard to that.  So we left that alone.

24          He just wanted to add that he just -- that the threats

25   were not malicious.  He just wanted attention and he wanted

1    public recognition.

2            And I ended by asking him if he had a preference where

3    he'd like to be designated.  Most of his family still lives in

4    Illinois, siblings.  His parents live in Arizona.  He said he

5    does not care about any designation.  And at that point I

6    concluded the interview.  I asked if he had anything else to

7    add and he said he did not.

8            THE COURT:  All right.  Thank you.

9            PROBATION OFFICER:  Yes, sir.

10           THE COURT:  Let me turn to the government.  Any

11   objections to the original presentence investigation report or

12   the supplemental report provided orally by the probation

13   officer?

14           MS. WALL:  No, your Honor.

15           THE COURT:  I turn to Mr. Jupiter and ask you that

16   question.  Then I'm going to ask Mr. Christopher.

17           MR. JUPITER:  Your Honor, we submitted two objections

18   to the presentence report at the time the first one came out.

19   We -- I continue in those objections.  I certainly objected to

20   Mr. Christopher being interviewed based on what I observed as

21   that his mental health has deteriorated to the point where he's

22   incompetent.

23           THE DEFENDANT:  Objection.

24           MR. JUPITER:  And --

25           THE COURT:  All right, Mr. Christopher, just -- I'm

1  going to hear from you in just a moment.  Okay.  Go ahead,

2  counsel.

3          MR. JUPITER:  And his refusal to have -- not just

4  consider advice of counsel but to meet with counsel I think is

5  related -- is directly related.  And I've given the court what

6  I hope was in specific enough detail as to that deterioration

7  since the court has made a finding of -- made a finding of

8  competency.  So I don't think the court should allow him to

9  participate in this process in this state.

10          And I think that based on the -- all of the mental

11 health history we found as well as observations and as well as

12 what the court is observing now, that the best course of action

13 at this point would be the court to order him to the custody of

14 the Attorney General under 18 U.S.C. 4241 to restore

15 competency.

16          THE COURT:  Okay.  What are the objections that you

17 have to the presentence investigation report?

18          MR. JUPITER:  Well, one objection was acceptance of

19 responsibility.  And now -- so, actually, we withdraw the

20 objection because the probation officer has now stated that he

21 has accepted responsibility.

22          THE COURT:  And the second?

23          MR. JUPITER:  The second is based on the

24 considerations with regard to more than one threat.  And the

25 probation officer found that there was more than two threats.

```
 1            Now, first of all, I made that statement before
 2   Mr. Christopher made these statements to the probation officer,
 3   obviously, over objection of counsel.  But the probation
 4   officer in the first probation -- first presentence report only
 5   spoke to postings on the Internet.
 6            My recollection after counsel made the objection, he
 7   put in an addendum of an additional threat that was made on the
 8   video.  My recollection of that particular video -- I reviewed
 9   several videos, your Honor; and if it's the one I'm thinking
10   of, I think those are comments that are made about the threat.
11   I don't think comments that are made about a threat constitute
12   an additional threat.  And for those reasons I think that's
13   considered -- this is part of what he was doing to gain
14   publicity, gain attention.
15            THE DEFENDANT:  Got a point there.
16            MR. JUPITER:  So that I don't think that -- thank you,
17   Steven.  I don't think that there's any that makes an
18   additional threat.  So for purposes of the guidelines this was
19   all related to one threat and the -- for instance, the other
20   threats that the probation officer marks out in his first draft
21   he puts it in the classification of this is relevant -- that is
22   not part of relevant conduct.
23            So, similarly, we would say that those -- for those
24   reasons you don't get an enhancement for that.  And also you
25   can -- you get a reduction if it's not more -- if it was only
```

1    one single threat where none of the enhancements would apply.

2    So those were the objections we had.

3            THE COURT:  Okay.  Thank you.  Mr. Christopher, would

4    you please approach the podium and answer the same question.

5    Do you have any objections?

6            THE DEFENDANT:  Well, I got to admit that Mr. Jupiter

7    does have a point there.  It wasn't another threat concerning

8    the video, which was just remarking -- commenting on my threat

9    to Mr. Obama.  So, yes, I do not believe that it would be --

10   that would be appropriate or fair to rule that as a second

11   threat.  There was one threat made.

12           In regard to Mr. Jupiter feeling that my mental

13   health, my condition has deteriorated, I object to that

14   totally.  I'll give you the reason why I did not want to meet

15   with Mr. Jupiter in jail.  I told him this two days ago, on

16   Wednesday, as well.

17           I told him, *Every time I've met with you in the past,*

18   *Mr. Jupiter, that I would feel nauseated after speaking with*

19   *you; and it is because you don't believe in me.  You don't have*

20   *faith in me that I am the son of God and I am the Messiah.  And*

21   *because there's this conflict of interest there -- here, you*

22   *are saying that you represent me and, yet, you do not believe*

23   *in me.*

24           I view that as -- it's counter-current to my cause, my

25   belief here.  I'm here to project myself as the Messiah.  I am

1   here to tell the world.  This is all part of the plan, you

2   know.  Sometimes -- it's a crooked path sometimes to get to the

3   point where you need to get to to tell the world, to show the

4   world who you are.  And, sadly, sometimes you have to wear --

5   like I said in the letter, you have to wear a malevolent mask.

6   You have to masquerade yourself as this villanous person.  But

7   it's not at all who you are.

8          And so, anyway, Mr. Jupiter does not believe in me.

9   He stated that publicly back here in July.  He said, *I do not*

10  *believe in that Mr. Christopher is the Messiah*.  He said that

11  publicly.  You have that on record.  And he continues to

12  believe that and that's fine.  He can have those viewpoints.

13  But if he's going to represent me, no way.  No.

14         And so I would feel -- I would feel this nauseous

15  feeling after I would speak with him.  I'm like, I -- I love

16  myself enough to protect myself from speaking with this

17  gentleman who is supposed to be representing me.  And so now

18  for here he is to say that my condition -- my mental health

19  condition has deteriorated because I do not wish to speak with

20  him?  No.  I explained it.

21         Actually, on Wednesday he was very apologetic after I

22  explained to him why I wasn't meeting with him.  He said, *I'm*

23  *sorry.  I'm sorry*.  And then the conversation was very short

24  and he left the room.  And here I am today to find out to my

25  surprise that he's filed a motion again to question not only my

1    competency, but to question your ruling upon my competency.

2            Shame on you, Mr. Jupiter.  Shame on you.  Shame on

3    you.  I'm embarrassed to have you as my attorney.

4            THE COURT:  All right.  Now, so then that's the reason

5    why you didn't want him present when you met with the probation

6    officer?

7            THE DEFENDANT:  Today -- yeah, I -- I'm like I don't

8    want this person present when -- I really do not want him

9    representing me any further, because he has to get his act

10   together.  Either -- you know, I respect him as a person.  I

11   think he's a decent human being, but I think he's a little --

12   he's a little messed up.  Actually, I question his competency.

13           THE COURT:  Okay.  Now, then, to the original

14   presentence investigation report, do you have any objection to

15   that?

16           THE DEFENDANT:  No.

17           THE COURT:  Okay.

18           MR. JUPITER:  I don't think he's read it, your Honor.

19           THE COURT:  Did you read it?

20           THE DEFENDANT:  No, I didn't read the full report.

21   Okay.  I'll give you that.  Maybe I should read it first.

22           THE COURT:  Okay.  But you haven't read it at all?

23           THE DEFENDANT:  I'm sorry.  I didn't hear that.

24           THE COURT:  Did you read any parts of it?

25           THE DEFENDANT:  No, I didn't read any part of it at

1   all.

2          THE COURT:  Okay.  Now, I need to have you read it so

3   you can tell me whether you agree or disagree with any of it.

4          THE DEFENDANT:  Okay.  That's fine.

5          THE COURT:  Well, to do that I'm going to have to take

6   another recess.

7          THE DEFENDANT:  Okay.

8          THE COURT:  So, Mr. Jupiter, give him a copy of it.

9   It's now about 1:40.  We'll resume in one hour.  All right.

10  And by that time then he should have read the report and we'll

11  continue.  So we'll be in recess until then.

12         MR. JUPITER:  Will the court reconsider my motion?

13  Will the court conduct a review of --

14         THE COURT:  Not at this time.  All right.  One-hour

15  recess.

16    (NOON RECESS)

17         THE COURT:  You may be seated.  All right.  We're back

18  on record.  Mr. Christopher, did you have a chance to read the

19  presentence investigation report?

20         THE DEFENDANT:  Yes, I did.

21         THE COURT:  Do you have any objections to anything

22  contained within that report?

23         THE DEFENDANT:  Well, pretty much the same as

24  Mr. Jupiter was saying.  Well, we talked -- already talked

25  about the accepting responsibility, which we clarified about

1    that.  And I do object to what he objected about where the

2    prosecution said I made more than one threat.

3           Obviously, we talked about the YouTube video where I

4    think that anyone could clearly see that it was not a threat.

5    It was just stating that I made a threat.  It was just -- it

6    was not a threat.  And they also mentioned within that Alien

7    Earth threat -- they said there was another threat within that

8    threat.  Well, I think that's just kind of like frivolous,

9    because, I mean, it's -- I just viewed it as one threat.

10          And one of the other objections that Mr. Jupiter made

11   was that he felt like that I was -- even though you ruled me

12   mentally competent, he still felt that I was mentally

13   incompetent.  And so he felt like there should have been a

14   reduction there.  Honestly, I have to disagree with him because

15   I -- you know, I am competent.  So that's my analysis of that.

16          THE COURT:  Okay.  Government, what about the threat

17   matter?  One threat?  More than one threat?

18          MS. WALL:  The government agrees with probation that

19   there was more than one threat.

20          THE COURT:  And what's the basis for that?

21          MS. WALL:  The YouTube video was prior to the

22   January 11th posting; the government considers that a threat.

23   And the January 15th posting after the threat for which he was

24   arrested we believe constitutes at least three threats.

25          THE COURT:  Response from either side over here,

1   either one of you?

2        MR. JUPITER:  Your Honor, one thing I didn't mention

3   in my original objection was that I think the court should --

4   and it is in my written objection -- the court should only

5   consider conduct prior to the -- prior to the threat that's the

6   offense of conviction.

7        So the only -- I suppose the only thing under that

8   objection would be the postings -- no.  It would be the YouTube

9   video that they claim was before.  I quite frankly don't know.

10  I don't have any evidence that that supposedly occurred before.

11       At any rate, if that one was to be considered by the

12  court, I think the court should find -- make some findings as

13  to what was said in that video.  I don't have -- if it's the

14  video that I think they're talking about, I don't presently

15  have that one.  I didn't download all of the videos.

16       THE COURT:  Well, let me turn to probation.

17       PROBATION OFFICER:  Yes, sir.

18       THE COURT:  Can you address that?

19       PROBATION OFFICER:  Yes, sir.  I reviewed the video

20  titled The Truth.  And as I stated in my addendum, between the

21  1 minute 28 mark through the 1 minute 42 minute mark of the

22  video Mr. Christopher threatens to kill Barack Obama, Jewish

23  leaders and Vladimir Putin.  So I didn't have the exact date

24  the video was posted.  It didn't state that on the video.

25       THE DEFENDANT:  We played that video in court.  It was

1  stating that I made a threat, past tense.  And if you want to

2  see that video again, feel free.

3          PROBATION OFFICER:  May I add something?

4          THE COURT:  Go right ahead.

5          PROBATION OFFICER:  Mr. Jupiter and Mr. Christopher

6  have provided the court with their opinion of what is a threat,

7  whether it was multiple threats or one threat.  In my addendum

8  I cited applicable case law that's on point with this argument.

9          Seventh Circuit in 2004, *U.S. v. Fraser*, the court

10  held that the two-level increase for more than two threats were

11  applicable where the defendant made three separate telephone

12  call threats to the same person.  Three calls to the same

13  person, even though it's the same threat to the same person,

14  that it was made three different times, that counts as multiple

15  threats, as is the case here.

16          Additionally, in *U.S. v. Humphreys,* in the Eighth

17  Circuit, 2003, that defendant, Israel Humphreys, a/k/a Prophet

18  Israel, communicated threats to burn the president in an

19  Internet chat room, by fax to the White House, and in person to

20  three individuals at different times.  This defendant

21  communicated about the same threat in a chat room or a message

22  board and also on YouTube.

23          It's the same person, President Obama, he communicated

24  these threats on different dates and through different media.

25  So that's why we recommended the enhancement.

```
 1              THE DEFENDANT:  Like I said, the video is not a
 2   threat.
 3              THE COURT:  You say the video is what?
 4              THE DEFENDANT:  It's not a threat.  The video is not a
 5   threat.
 6              MR. JUPITER:  If I can address --
 7              THE COURT:  Well, let's see.  What he's saying is that
 8   the video was talking about a past threat.
 9              THE DEFENDANT:  Okay.
10              PROBATION OFFICER:  In my speaking with
11   Mr. Christopher, he advised me today that the video was posted
12   to YouTube prior to the January 11th or 12th threat and -- that
13   was made on alien-earth.org.
14              THE DEFENDANT:  I said I -- actually -- I said that
15   and then I corrected myself.  I said I wasn't sure if it was
16   after or before.  Isn't that correct?  Didn't I say that?
17              PROBATION OFFICER:  I'm not sure.  I thought that he
18   indicated --
19              THE COURT:  Go ahead.  Speak to me.  And,
20   Mr. Christopher, I'll let you talk to me in just a moment too.
21   Go right ahead.
22              PROBATION OFFICER:  I thought that he made the video
23   recording -- I thought he made the video prior to January 11th.
24   Even if he made the video after January 11th, I would still
25   recommend the increase.  If he made one threat on a chat room,
```

```
 1   had time to cool off, came back to it later and said, Maybe I
 2   said something I shouldn't have -- by his own admission, he
 3   made multiple threats to gain public attention.  And he did
 4   that.  He did that through the chat room; he did that through
 5   YouTube.  So our position, although it's to one person,
 6   President Obama, he made multiple threats.
 7            THE COURT:  Can we play it?  Can we play the YouTube?
 8            PROBATION OFFICER:  I don't have the DVD with me, but
 9   I'm sure we can find a way to play it.  Yes, sir.
10            THE COURT:  Okay.
11            MS. WALL:  I have a copy of the video with me, your
12   Honor.
13            THE COURT:  Can we put it on?
14      (DVD PLAYED)
15            MS. WALL:  Your Honor, that concludes the part that
16   probation was pointing out that we consider a threat prior to
17   January 11th.
18            THE COURT:  Okay.  To the defense, is there anything
19   more you'd like to hear on this tape?
20            MR. JUPITER:  There's nothing more I want to hear on
21   the tape.  No.
22            THE COURT:  Pardon?
23            MR. JUPITER:  No, your Honor, not on this tape.  No.
24            THE COURT:  To probation, is this the portion that you
25   referred to earlier?
```

```
 1              PROBATION OFFICER:  Yes, your Honor.  The 1:28 to 1:42
 2   mark of this video is what I referred to.
 3              THE COURT:  Okay.  And what you're referring to is the
 4   statement that he made threats against the president before?
 5              PROBATION OFFICER:  Yes, sir.  And he -- to the
 6   president and he also states to "Barack Obama."
 7              THE COURT:  I need you to raise your voice.
 8              PROBATION OFFICER:  Yes, sir.  He said "The
 9   President," and then he also -- he says threaten to kill the
10   president and he also states threaten to kill Barack Obama as
11   well.  He stated it twice.  He referred simply as "President,"
12   and then he also referred to "Barack Obama."
13              THE COURT:  Okay.  Twana.  I thought we were going
14   further in the tape.  Play it again.
15         (DVD PLAYED)
16              THE COURT:  Okay.  That's fine.  And the government's
17   position.
18              MS. WALL:  Your Honor, the government's position is
19   that that -- it's all in the delivery.  I mean, he's referring
20   to threats in the plural in that video.  This video, the
21   January 11th posting and then the January 15th posting all talk
22   about the threat to kill the president.
23              Additionally, your Honor, in the postings on the web
24   page he tickers off the days.  "Six days until my Presidential
25   assassination."  "Nine days until my Presidential
```

1    assassination."  Clearly, there's more than two threats made,

2    and we believe and support the position of probation on this

3    issue.

4              THE COURT:  Now, when he ticks off the dates --

5              MS. WALL:  Yes, sir.

6              THE COURT:  -- which tape is that on?

7              MS. WALL:  That is on the postings that were printed

8    off the Internet.

9              THE COURT:  And on what date did he do that?

10             MS. WALL:  On January 11th, the original posting for

11   the count of conviction, it has, "Okay.  We have six days until

12   my Presidential assassination."  Additionally, on 1/13 he says,

13   "We have eight days until my Presidential assassination."  On

14   1/14, "We have six days until my Presidential assassination."

15   And these are all postings where he is chatting in a chat room

16   on the Internet.  It wasn't a specific video posting, but it

17   was on the chat page, on the Internet alien-earth.org chat

18   room.

19             THE COURT:  The portion we just heard where he says "I

20   have threatened presidents" and then he names some people and

21   then among them he names Barack Obama.  Now, what was the date

22   that this is posted?

23             MS. WALL:  We have not been able to confirm from

24   YouTube when it was posted until his interview with Mr. Wright

25   this morning when he told Mr. Wright that he did post it prior

1    to the January 11th count of conviction.  That's how we have

2    the information of when, because we have not been able to

3    obtain from YouTube the exact date of this posting called The

4    Truth.

5              THE COURT:  He's indicted here for making a threat

6    against the president.

7              MS. WALL:  Yes, sir.

8              THE COURT:  So my question is, with regard to this

9    tape, when he mentions Barack Obama, was Barack Obama president

10   at the time that he says that he made a threat?  Because he

11   says, "I've threatened presidents," and then he named some

12   individuals, among whom is Barack Obama.

13             So my question, then, is, was that a threat then that

14   would be a lodge -- that should be construed as being lodged

15   against President Barack Obama as opposed to Senator Barack

16   Obama?

17             MS. WALL:  No, your Honor.  At that time he was the

18   president-elect.  So he was not the president on January 11th.

19             THE COURT:  I know.  And so, then, is he making a

20   threat at that time against the president?

21             MS. WALL:  I would say yes.

22             THE COURT:  On what basis?

23             MS. WALL:  That to him, in his mind, President Obama

24   was the president.  I don't think that he understood the

25   difference between president-elect and president.  And I think

1   that was his general assessment of Barack Obama's position at

2   the time.

3              THE COURT:  Probation.

4              PROBATION OFFICER:  I believe the indictment actually

5   refers to President-Elect Barack Obama.  And whether he did it

6   before January 11th or after January 11th, Mr. Christopher

7   advised me today that he arrived in Mississippi on

8   November 6th, 2008.  He advised me that he made this video and

9   posted it to YouTube after arriving to Mississippi.

10             So November 6th I would argue that the presidential

11  election I believe would have been completed by that time.  So

12  after November 6th Barack Obama was president-elect.  So

13  between that time period it would have been a threat against

14  President-Elect Byram Obama.

15             THE COURT:  Okay.  Thank you.  Mr. Jupiter, not only

16  that question but in addition I have one more question to you.

17  There was this -- there's this posting of a countdown wherein

18  your client made statements.  Why shouldn't all of those be

19  construed as multiple threats?

20             MR. JUPITER:  Well, first of all, your Honor, perhaps

21  we should look at that conduct, but that was not included in

22  the presentence report.  So I thought that we were only going

23  to deal with the things that were dealt with and that were

24  indicated in the presentence report, which the presentence

25  report -- the probation officer reported to support why the

1    enhancement should be applied.

2         He indicated in the original presentence report the

3    threat that's the offense of the conviction and the two

4    postings.  After we objected to it, then he indicated this

5    YouTube video, which I think clearly shows that's not a threat.

6    He's talking about his prophecy and how he's getting attention

7    to his prophecy and he's talking about things that he's done in

8    the past to get attention to his prophecy.

9         And then now when that's in doubt, the government is

10   bringing out -- we're dealing with yet -- something else that

11   wasn't brought up in the presentence report is these postings

12   on -- these other postings that were on YouTube, which I would

13   have suggested that -- if the government wanted to support

14   their bid for an enhancement, that that should have been

15   submitted by either the government or probation.

16        But even if those are submitted, your Honor, I don't

17   think that's -- I think they still relate to him talking about

18   one particular thing that he -- one particular threat that he

19   made, as he stated, in order to get attention to his cause.

20        I don't think talking about the fact -- you know, I

21   say, *I'm going to beat up Johnny.  I told Johnny I'm going to

22   beat him up*, and then I go around telling people, you know, *I

23   told Johnny I was trying to get attention from everyone when I

24   told Johnny I was going to beat him up*, I don't think every

25   time I say it -- under that scenario, your Honor, I suppose

1    even his testimony on the stand at his competency hearing would

2    then be considered a threat, because anytime he talks about,

3    you know -- you know, *There's truth to what I say because look*

4    *at other things I've done in the past.  Look at these other*

5    *things I've done in the past.*  So every time he talks about

6    this prophecy he has and tries to support it by showing things

7    that he's done in the past, well, then the court could very

8    well consider that another threat.

9           THE COURT:  No, no.  But I'm looking at it as an

10   admission that he's made threats.

11          MR. JUPITER:  Well, then, the problem with that is

12   that we're using -- we're using the defendant -- those

13   statements -- even the probation officer points out a number of

14   threats that are not considered part of relevant conduct.  So I

15   don't think we can just take those undated statements and

16   say -- and not -- quite frankly, I don't think we can use the

17   defendant's statements that he made with regard to that as

18   credible to show that it's part of relevant conduct.  Then are

19   we going to accept everything that the defendant has said as

20   true?  And I don't think that the court is prepared to do that.

21          THE COURT:  Okay.  Thank you very much.  Probation.

22          PROBATION OFFICER:  Yes, sir.  I'd like to --

23          THE COURT:  Speak a little louder.

24          PROBATION OFFICER:  I'd like to make a clarification.

25   Paragraph 14, page five, of the presentence report, the last

1    sentence of paragraph 14 I state, "According to the case agent,

2    Christopher had threatened the president-elect in at least one

3    of the YouTube videos."  So that was included in the original

4    presentence report.

5          When I had to defend the enhancement, at that point I

6    went back and was more specific with the actual minute mark of

7    the video.  But the YouTube video was referenced in the

8    original presentence report.  And, additionally, the

9    January 11th and the January 15th, threat was referenced in the

10   original presentence report.

11         THE COURT:  All right.  Thank you.

12         PROBATION OFFICER:  Yes, sir.

13         THE COURT:  The court finds that defendant made

14   multiple threats.  I base this on the following:  That on the

15   YouTube he says, "I've made threats against the president."

16   And while I don't construe that statement as a threat, I

17   construe it as an admission that he had made threats in the

18   past against the president.  Secondly, the countdown -- the

19   various countdowns should all be construed as separate threats.

20   So, therefore, I find multiple threats.

21         Now, Mr. Jupiter, you had some other objections.  The

22   objection that deals with the defendant's competence has

23   already been addressed by the court, and I do not intend to

24   review that.  So your motion for -- your supplemental motion or

25   your latest motion for the court to review the defendant's

1    competency is denied.  Any other motions that the defense has?

2          MR. JUPITER:  No, your Honor.  I would just point out

3    that the issue of competency remains from -- under 4241 from

4    the time the proceedings begin all the way through to

5    sentencing, so that -- and I -- certainly, we respect --

6    because that was our contention at that time, certainly, we

7    respect the court's prior ruling.

8          Nevertheless, the defendant has to be competent

9    throughout.  A finding of competency at one period certainly --

10   and I don't -- I'm not suggesting that the court is saying

11   that, but that's what our objection is.  We're not asking the

12   court to review its prior decision.  We're saying -- we're -- I

13   say "we."  It's not "we" because, obviously, the defendant

14   himself is not claiming this; I'm claiming it -- that the

15   defendant -- I think the court's -- at the time that the court

16   made its ruling I can clearly say the defendant met with me.

17   The defendant, although he would say some of these same things,

18   we demonstrated at the hearing that he was able to also engage

19   with counsel on legal concepts, on trial concepts, things that

20   he had to face, things -- all sorts of considerations.

21         THE COURT:  But, Mr. Jupiter, during that initial

22   representation, you had your difficulty with the defendant at

23   that time too.

24         MR. JUPITER:  As a matter of fact, your Honor, my

25   initial position was that he was incompetent when he first came

1    back.

2              THE COURT:  But, I mean, but -- I'm not talking about

3    that.  I'm talking about his statements at that time that he

4    did not want to be represented by you.

5              MR. JUPITER:  That was the -- when he initially -- the

6    initial hearing.  And, your Honor -- and based on -- and at

7    that time he refused to meet with me at the first.

8              THE COURT:  I know.  All I'm pointing out is that the

9    conduct now is similar to the conduct then with regard to his

10   desire for representation.  You recall that I counseled him to

11   meet with you, to hear what you had to say, because at one

12   point he said he did not want you representing him.

13             I was only -- I'm only mentioning that because the way

14   you're describing it now it's as though he had never refused to

15   meet with you before.  Whereas, he did refuse to meet with you

16   at one time.

17             Now, I'm not saying that because I made the ruling

18   earlier that I subscribe to the same ruling.  I'm saying that I

19   have no reason to change my mind.  Nothing has been presented

20   to me evidentiarywise to change my mind as to that earlier

21   ruling.  I'm certainly aware that competency is an issue to be

22   raised at any time, but I have no evidentiary pronouncements,

23   documents or anything else which convinces me that that ruling

24   was in error.  Accordingly, I still subscribe to that ruling.

25             Now, then, are there any other objections you have to

1   the presentence investigation report?

2          MR. JUPITER:  I believe I've stated them all, your

3   Honor.

4          THE COURT:  Okay.  Now, Mr. Christopher -- why don't

5   you stand right there, Mr. Jupiter, because I want

6   Mr. Christopher to come up to the podium too.  Mr. Christopher,

7   from time to time you have disagreed with your attorney.  And

8   since this is your case and your attorney speaks for you, but,

9   nevertheless, it is still, you know, your case, then I need to

10  ask you if you have any --

11          THE DEFENDANT:  Can you speak up, please?

12          THE COURT:  Do you hear me?

13          THE DEFENDANT:  I can't hear you that well.  Can you

14  speak up, please?

15          THE COURT:  Okay.  Do you have any objections to the

16  presentence investigation report?

17          THE DEFENDANT:  Like I -- well, I've already -- I

18  think I've already mentioned those.  We talked about them.  You

19  ruled that I've made multiple threats.  You know, to me,

20  it's -- it's more like protocol.  I mean, I view -- I'd like to

21  get more in -- I mean as far as the presentence report goes,

22  no, it's fine.  You can --

23          THE COURT:  Okay.

24          THE DEFENDANT:  It's fine.  I don't -- I'd rather talk

25  about more pertinent issues than the presentence report.

1          THE COURT:  Okay.  And maybe some of those issues

2    involve the letters that you submitted to the court.

3          THE DEFENDANT:  Yes, they do.  Yes.

4          THE COURT:  Okay.  Now, you submitted five letters

5    and --

6          THE DEFENDANT:  I have another one in my hand that you

7    haven't received that I'd like you to receive today, actually.

8          THE COURT:  Okay.  Well, I have five here --

9          THE DEFENDANT:  Yes.

10         THE COURT:  -- that I'm going to put into the record.

11   Now, Mr. Jupiter, have you seen those?

12         MR. JUPITER:  I believe I've seen all of them, your

13   Honor.

14         THE COURT:  Okay.  What about the government?  Has the

15   government seen them?

16         MS. WALL:  Your Honor, we have printed off the copies

17   that were on the Internet recently, the five or six that -- I'm

18   sure it's the same.

19         THE COURT:  Okay.  Now, I'll make these a part of the

20   record.

21         THE DEFENDANT:  I'd like to add one to those records.

22         THE COURT:  Okay.

23         THE DEFENDANT:  It's this one right here.  Actually,

24   I'd like to add more than one.

25         THE COURT:  Okay.  And then there are some matters --

1    right, some letters from the Internet which are different, and

2    I'm making these a part of the record also.

3              THE DEFENDANT:  Which letters from the Internet are

4    you talking about?

5              THE COURT:  Will the court security officer get the

6    latest one?

7         (DOCUMENT TENDERED TO THE COURT)

8              THE DEFENDANT:  I want to give you -- my initial

9    letter to you I mentioned that Mr. Jupiter had in his

10   possession sketches that I made, city schematics of the New

11   Jerusalem, which is upon the rock called Uluru in Australia.

12   And I asked him today which sketches he had given to you.  He

13   admitted that he gave you some, but he couldn't remember which

14   ones.

15             And so I would like to know which ones you have

16   received and -- because I would like to give you the ones that

17   you haven't seen.  And there's also some other sketches I would

18   like to give you to help you understand, to help you, quote,

19   see with spiritual eyes, which was the first sentence in my

20   letter to you.

21             THE COURT:  Mr. Jupiter, do you have a copy of those

22   that you gave to me?

23             MR. JUPITER:  No, your Honor.

24             THE COURT:  Okay.  Then, Mr. Christopher, why don't

25   you submit to me those that you'd like for me to see.

```
 1              THE DEFENDANT:  I would like to do that, yes.  Now,
 2  some of these I don't have copies of and they are originals
 3  and --
 4              THE COURT:  We'll make copies, Mr. Christopher.
 5              THE DEFENDANT:  Yeah, I'd appreciate that.
 6      (PAUSE)
 7              THE DEFENDANT:  Okay.  Some of them are in color, and
 8  I'd recommend that you do the ones that are in color, that you
 9  would see those as opposed to the black-and-white copies that
10  you make.
11      (DOCUMENT TENDERED TO THE COURT)
12              THE DEFENDANT:  A lot of them have to deal with my
13  understanding -- my cosmological understanding of the universe,
14  which is actually contrary to the conventional understanding of
15  the universe which man has adopted ever since Copernicus in the
16  1700's.  And -- because my understanding of the universe fits
17  the Biblical framework of the understanding of the universe and
18  it is scientifically backed and proven.  Even though it's very
19  unconventional and very unaccepted worldwide, it is accurate.
20              And because it is accurate, I can -- I can foresee how
21  the end of time in 2012, the Mayan cal- -- once I knew what the
22  Mayan calendar, fits a doom-day scenario where all the
23  countries of the world have to migrate to the continent of
24  Australia prior to December 22nd of 2012.  This is the main
25  crux of my reasoning behind all these malevolent masquerade
```

1    threats that I've been making.  It's because I need to get

2    people's attention.  And I was willing to sacrifice my freedom

3    in order to do that.  And even though it's very painful, I've

4    been through a lot of suffering these past ten months.

5              And I want you to understand, Mr. Wingate, my heart,

6    you know.  It's -- in my letter I addressed to you I mentioned

7    Psalm 2.  And if you're familiar with Psalm 2, it talks about

8    judges of the earth and it's admonition for them to kiss the

9    son.  And I'm telling you that I am the son.

10             And, now, a lot of people would not agree with that

11   because they expect some kind of heavenly descent of this son

12   of man coming down again to judge the world.  However, that has

13   not been an accurate description of the second coming of

14   Christ, even though scripturally it might point to that.  But

15   I'm trying to help you understand that.

16             A lot of aspects -- a lot of passages in scripture are

17   actually implanted in there as little white lies, I would call

18   them, from the heavenly Father.  And these little white lies

19   are geared to help humanity, help them motivate, one thing, to

20   keep a high ethical standard throughout the centuries.  2,000

21   years ago like, for instance, in Matthew 24, Jesus said, you

22   know, "Many shall come in my name.  Many shall call themselves

23   Christ."  Then he went on to give a detailed account and

24   detailed description of how it would look in the end times.

25             However, there's a disclaimer in that chapter, and

1    that's in verse 34 where it says, "Surely, verily, this

2    generation shall not pass until all these things be fulfilled."

3    Well, obviously, that generation passed a long time ago.  And

4    so why -- why would he go into this detailed accounts if it

5    wasn't accurate?  If you understand the heart of the Father,

6    the heart of the Father God, is there -- he uses little white

7    lies to motivate people, to keep a high ethical standard

8    throughout the centuries.

9          If he keeps his people, people that love God, people

10   that are called by his name to have this attitude of expectance

11   that he can come back at any time, he can come back within

12   their lifetime, they're going to behave.  And that's what you

13   see throughout scripture.

14         In the Book of Thessalonians the Apostle Paul he talks

15   about this rapture of the saints.  It's the same thing.  The

16   Apostle Paul, if you read that, you will see that he was

17   convinced in himself, in his lifetime, he said, "We which

18   remain shall be caught up together with the Lord in the air."

19   So he was fully convinced that he would be -- that the Lord

20   would return in his lifetime.

21         So I'm trying to help you understand that God uses

22   white lies in scripture.  And it's actually backed up that he

23   does lie in scripture.  If you read Isaiah, chapter 28, it

24   says, Precept shall be upon precept, line upon line, here a

25   little, there a little, that they may go and fall backwards,

1    and they've made lies their refuge.  So God actually admitted

2    that he put lies in scripture.

3          So -- but it's not -- not to confuse people, not to --

4    it's like a parental white lie, telling a child, *The boogie man*

5    *is going to get you* or, you know, some -- it's out of love and

6    it's the heart of the Father.  And I'm trying to express to you

7    I have the heart of the Father in this matter.  I have the

8    heart of Father God.  God loves humanity.

9          And he's using me as an instrument to help you

10   understand that.  I'm here.  I'm sacrificing my life.  I'm

11   sacrificing my freedom.  I have no malevolent intentions

12   whatsoever.  I've undergone severe trauma and pain in my life.

13         My marriage -- my wife was terribly abusive toward me

14   in my marriage.  Now, Mr. Wright mentioned that I have a past

15   criminal record for violating restraining orders against my

16   wife.  Well, there's another side of that coin.  And the other

17   side of that coin is my wife has serious psychological issues.

18   She's been involuntarily committed numerous occasions.

19         And prior to her filing any restraining orders against

20   me, I was the one who had to file a restraining order against

21   her.  You can verify that.  They're on record.  You can check

22   Cook County -- Lake County, Illinois.  You can -- yeah, Lake

23   County, Illinois, and McHenry County, Illinois.  I had to file

24   temporary restraining orders against her because she was

25   violent.  She's -- there was many a -- I mean, she would stab

1    me with knives.  I have stab wounds all over my body.  She

2    would pour boiling water over my head, terrible, vicious

3    things.  And I truly believe she was possessed.

4            And I lived with it day in day out in this marriage

5    for 15-plus years.  Initially, I didn't want her to get in

6    trouble.  So I would keep it a secret.  But, eventually, I had

7    to say something.  And at that point, you know, I had her

8    arrested a few times for domestic battery.  And over the years

9    I would file these restraining orders.  And that would only be

10   temporary because I had mercy, because I didn't want her

11   separated from her children.  I had mercy on her.  So I allowed

12   her back into the home again and again.  You know, there was at

13   least -- I believe there was three restraining orders that I

14   filed against her.

15           And it got a point in time where she started turning

16   things around.  She started getting vindictive on me, you know,

17   bitterness and anger.  So she started making up these --

18   conjugating lies about me.  And so she started turning around

19   and started filing them against me.  Yeah, I violated them

20   sometimes because I just -- I felt like they were bogus.  You

21   know, I just -- I just couldn't stand being away from my sons.

22           But I'm trying help you understand I'm not a -- I'm

23   not a mean -- I'm not a mean person.  I'm a good person.  And I

24   want -- I want you -- I've not -- I have not shared my heart

25   with many people, but I want you to see my heart.  Okay?  I

want you -- I wrote it in the letter because I think -- I
respect you, even though I don't call you by a flattering title
"Your Honor" because I don't believe -- I don't believe that I
should be doing that.  Biblically it's not right.

The prophet Elihu in the Book of Job, he says,
"Surely, I shall not give man flattering titles.  From the day
that I do so my Lord will take me away."  Judas even said do
not call one master, do not call one teacher or Lord or
whatever, for one is your master, even Christ.  All you are
brethren -- brothers.

So it's not that I don't respect you.  I'm trying to
help you understand who I am.  I am the Christ.  I am the
returned Christ.  And, yeah, you can view this by my actions
that I've made threats like this; but I'm asking you to look in
my heart just as -- just as God -- as God told Samuel that he
does not look at outward appearances, but he looks on the
heart, when he anointed David as king.  Samuel thought that
David's older brothers would be anointed.  But, no, God looks
in the inside.

And I'm sharing -- I'm asking you to look in my heart.
I'm not only asking you, I'm asking God to reveal my heart to
you, because I think you're -- I do think you are an honorable
man, and that's why I've called you and that's why I believe
that God has called you to anoint me, to kiss me on the head
and show the world that I have returned.  I've come in under

1  the radar, but I'm here.  I'm back.  I'm here to lead humanity

2  into prosperity and to peace.

3          THE COURT:  You know, Mr. Christopher, we talked about

4  this a bit last time, and you shared some of your views with

5  me.  And I asked you some of the questions that perplexed me.

6  I told you that your language on the YouTube was not exactly --

7  could not be exactly construed as Christian.

8          THE DEFENDANT:  Well, I understand that.  I'd like to

9  respond to that if you don't mind.

10          THE COURT:  And -- well, you know, there was some

11  bitter and some hard language.

12          THE DEFENDANT:  Sure it was.

13          THE COURT:  And curses.

14          THE DEFENDANT:  Uh-huh (indicating yes).

15          THE COURT:  And I ask you, how would that comport with

16  your position here?

17          THE DEFENDANT:  I'd like to respond to that.

18          THE COURT:  I'd like to hear it.

19          THE DEFENDANT:  Okay.  Well, I -- I perceive from you

20  that -- I mean, you've mentioned to me that you've read

21  scripture and the Essene Scrolls.  So it seems to me that

22  you're versed in spiritual matters.  Matthew, chapter 23, I

23  don't know if you've read that; but Jesus Christ, he goes in

24  and he's saying, "Woe to you Pharisees, you hypocrites, you

25  brutal vipers."

1          I want to ask you a hypothetical question.  Okay.

2    You're here as a federal judge.  So you have a position of

3    authority in this land.  Okay.  In Biblical times, maybe 2,000

4    years ago, imagine if you were one of the members of the

5    Sanhedrin in a Herodian temple and this figure, this person,

6    this beggar, whatever, this man from Nazareth comes in and he

7    starts -- he looks at these people exchanging money, taking --

8    you know, selling doves and pigeons and stuff in a temple which

9    is supposed to be holy and he starts picking up these tables

10   and throwing them all over the place and he's mad as hell.

11         Now, I'm not sure if you have an accurate

12   understanding of who Messiah is.  Messiah is a very dynamic

13   person.  When I say dynamic, I mean he can go from both ends of

14   the spectrum.  He can be as -- he can be a lion and he can be

15   fierce.  And where's that fierceness coming from?  It's coming

16   from the heart of the Father God because he has righteous anger

17   for oppression, for what he sees as something wrong in

18   humanity.  And the only way he can thwart that is by his

19   fierceness, the fierceness that comes out of his mouth and his

20   voice.

21         But it's a double-edged sword, because he can be a

22   lamb too where he's gentle.  He can speak tenderly to somebody

23   and have compassion on them and hug them and take them in.  I

24   wish I could give you a hug and I wish you could experience the

25   love of the Father that works through me.  I would like to do

1   that to you some day, because I want you to understand that I

2   exhibit -- I am the physical manifestation, I'm the image of

3   the invisible God.  God the Father is invisible, but I am here

4   as a man and as the son of God.  And I represent him.

5           And also if you look in the Old Testament, if you read

6   about God, God is mad sometimes.  And, yeah, I bet back in that

7   day some of these -- I bet -- I bet he used curse words too.  I

8   can guarantee that.  Not that it's -- not that I advocate it.

9   I think there's a time and place for it, though.  It's when

10  you're engaged in a verbal warfare with somebody and the only

11  way they're going to listen to you is if you respond fiercely.

12          I don't like it.  I don't like that at all.  I don't

13  want to threaten anybody else for the rest of my entire life.

14  But I felt like I had to do that in order to get to this

15  position, this -- it was a platform for me.  And I want you to

16  understand that.

17          THE COURT:  Okay.  Well, we talked about that last

18  time too.  And then these matters on the YouTube where you cry

19  out "Jew boy," you know, "we're coming to get you" --

20          THE DEFENDANT:  Uh-huh (indicating yes).

21          THE COURT:  -- that sounds like another threat.

22          THE DEFENDANT:  Sure, it does.

23          THE COURT:  And that "We're coming to get you," I said

24  that didn't sound very Christian either --

25          THE DEFENDANT:  Well, it's -- you know.  I'm -- like I

1   said before, my conduct, I don't think you can -- I mean, I

2   wouldn't consider it Christian either, no.  Christian conduct,

3   but I'm not necessarily Christian.  I am Christ.

4        And what I would also like to say to you is that a lot

5   of my statements against the Jews -- well, Jesus of Nazareth,

6   his followers considered him the king of the Jews.  So here I

7   am, I'm telling you I am the king of the Jews.  I'm the second

8   coming of Christ.  I am the king of the Jews.

9        And since I'm the king of the Jewish people, I have a

10   voice.  And I will speak my voice against them because I see

11   them committing atrocities, egregious atrocities, throughout

12   the world.  And they are a people that are called by my name.

13   So judgment begins with the house of the Israel first.  That's

14   scriptural.

15        So I don't like saying that stuff against Jews.  I

16   love everybody.  But they are a backslidden, stiff-necked

17   people.  They -- they were instrumental in crucifying Jesus

18   Christ of Nazareth.  Okay.  They didn't do it, but they

19   instigated the Roman authorities to crucify him.

20        Now, if you can understand that I claim to you, I'm

21   telling you I am the seed of Christ -- Isaiah, chapter 53, says

22   that Jesus will see his offspring.  I'm telling you I am of the

23   bloodline.  Now, we mentioned earlier when I was back here in

24   July, we talked briefly about Egyptian -- the gods of the

25   Egyptian lord Osiris and Horus --

1        THE COURT:  Yeah, we got into quite a bit --

2        THE DEFENDANT:  Yes, we did.

3        THE COURT:  -- last time you were here.

4        THE DEFENDANT:  We talked about how Horus was the son

5   of Osiris.  Well, if you understand anything about Horus, he

6   was like -- he was a prototype of Christ.  He was the son of

7   Horus (sic) and Isis.  And his main mission in his life was to

8   get vengeance over the death of his father, Osiris, which was

9   committed by Set, which was the brother of Osiris.

10       So here I am, I am -- I have come to -- in vengeance

11  of the death committed against my father, Jesus of Nazareth.

12  So, yeah, I'm mad.  I'm mad at Jews.  Yeah, you better believe

13  I'm mad at Jews.

14       THE COURT:  I'm not going to go back over those

15  various discussions that, quite frankly, I enjoyed some of

16  those discussions --

17       THE DEFENDANT:  I did too.

18       THE COURT:  -- to review some of the literature.

19       THE DEFENDANT:  I did too.

20       THE COURT:  But we're not going to go back over all of

21  it, but you mentioned Horus, who would have preceded Jesus

22  Christ by some 2,000 years and would have been considered to be

23  a predecessor of the circumstances that surrounded Jesus' birth

24  and death and that Horus was crucified and that he was cut into

25  33 parts and on the third day that those parts were reunited.

1          THE DEFENDANT:  There are 14 parts.

2          THE COURT:  13.

3          THE DEFENDANT:  13?

4          THE COURT:  There are 33.  I'm sorry.  33.

5          THE DEFENDANT:  Well, you said 33, I --

6          THE COURT:  33.

7          THE DEFENDANT:  No, I thought it was 14.  But,

8  anyway...

9          THE COURT:  33 parts.  And that it went back that he

10  then rose.  And there's an interesting book that I told you

11  about last time I asked you had you read.  It's called *The*

12  *World's Sixteen Known Crucified Saviors.*

13          THE DEFENDANT:  Yes, I've heard about that.

14          THE COURT:  Dion --

15          THE DEFENDANT:  Dionysus, I've heard of that too.

16          THE COURT:  Right.  And I said you might consider

17  looking at that.  I also asked you had you read some of the

18  books of the Apocrypha.  Those books were not included in the

19  Bible but are construed to be removed from the Bible, not

20  included, because they were not divinely inspired.

21          And I asked you had you read the antiquarian gospel of

22  Jesus Christ which says that Jesus was not crucified on the

23  cross.  And I asked you out of that because of something you

24  stated.  And then I asked you about the other books of the

25  Apocrypha, some I think 50 in all, all of which I have read,

1    which were not included in the Bible.  And then we talked about

2    some of the Biblical matters that are there.

3             THE DEFENDANT:  Yeah.

4             THE COURT:  So we had --

5             THE DEFENDANT:  Yeah, we had discussions.

6             THE COURT:  -- discussions on these matters.

7             THE DEFENDANT:  You know, I don't know where you stand

8    on that, whether or not Jesus Christ was crucified, but --

9             THE COURT:  Well, I wasn't trying to tell you where I

10   stood.

11            THE DEFENDANT:  Okay.

12            THE COURT:  I was just asking you about this stuff

13   that you mentioned and I asked you had you read some of

14   those --

15            THE DEFENDANT:  I read some of them, yeah.

16            THE COURT:  -- because of some of the views you took.

17   And so -- because some of the views you took, I said it reminds

18   me of some books I've read.

19            THE DEFENDANT:  Okay.

20            THE COURT:  And so then I just asked you had you

21   actually read those books or was this an idea you had

22   independently of anything that you might have read before.

23            Now, these pictures you've submitted to me, these

24   drawings.

25            THE DEFENDANT:  Yes, sir.

1          THE COURT:  All right.  Now, I've looked at them and

2  I -- I think -- I think I understand some of the drawings that

3  you have here.

4          THE DEFENDANT:  Okay.

5          THE COURT:  But by these drawings, you want me to see

6  what you visualize as the new city.

7          THE DEFENDANT:  As the new city, yes.  As the city of

8  God, yes, that will be constructed in Australia, yes.

9          THE COURT:  Okay.  Have you ever read St. Augustine?

10          THE DEFENDANT:  No.

11          THE COURT:  Okay.

12          THE DEFENDANT:  One of the pictures I showed you --

13          THE COURT:  Wait.  There's some writings by

14  St. Augustine on the new city of God.

15          THE DEFENDANT:  Is it really?

16          THE COURT:  And I just -- but I was looking at how you

17  have these constructed.  And is there any particular or special

18  construct you give to this drawing?

19          THE DEFENDANT:  Well, it's based off of sacred

20  geometry.  And the number nine is very, very, very relevant

21  within the foundational design of the city.  And that coincides

22  with the seal of the living God that I've designed.  I don't

23  know if you saw that --

24          THE COURT:  Yeah, in the left-hand corner.

25          THE DEFENDANT:  Well, no.  It's actually -- there's

1    another piece of paper.  That one is a very -- that's an older

2    version.

3                THE COURT:  But, I mean, I'm looking for the seal.

4    That's the seal, isn't it?

5                THE DEFENDANT:  Well, the current seal is dated

6    November 5th.  It's a piece of this picture with the hand on it

7    and there's a -- I'm holding it in my hand.  I'm hold a copy --

8                THE COURT:  Okay.  I saw it.

9                THE DEFENDANT:  Okay.  That is the seal of the living

10   God.  Now, a lot of people freak out about getting marked,

11   especially on the right hand or the forehead, because they

12   think it's the mark of the beast.  And I'm trying to help

13   people understand, educate people that actually, contrary to

14   that, scripture actually endorses for God's people to be sealed

15   or marked.

16               It mentions it in Psalm 37:37 to mark the perfect man.

17   Ezekiel in chapter 9, God tells him to mark God's people who

18   lament for Jerusalem.  Cain was marked for protection so he

19   wouldn't get murdered.  Talks about having a holy covenant in

20   Psalm 50 where God's people, the saints, to gather together,

21   those who make a covenant by sacrifice.

22               And especially in the Book of Revelation, chapter 14,

23   it talks about the seal of the living God.  And the seal is

24   based off of scripture, of prophecy out of the book of Isaiah,

25   how it relates to me and how it relates also into the Book of

1    Revelation.  It talks about having -- in chapter 3 in

2    Revelation, it talks about having the name of the city of God,

3    which is Zion, having the name of God, which is living God

4    around the perimeter, and having my new name -- Jesus Christ

5    has a new name and his new name is Steven.  Steven means crown.

6             That's also parallelled in Isaiah, chapter 62, where

7    it says, "Thou shalt be a crown of glory and a diadem of beauty

8    in the hand of the Lord and thou shalt have a new name which

9    the Lord shall give you."  And so this is a fulfillment of this

10   word.  People in other -- this distinguishes God's people from

11   the rebellious people.  People have to wear a mark and it is to

12   be tattooed on the right palm or on their forehead.

13            And a lot of people freak out about that because they

14   think it's the mark of the beast.  And, actually, there's a lot

15   of aspects in scripture, especially in the Book of Revelation

16   where God actually tricks humanity to make them think that

17   something is evil when actually it is holy.  And a lot of

18   aspects are symbolically written to conversely apply to

19   matters.

20            And he talks about saving one third of humanity.

21   That's in the Book of Zechariah.  Well, actually, if you read

22   the Book of Revelation, it says one third of humanity will be

23   destroyed.  Well, which is it?  Is it one third destroyed or

24   one third saved?  That's something that you need discernment to

25   understand.

```
 1              I have a witness here.  Her name is Sheila E. Enright.
 2    Actually, she's part of the group of people that I've been
 3    submitting these letters to.  And she flew in here from
 4    California.  She's a real good friend of mine, and I would like
 5    her to speak on my behalf as well.
 6              THE COURT:  Okay.  Now, Mr. Jupiter, have you spoken
 7    with that witness?
 8              MR. JUPITER:  I have, your Honor.
 9              THE COURT:  Okay.  And do you have any objection to
10    her coming as a witness?
11              MR. JUPITER:  Well, your Honor, I'm just -- no, I
12    don't have an objection.
13              THE COURT:  Okay.  Then, ma'am, come forward and be
14    sworn.
15       (PAUSE)
16              THE DEFENDANT:  Well, in any event, I'm really -- you
17    know, my initial letter to you was an admonishment to instruct
18    you -- I mean Psalm 2 says to instruct the instructed judges of
19    the earth.  And, yeah, you can look at this case as a normal
20    case that some guy, he's making threats against a president,
21    he's making threats, you know, and he needs to be sentenced
22    and -- but I'm asking you to view me differently because I am
23    the son of God.
24              THE COURT:  Okay.  And so, then, you might help me
25    with your recommendation, then.  What do you think that the
```

1    sentence should be?

2            THE DEFENDANT:  My sentence should be?

3            THE COURT:  Yes.

4            THE DEFENDANT:  Well, I think I should be let go today

5    as soon as possible.  And I -- and not only let go, I want to

6    work with you to help build -- help build this city of God.  I

7    need people, people in governmental positions and authority, so

8    we can work together and we can all contribute in a peaceful

9    effort.

10           I want to meet with President Obama.  I want to talk

11   to him.  I want to tell him my heart.  I want to share with

12   him.  I want to -- I would ask to see him and to -- and so we

13   can all work together.  I'm the solution.  This is the solution

14   for humanity.  It's right here.

15           You've heard many prophecies about 2012 and how

16   they're coming into fruition.  Well, this is the answer.  And I

17   am in no way malevolent whatsoever.  I'm asking you to view

18   with spiritual eyes and to help see that I'm -- yeah, I've

19   undergone a lot of psychological traumas in my life -- well,

20   not a lot -- well, yeah, a lot with my wife.  And, yes, I've

21   been committed before.

22           But I'm asking you to understand that those were

23   temporal.  I'm speaking with lucidity.  I'm speaking clearly.

24   I'm not mentally ill.  And I believe Sheila can testify on that

25   matter as well.

```
 1              THE COURT:  Well, we're going to let her testify right
 2   now.
 3              THE DEFENDANT:  Okay.
 4              THE COURT:  So, then, come forward and be sworn.
 5       (WITNESS ADMINISTERED THE OATH)
 6              THE COURT:  Mr. Jupiter, you need to conduct the
 7   examination.
 8              MR. JUPITER:  Your Honor, I have no questions for the
 9   witness.
10              THE COURT:  Okay.  Mr. Christopher, what would you
11   like for her to speak about?
12                        SHEILA E. ENRIGHT,
13   having first been duly sworn, testified as follows:
14                        DIRECT EXAMINATION
15   BY THE DEFENDANT:
16   Q.  Well, let's just initially start out with, can you just
17   state your name, please.
18   A.  Sheila Enright.
19   Q.  And where are you from?
20   A.  Arcadia, California.
21   Q.  And how do you know me?
22   A.  I met you at godlikeproductions.com.
23   Q.  And can you just --
24   A.  Owned by Jason Lucas.
25   Q.  Okay.
```

A.   Alex Shamal and Sero Peturo (phonetic).

Q.   Okay.  And do you just want to describe anything about me,
whatever you want to say about me or --

A.   I find you very friendly with a big heart, gentle soul, a
good friend and a brother.

Q.   Thank you.  What is your understanding of my viewpoints
that I'm claiming that I am the Messiah, the son of God?

A.   I believe you're one of the Christ.

Q.   Okay.  That's fair enough.

A.   And I believe I'm your equivalent.

Q.   Okay.  That's fair enough too.  Actually, I -- my viewpoint
is very similar to yours in that respect.  Would you like to
say anything else as far as anything you've been thinking about
saying or --

A.   I'm here as a representative of your family and friends who
are concerned about you and to let this court know that you're
not a throwaway person that no one cares about, that you
have -- you wouldn't hurt a fly.  And we all know that.  We
have all experienced that.  We have all experienced your
friendliness.  We've seen your popularity on the Internet.

      The people that are against you are similarly against me.
So it's a very black, nefarious place to hang out.  And there
was a previous trial here that kind of demonstrated that too.
The Internet is a -- is a nefarious unknown that is just black
and white letters on the screen.  You do not know --

1  Q.   Yeah.

2  A.   -- who you're talking to unless, like you, you reach out

3  and say let's meet.  And so that is -- and so we eventually

4  met --

5  Q.   Right.

6  A.   -- through PM's at godlikeproductions.com.  And we -- I

7  flew to Chicago because my family lives in Michigan.  And I met

8  Steven and his family there, Pam.  He was staying at his

9  sister's, Pam's, house.  And I didn't get a chance to meet her.

10  And then I missed my flight to -- actually, it was my birthday.

11  Q.   May 20th, right.

12  A.   Yeah, May 20th.  And Steven took me to Sears Tower, and we

13  had a wonderful time.  And the next day I was supposed to be

14  with my mom.  So I missed my flight and he drove me over to my

15  mom's house in Michigan.  My mom met him.

16      She's a clinical psychologist.  And she gave me her view of

17  how, you know, Steven -- Steven's health, mental health, in her

18  expert opinion.  And I took that under consideration and

19  invited Steven to my house in California during the month of

20  June 2008.  And he stayed with me for approximately five weeks.

21  And then he went home 4th of July or 3rd of July, something

22  like that.

23  Q.   Just prior to that, yeah.

24  A.   And started living with his brother.  And --

25  Q.   How would you describe our time together in California?

1   A.   We went to a conspiracy conference in San Jose.   We went to

2   Mt. Shasta.   Let's see.   What else did we do?

3   Q.   Did we have fun?

4   A.   Oh, yeah, we had a lot of fun.

5   Q.   Okay.

6   A.   And when Steven left, that's when things kind of went

7   downhill.   He started interacting with the foreign

8   administrators at godlikeproductions.com.   I introduced him to

9   alien-earth.org.   There's actually only about four or five

10  people that post at alien-earth.org at any one particular time.

11  We don't know who bought the server or who runs the server.

12  It's some black box organization.

13      My phone calls are monitored.   My e-mails are monitored.

14  They know what I'm doing at all times and they tell me on -- in

15  threads.   I'm in contact with other people that know this, and

16  they are similarly monitored.   And they have filed field

17  reports with the FBI.   So I don't want to get into all these

18  other investigations of these websites.

19  Q.   Yeah.

20  A.   But they're correlated to the stress and the pressure they

21  put on Steven that made him actually go on the run across the

22  country to where he ended up here in Mississippi.   He's

23  actually on the run from these guys.   So --

24  Q.   Do you feel -- how easy would you -- I mean, once you're

25  engaged in this kind of --

1   A.   I fight them every day.

2   Q.   Yeah, it's kind of -- it's almost like it's -- they draw --

3   they drain energy from you and you have to actually resort to

4   these nefarious type --

5   A.   It's vampiristic.

6   Q.   Right.

7   A.   The environment is vampiristic.

8   Q.   Right.

9   A.   If you want to leave, they will pull you back in.

10  Q.   Right.

11  A.   So there are many -- what would I call it, addicts

12  similarly pulled in.  And I would admit that I would love to

13  get away from these websites, but as of yet I have not been

14  able to.

15  Q.   So you can understand maybe why I kind of -- my conduct in

16  some of my videos was directed to them in the manner it was, or

17  how you would respond to that?

18  A.   Well, I would never have approached it the way you

19  approached it.

20  Q.   Okay.

21  A.   But Jason Lucas is not a good character.

22  Q.   Okay.

23  A.   And that's why you have a lot of support.  And your video,

24  when you're saying "Jew boy," you're talking to Jason Lucas --

25  Q.   Right.

1    A.   -- who's a three-and-a-half-foot-tall midget who lives in

2    Florida.

3    Q.   Okay.

4    A.   Who I won't get into his stuff because it's none of my

5    business, but that's who he's talking to.  He's not talking to

6    Jews in general.  He's talking to Jason Lucas.

7    Q.   Okay.

8    A.   And Jason Lucas fought back.  He got scared because Steven

9    went down to Florida.  And so he posted Steven's criminal

10   record on his website.  Now, this website is very, very

11   popular.  Millions of people probably have seen it.  Thousands

12   of people see it every day.  When he did that, he posted a fake

13   record appended to Steven's real record --

14   Q.   That's right.

15   A.   -- totally breaking the law.  Well, I have that copied.

16   And because of that, I am getting -- I've been pressured not to

17   pursue that from him.  It's the same -- we all know about his

18   tactics of trying to instill fear.  I have gotten death

19   threats -- I've copied those on to my computer -- just for

20   saying that I was going to come here and talk about it.

21   Q.   Oh, really.

22   A.   Yes.

23   Q.   So you were pressured not to show up here today.

24   A.   There was a threat at alien-earth.org last week said,

25   "Where is Bryce?"  So they're wondering the where Bryce is.

1   Q.  Bryce is my son.  Is that who they meant?

2   A.  Yes.  How do they know he's missing?  I didn't know he's

3   missing.

4   Q.  I don't have -- see, that just grieves my heart because I

5   haven't spoken with my children in almost two years.  And for

6   them to say something like that freely --

7   A.  That's their tactics.

8   Q.  Yeah.

9          THE COURT:  All right.  Any cross-examination?

10         MS. WALL:  No, your Honor.

11         THE COURT:  All right.  Thank you so much.  Now let's

12  return to sentencing.  Probation.  Where is my probation

13  officer?

14     (PAUSE)

15         THE DEFENDANT:  Mr. Wingate, can I just ask you if you

16  could just postpone the sentencing until Monday?  I really want

17  you to contemplate and prayerfully think about your decision.

18  Could I ask you to do that?

19         THE COURT:  I'm going to go forward.

20         THE DEFENDANT:  Okay.

21     (PAUSE)

22         THE COURT:  I have to make a ruling on the matter of

23  acceptance of responsibility.  The originally submitted

24  presentence investigation report recommended to the court that

25  the court not provide any mitigation points for acceptance of

1    responsibility.

2          Since Mr. Christopher has now talked to the probation

3    officer during the recess and since he has now accepted

4    responsibility, then the court will amend the presentence

5    investigation report to indicate that he should be awarded two

6    points for acceptance of responsibility.

7          Now, since he is now provided points for acceptance of

8    responsibility, that now changes the guideline range.

9    Probation officer, what is the new guideline range now?  We

10   start off with a base offense level of 18?

11         PROBATION OFFICER:  Yes, sir.  Originally it was 20.

12   Being reduced by two points would reduce that down to 18.  With

13   a criminal history category of III, the guideline range of

14   imprisonment would be 33 to 41 months.

15         THE COURT:  33 to 41 months?

16         PROBATION OFFICER:  Yes, sir.

17         THE COURT:  And the supervised release range?

18         PROBATION OFFICER:  It would stay the same.

19         THE COURT:  Two to three years.

20         PROBATION OFFICER:  Yes, sir.

21         THE COURT:  And the fine range?

22         PROBATION OFFICER:  6,000 to 60,000.

23         THE COURT:  6,000 to 60,000?

24         PROBATION OFFICER:  Yes, sir.

25         THE COURT:  Thank you.

```
1              PROBATION OFFICER:  Yes, sir.

2              THE COURT:  I turn now to the government and ask, do

3    you agree with these calculations?

4              MS. WALL:  Yes, your Honor.

5              THE COURT:  To the defense, do you agree with these

6    calculations?

7              MR. JUPITER:  Your Honor, we agree with the

8    calculations, but request an additional point for acceptance of

9    responsibility.  Based on the fact that the government's --

10   technically, under the guidelines the government is -- it's

11   required to have a government motion.  The government's refusal

12   to grant a motion in this case is based on the defendant's

13   unwillingness to sign a plea agreement.  That's their policy.

14   They do not make a motion if you don't sign a plea agreement,

15   and that's because the defendant does not give up his right to

16   appeal.

17             We would submit that that policy is unconstitutional

18   and, therefore, the court should not honor that policy and

19   grant the -- grant an additional point, whether it be by

20   departure or otherwise, based on the constitutional concerns of

21   the defendant's rights to appeal sentences.

22             THE COURT:  Okay.  The court denies the motion.

23             MR. JUPITER:  Otherwise, the calculations are correct,

24   your Honor.

25             THE COURT:  Okay.  I believe I've heard allocution and
```

1    statements of counsel, unless, Mr. Jupiter, you have anything

2    else you'd like to say.

3             MR. JUPITER:  No, your Honor.

4             THE COURT:  And I've heard from the government.

5    Now --

6             MS. WALL:  Yes, your Honor.

7             THE COURT:  -- does the government --

8             MS. WALL:  There was --

9             THE COURT:  And did you tell me your recommendation?

10            MS. WALL:  Your Honor, the government recommends the

11   maximum sentence under the guidelines.

12            THE COURT:  Okay.  The court has considered the

13   advisory guidelines computations and the sentencing factors

14   under 18 U.S.C. Section 3553(a)(1) through (7).  It's the

15   judgment of the court that the defendant, Steven Joseph

16   Christopher, serve a term of 36 months imprisonment in the

17   custody of the United States Bureau of Prisons.

18            The term of imprisonment shall be followed immediately

19   by a two-year term of supervised release subject to the

20   standard and mandatory conditions as listed on the judgment

21   order in addition to the following special conditions.

22            A:  The defendant shall submit to and complete any

23   mental health treatment program as directed by the supervising

24   United States probation officer.  The defendant shall follow

25   the specific instructions concerning the requirements of the

1  treatment program as directed by both the treatment provider

2  and the supervising United States probation officer.

3          B:  The defendant shall submit to a search of his

4  person or property conducted in a reasonable manner at any time

5  by the supervising United States probation officer.

6          Due to the defendant's inability to pay a fine, the

7  court will not order a fine.  It is further ordered the

8  defendant pay a special assessment fee of $100 which is due

9  immediately.  The defendant is remanded to the United States

10 Marshal Service for service of his sentence and to await

11 designation of a prison facility.  Mr. Jupiter, do you

12 understand the sentence?

13         MR. JUPITER:  I do.

14         THE COURT:  Mr. Christopher, do you understand the

15 sentence?

16         THE DEFENDANT:  I understand what you're saying.

17         THE COURT:  Okay.  And to the government?

18         MS. WALL:  Yes, your Honor.

19         THE COURT:  All right, then.  That is the sentence of

20 the court.  And good luck to you, Mr. Christopher.  You all may

21 be excused.

22         MS. WALL:  Thank you, your Honor.

23         THE DEFENDANT:  May God have mercy on you.

24         THE COURT:  Thank you, Mr. Christopher.

25    (HEARING ADJOURNED)

```
 1                    CERTIFICATE OF REPORTER

 2

 3        I, MARY VIRGINIA "Gina" MORRIS, Official Court

 4   Reporter, United States District Court, Southern District of

 5   Mississippi, do hereby certify that the above and foregoing

 6   pages contain a full, true and correct transcript of the

 7   proceedings had in the aforenamed case at the time and

 8   place indicated, which proceedings were recorded by me to

 9   the best of my skill and ability.

10        I certify that the transcript fees and format

11   comply with those prescribed by the Court and Judicial

12   Conference of the United States.

13        This the 24th day of January, 2010.

14

15                    s/ Gina Morris
                      _____
16                    U.S. DISTRICT COURT REPORTER

17

18        I certify that the foregoing is a true and correct copy

19   of the transcript originally filed with the clerk of court on

20   1/25/2010, and incorporating redactions of personal identifiers

21   requested by the following attorney(s) of record, Omodare B.

22   Jupiter, in accordance with Judicial Conference policy.

23   Redacted characters appear as a black box in the transcript.

24                    s/ Gina Morris
                      _____
25                    UNITED STATES COURT REPORTER
```