UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
JACKSON DIVISION

UNITED STATES OF AMERICA

VS.                              CRIMINAL NO. 3:09CR12HTW-JCS

STEVEN JOSEPH CHRISTOPHER

SENTENCING AND DETENTION HEARING

BEFORE THE HONORABLE HENRY T. WINGATE
UNITED STATES DISTRICT JUDGE
AUGUST 28, 2009
JACKSON, MISSISSIPPI

APPEARANCES:

FOR THE GOVERNMENT:   MS. MARY HELEN WALL

FOR THE DEFENDANT:    MR. OMODARE JUPITER

REPORTED BY:  CHERIE GALLASPY BOND
Registered Merit Reporter
Mississippi CSR #1012

_____

245 E. Capitol Street, Room 120
Jackson, Mississippi  39201
(601) 965-4410

TABLE OF CONTENTS

WITNESS FOR THE DEFENDANT                          3

VICTOR CIUMMO                                      26

    Direct Examination By Mr. Jupiter   ........26

    Cross-Examination By Ms. Wall   ............32

1            THE COURT:  United States v. Christopher.

2            MS. WALL:  Yes, Your Honor.

3            THE COURT:  Is the government prepared to go forward?

4            MS. WALL:  Government is ready to proceed.

5            THE COURT:  Defense?

6            MR. JUPITER:  We are ready, Your Honor.

7            THE COURT:  Now, then, to the government, the purpose

8    of this hearing?

9            MS. WALL:  Your Honor, this is a change of plea of

10   guilty today to the charges of threats against the President of

11   the United States, and there is no plea agreement today between

12   the government and the defense.  This will be an open plea.

13           THE COURT:  Open plea.  All right.  Defense counsel,

14   do you agree this is an open plea?

15           MR. JUPITER:  I do, Your Honor.

16           THE COURT:  I need to swear in your client.

17           THE DEFENDANT:  I don't swear on the Bible.

18           THE COURT:  What about affirm?

19           THE DEFENDANT:  Affirm.

20           THE COURT:  Okay, then.  We will affirm you without

21   you having to place your hand on the Bible.  I believe you did

22   that last time.  I do that a lot of times.

23           (Defendant sworn through affirmation)

24           THE COURT:  Mr. Christopher, good morning again to

25   you.

1          THE DEFENDANT:  I'm sorry?

2          THE COURT:  Good morning.

3          THE DEFENDANT:  Good morning.

4          THE COURT:  You have affirmed to tell the truth, and

5    do you understand then that if you make false statements to the

6    court that you are liable for prosecution?

7          THE DEFENDANT:  Yes.

8          THE COURT:  And, of course, under the criminal charge

9    of perjury, you do understand what perjury is?

10          THE DEFENDANT:  I do.

11          THE COURT:  All right.  Now, Mr. Christopher, I

12   understand you wish to make an open plea?

13          THE DEFENDANT:  Yes.

14          THE COURT:  You understand what an open plea is?

15          THE DEFENDANT:  Yes, I do.

16          THE COURT:  How old are you?

17          THE DEFENDANT:  I'm 42.

18          THE COURT:  And your date of birth?

19          THE DEFENDANT:  December 31, 1966.

20          THE COURT:  And how much schooling have you had?  I

21   know with talked about this matter before so if I ask you a

22   question, Mr. Christopher, that seems as though you and I have

23   discussed this matter before, don't attribute it to some lack

24   of memory on my part.  But I have to make a record here which

25   is different from the one we made last time.  Okay?

1              THE DEFENDANT:  Okay.

2              THE COURT:  Now then, tell the record -- for the

3     record explain how much education you have.

4              THE DEFENDANT:  I have up to a bachelor's degree in

5     college at a four-year university at the University of Illinois

6     in Chicago, graphic design degree.

7              THE COURT:  I believe you worked in graphic design for

8     a period of time?

9              THE DEFENDANT:  Yes, for a lengthy period of time.

10             THE COURT:  All right.  Now, then, so you can read and

11    write?

12             THE DEFENDANT:  I'm sorry.  I didn't hear that.

13             THE COURT:  So then you can read and write?  Again

14    this is something I have to ask.

15             THE DEFENDANT:  Of course, I can, yes.

16             THE COURT:  We have someone who state on the record

17    that he or she has attended some institution, and then later in

18    some posttrial hearing we find out that nevertheless the person

19    can't read or write because the person stated falsely that he

20    had attended the institution, I'll have to come back and go

21    over this all again.  So even though these questions seem quite

22    simplistic to you in some regards, I still have to ask them.

23             Have you taken any drugs of any type, prescription

24    drugs or nonprescription drugs or consumed any alcoholic

25    beverages within the last 24 hours?

1          THE DEFENDANT:  No.

2          THE COURT:  Have you ever been treated by any doctor,

3   psychiatrist or psychologist or any hospital, clinic or mental

4   institution for any mental disease or disorder?

5          THE DEFENDANT:  Yes.

6          THE COURT:  And when were you treated?

7          THE DEFENDANT:  I was treated -- I was hospitalized on

8   three different occasions.  One was at the beginning of 2007, I

9   believe, for about one week.  Another one was, I think, in the

10  spring of 2007 for about one month, and then once was in the

11  spring of 2008 for about one month.

12         THE COURT:  On at least one of those occasions you

13  were involuntary hospitalized.  Is that correct?

14         THE DEFENDANT:  Yes.

15         THE COURT:  Is it just one?

16         THE DEFENDANT:  I was involuntary committed -- I guess

17  you call it involuntarily -- at least twice.

18         THE COURT:  Twice.  The third one, did you voluntarily

19  submit yourself?

20         THE DEFENDANT:  I may have to think about that.  The

21  third one, yes, I did voluntarily submit myself.

22         THE COURT:  Let's talk about that.  When you

23  voluntarily submit yourself, why did you do that?

24         THE DEFENDANT:  I just wanted an objective evaluation

25  of what was going on with me at the time.  This was the first

1  one actually, and so I just turned -- I asked a doctor to

2  review to make a determination about what I was going through

3  at that particular time.

4          THE COURT:  And what was the ultimate outcome?

5          THE DEFENDANT:  The outcome was that I was sent for

6  that one-week period of time to a mental health hospital, and

7  then I was released after one week with medication.  He

8  medicated me.

9          THE COURT:  Okay.  You said with no medications?

10          THE DEFENDANT:  With medication.

11          THE COURT:  What kind of medications?

12          THE DEFENDANT:  I believe at that time it was

13  Risperdal.

14          THE COURT:  What kind of prognosis did you receive?

15          THE DEFENDANT:  I don't remember the exact prognosis.

16  It was probably in the lines of bipolar or something like that.

17          THE COURT:  What about the other two occasions when

18  you were involuntary committed?  One time was the instance of

19  your wife.  Is that correct?

20          THE DEFENDANT:  My wife actually -- she asked to have

21  me committed, yes.

22          THE COURT:  How long did you stay at that time?

23          THE DEFENDANT:  I stayed one month.

24          THE COURT:  Was that your second commitment or your

25  third one?

1     THE DEFENDANT:  That was my second.  Actually she was

2  involved with the second and the third.  The third one she was

3  indirectly involved with that one as well.

4     THE COURT:  Then the third one was an involuntary

5  commitment, and I believe that at least one of those involved

6  some charge of domestic violence.

7     THE DEFENDANT:  Charge of domestic violence?

8     THE COURT:  Uh-huh.

9     THE DEFENDANT:  I don't believe that was the case.

10     THE COURT:  It was not some argument between you and

11  your wife that led to that?

12     THE DEFENDANT:  There was no domestic violence

13  incident that was reported, I don't believe.  We had -- I think

14  we had a disagreement but I don't think there was any --

15  actually a third one, yeah, she had failed a restraining order

16  against me.  She claimed I violated the restraining order.

17     THE COURT:  And the circumstances leading up to her

18  filing the restraining order, did she claim some violence?

19     THE DEFENDANT:  No, she claimed that I was mentally

20  affecting her but I was not violent toward her.

21     THE COURT:  Okay.  Now, then, were you provided

22  medications for these three different visitation?

23     THE DEFENDANT:  Yes.

24     THE COURT:  And are you still on any of those

25  medications?

1          THE DEFENDANT:  No.

2          THE COURT:  Have you since then started taking any

3    medication for any other problem?

4          THE DEFENDANT:  No.

5          THE COURT:  Okay.  So when is the last time you took

6    any of these psychiatric medications?

7          THE DEFENDANT:  It would be July of last year.

8          THE COURT:  And did you stop taking those medications

9    with the approval of the psychiatrist, psychologist involved in

10   your matters, the incarcerations?

11         THE DEFENDANT:  The last visit I had with a

12   psychiatrist, he said that you could eventually go off of

13   medication.  I don't remember his name, but he was with the

14   Alexian Brothers Mental Health Center in Arlington Heights,

15   Illinois.  At that time I was taking a medicine called Invega,

16   and it was a moderate to low dosage.

17         MR. JUPITER:  Can I ask Mr. Christopher something in

18   private, Your Honor?

19         THE COURT:  Yeah, go ahead.

20         (Short Pause)

21         MR. JUPITER:  Thank you, Your Honor.

22         THE COURT:  So then to answer my question, did he

23   recommend that you would go off the medication?

24         THE DEFENDANT:  No, he didn't recommend it.  I stopped

25   taking it.

1          THE COURT:  That was a decision that you made on your

2     own?

3          THE DEFENDANT:  Yes.

4          THE COURT:  Okay.  Now, in order to enter a plea of

5     guilty, you must be mentally competent, that is, you're able to

6     appreciate the seriousness of this hearing to your future.  You

7     must be able to consult with your attorney and to understand

8     his advice to you.  So under this definition of mental

9     competence, are you mentally competent this morning?

10          THE DEFENDANT:  Yes, I am.

11          THE COURT:  You also must have been mentally competent

12     on the date which is charged in the indictment.  The indictment

13     says that on or about January 11th, 2009, in Lincoln County in

14     the Jackson Division of the Southern District of Mississippi

15     that you uttered words threatening the President, threatening

16     the life of the President.  On the date which is here alleged,

17     were you able to know the difference between right and wrong on

18     the date which is alleged here, that date being on or about

19     January 11th, 2009?

20          THE DEFENDANT:  Yes, I was able to determine right

21     from wrong.

22          THE COURT:  Okay.  Now, to the defense counsel, do you

23     raise any objections concerning competence of your client?

24          MR. JUPITER:  No, Your Honor.

25          THE COURT:  To the prosecution, do you raise any

1   objections concerning competence?

2          MS. WALL:  Your Honor, as the court is aware, we've

3   had an extensive hearing on this issue, and the government

4   accepts the court's final ruling that the defendant is

5   competent.

6          THE COURT:  But at the hearing before this hearing,

7   the government took the position that the defendant here is not

8   competent to stand trial.  Is that correct?

9          MS. WALL:  Yes, Your Honor.

10          THE COURT:  And what about competence at the time of

11   the offense?  Did the government take a similar position with

12   regard to competence at the time of the offense?

13          MS. WALL:  Your Honor, I believe at that hearing the

14   doctor's report was admitted, and he did make that finding.

15   However, the ultimate issue at the previous hearing was whether

16   he was competent to proceed at trial or plea or otherwise.  I

17   don't think that that issue was what the government at the time

18   was raising.

19          THE COURT:  I know, which is why I'm asking the

20   question now.  Does the government object to the defendant's

21   contention that he's competent not only to stand trial but that

22   he was competent at the time that he allegedly made threats

23   against the life of President of the United States?  So what

24   about your view or the government's view as to whether he was

25   competent at that time?

```
 1              MS. WALL:  No objection to his competence at the time

 2     of the crime.

 3              THE COURT:  Okay then.  Thank you.  The court finds

 4     that no one has objected to the defendant's competence with

 5     regard to the date upon which he allegedly made a threat

 6     against the life of the President of the United States.  The

 7     government, however, quarrels with the defendant's contention

 8     that he is presently competent to stand trial.  On an earlier

 9     date, this court held a hearing on this matter and found the

10     defendant competent to stand trial.

11              So then at that time the court overruled the objection

12     by the government and the court shall proceed as it ruled at

13     that time finding the defendant competent to understand trial

14     and, since there's no objection, also competent at the time of

15     the alleged statement.

16              The law requires, Mr. Christopher, that you be

17     adequately and competently represented by your lawyer.  Have

18     you had enough time to discuss your case with your lawyer?

19              THE DEFENDANT:  Yes.

20              THE COURT:  Are you satisfied with the amount of time

21     he's spent with you and also with his advice to you?

22              THE DEFENDANT:  Yes.

23              THE COURT:  Now, if you are dissatisfied about his

24     representation, then you have to make that known to me and then

25     we'll address it further.  But if you are dissatisfied and you
```

1   failed to make any objection at this point, then I may consider

2   that whole matter waived in case you make something -- or make

3   some objection in the future.

4        Now, about the representation you received thus far,

5   so are you satisfied thus far with the representation made for

6   you by defense counsel?

7        THE DEFENDANT:  Yes.

8        THE COURT:  Now, let's talk about your actual rights.

9   I'm sure you understand those rights because at the last

10  hearing I went over many of these rights, and you indicated

11  that you understood them.  But this is a different hearing, and

12  I still must make a record that you understand these features

13  of a trial.

14       So do you understand that upon a plea of guilty -- a

15  plea of not guilty -- let me back up.  Do you understand that

16  you may enter a plea of guilty or plea of not guilty to the

17  charge?

18       THE DEFENDANT:  Yes.

19       THE COURT:  If you decide to plead guilty, then I

20  proceed with this hearing to determine your statements under

21  such a plea and then set a sentencing date.  Do you understand

22  that?

23       THE DEFENDANT:  Yes.

24       THE COURT:  If you were to plead not guilty, however,

25  then we would have a different procedure, you know, facing us.

1   You'll have a right to a trial.  I would call in members from

2   the community if you wish to have a jury trial.  Or you could

3   have a bench trial incidentally.  But if you wanted a jury

4   trial, then I would call in members of the community who then

5   would serve as the jury panel, and then there would be

6   questions from the court, from defense counsel, from the

7   prosecution, touching upon the qualifications of those persons

8   to serve as jurors.

9           And ultimately we'll select at least 12 persons who

10  would serve as jurors in this case.  I said at least 12 because

11  there would be 12 on the regular jury and alternates who might

12  be selected.  So then those persons would be selected to serve

13  as a jury.  Do you understand that?

14          THE DEFENDANT:  Yes.

15          THE COURT:  Do you further understand --

16          MR. JUPITER:  One second, Your Honor.

17     (Short Pause)

18          MR. JUPITER:  Thank you, Your Honor.

19          THE COURT:  Do you further understand,

20  Mr. Christopher, that the government would have to proves its

21  case against you, that you're not to prove anything?

22          THE DEFENDANT:  Yes, I do.

23          THE COURT:  And the government would have to prove its

24  case against you on this charge and will have to prove it

25  before the jury by proof beyond a reasonable doubt.

1          THE DEFENDANT:  Yes.

2          THE COURT:  And the government would have to call its

3    witness in open court in your presence.  Your lawyer would have

4    the right to cross-examine those persons.  Your lawyer would

5    have the right to challenge any exhibits offered by the

6    government and you would not have to submit any evidence

7    whatsoever.  Do you understand that?

8          THE DEFENDANT:  Yes.

9          THE COURT:  You may testify if you wish to do so such

10   as what you did last time you were here.  If you were to choose

11   to do so, your lawyer would talk to you at length before you

12   testified, and if you wish to testify at a trial on these

13   matters, you may do so.

14          And on the other hand, if you wish not to testify,

15   then it's your right not to testify and I will advise the jury

16   that the jury could not make any adverse findings against you

17   merely because you didn't testify.  And you understand that

18   too?

19          THE DEFENDANT:  Yes.

20          THE COURT:  You may call witnesses.  You may produce

21   exhibits.  And if so, the government may challenge those

22   witnesses and those exhibits.  Do you understand that too?

23          THE DEFENDANT:  Yes.

24          THE COURT:  If you plead guilty, we will not have a

25   trial.  And earlier you said you wished to plead guilty so then

1  we would not have a trial if you adhere to that determination.

2  And I then will discuss this matter with you on the matter of a

3  plea, and then it would not involve any aspects of a trial.

4       Furthermore, Mr. Christopher, if you admit that you

5  committed the offense in question, then you'll be giving up

6  your right not to incriminate yourself.  And by that, I mean

7  the Fifth Amendment, which allows a citizen the prerogative not

8  to incriminate him or herself in any criminal procedure by

9  making statements that are injurious to that person's welfare,

10 that is, under the criminal code.  Do you understand all of

11 that?

12       THE DEFENDANT:  Yes, I do.

13       THE COURT:  Do you still wish to enter a plea of

14 guilty.

15       THE DEFENDANT:  I sure do.

16       THE COURT:  Now, let's go to the plea.  You've read

17 the indictment, I know.  And again, Mr. Christopher, you

18 understand that I have to ask you the same question I might

19 have asked before, but this is a different proceeding, a

20 different record.  So you have read this charge against you?

21       THE DEFENDANT:  Yes.

22       THE COURT:  And you understand it?

23       THE DEFENDANT:  Yes.

24       THE COURT:  You are charged under Title 18, United

25 States Code, Section 871, which makes it a crime for anyone

1  knowingly and willfully to make a threat to injure, kill or

2  kidnap the President of the United States.

3          If you were to go to trial, the government would have

4  to prove certain things:

5          One, that you wrote the words alleged to be the threat

6  against the President elect as charged in the indictment.

7          Secondly, that you understood and meant the words

8  written as a threat.

9          And, thirdly, that you wrote the words knowingly and

10  willfully, that is, intending them, that is the words, to be

11  taken seriously.

12          A threat is a serious statement expressing an

13  intention to kill, kidnap or injure the President which under

14  the circumstances would cause apprehension in a reasonable

15  person as distinguished from words used as mere political

16  argument, idle talk, exaggeration, or something said in a

17  joking manner.  It is not necessary to prove that you, the

18  defendant, actually intended to carry out the threat.

19          Now, do you understand what the government would have

20  to prove if this matter were to go to trial?

21          THE DEFENDANT:  Yes, I do.

22          THE COURT:  The maximum sentence for this violation

23  would be not more than five years incarceration and a fine of

24  $250,000.  It would also involve a period of supervised release

25  of at least three years.  Now, do you understand what the

1    maximum sentence could be?

2            THE DEFENDANT:  Yes, I do.

3            THE COURT:  Supervised release means that you would

4    have to answer to the probation office under the guidelines

5    provided to the probation office for you to follow.  And if you

6    would violate any of those guidelines, then you could be

7    returned to prison if you had been ordered earlier to have a

8    prison sentence.  Or even if you didn't have a prison sentence,

9    the court could include that in the options of discipline that

10   the court would have before it.

11           So do you understand what supervised release is?

12           THE DEFENDANT:  Yes, I do.

13           THE COURT:  Now, I'll going to determine the factual

14   basis for your plea.  The Assistant U.S. Attorney should now

15   stand and detail for me the circumstances underlining this

16   offense.  Listen carefully, Mr. Christopher, because when she

17   finishes, I will ask you whether you agree with her.  Counsel.

18           MS. WALL:  Thank you, Your Honor.  On January 14th,

19   2009, special agents from the Secret Service were contacted by

20   an administrator of a Web site called www.alienearth.org.  On

21   January 11, 2009, the Web site posted the following.

22           If the court will please, I will delete the expletives

23   that are in this threat.  It is fairly short.

24           THE COURT:  I want you to read off what the words are

25   in the threat actually were.  We recognize it is not your

1    words; but since the government is charging that he issued a

2    threat worded a certain way, then I want the record to reflect

3    all that he allegedly said.

4          MS. WALL:  Yes, Your Honor.  "Okay.  We have six days

5    until my presidential assassination.  Yes, I have decided I

6    will assassinate Barack Obama.  It's really nothing personal

7    about the man.  He speaks well, has a loving, although

8    controlling, wife and two cute daughters.  But I know it's for

9    the country's own good that I do this.

10         "And I'm not racist either.  My family is a little,

11   but isn't all Italian European families?  I mean, how many

12   times have you heard the word," the N word, "in the comforts of

13   your home?  I have a lot.  And it really bothered me, and I

14   would confront them about it.

15         "No, it's not because I'm racist that I will kill

16   Barack.  It's because I can no longer allow the Jewish

17   parasites to bully their way into making the American people

18   submit to their evil ways.  How many of you Obama supporters

19   are now disappointed after some of his armed-twisted Jewish

20   appointee decisions?  Makes you think he's not really in

21   charge, (which he isn't).  No, it's the same old, same old

22   filthy" -- expletive Your Honor.

23         THE COURT:  I'll ask you to read all that you say that

24   he said.

25         MS. WALL:  "Filthy mother fucking kikes who are

poisoning America, who have murdered thousands of innocent

lives on 9/11/01 and are thinking that they are going to get

away with it.  Barack I view more as a sacrificial lamb, but

the sacrifice must take place.  He had good intentions like the

Steve Taylor song goes, 'A politician next door, swore he'd set

the Washington arena on fire, thinks he will gladiate him, but

they're gonna make him a liar.'"

"So I'm stuck here in Mississippi, and I'll need bus

fare or some way of getting to Washington.  I don't own a gun

so maybe someone can give me one.  And I'll need a leak in the

Secret Service to get a close-up shot, someone close to the

podium since I've never fired a gun.  So I need to get an easy

shot off.

"What do you say, fellows?  Any help?  You all know we

can't live with the Jew scum any longer, don't you?  You got a

better solution?  I'm all ears, Stevie."

This Web site administrator reported threats to the

Secret Service on January 14th of 2009.  Secret agents later

learned from America Online that this IP address was a specific

number located to a Lena Lock, 2033 California Road Northwest

in Brookhaven, Mississippi.

Secret Service agents later went to this area and

found the defendant at this location and placed him under

arrest.  This all occurred, Your Honor, including the Web site

posting in the Brookhaven area in the Jackson division of the

1    Southern District of Mississippi.

2         THE COURT:  All right.  Now, earlier at one point in

3    your reading you mentioned, quote, unquote, the "N" word.

4         MS. WALL:  Yes, Your Honor.

5         THE COURT:  Were you reading verbatim that point?

6         MS. WALL:  No, Your Honor.  The "N" word that he

7    referred to was N-I-G-G-E-R.

8         THE COURT:  Okay.  Thank you very much.  Now, then,

9    Mr. Christopher, did you hear what she had to say?

10        THE DEFENDANT:  Yes.

11        THE COURT:  And my question is:  Do you disagree with

12   anything that she said?

13        THE DEFENDANT:  No.

14        THE COURT:  So, then, Mr. Christopher with regard to

15   the words that we've just heard, were you the author of those

16   words?

17        THE DEFENDANT:  The words that she just said, yes, I

18   wrote those words.

19        THE COURT:  All right.  And those words pertain to the

20   president elect of the United States?

21        THE DEFENDANT:  Yes.

22        THE COURT:  And those words you are admitting

23   constitute a threat?

24        THE DEFENDANT:  Yes.

25        THE COURT:  So then how do you plead -- oh, that you

1   did all this knowingly and willfully?

2          THE DEFENDANT:  Yes.

3          THE COURT:  So then how do you plead to the charge?

4   Guilty or not guilty?

5          THE DEFENDANT:  Guilty.

6          THE COURT:  All right.  Mr. Christopher -- Twana,

7   what's the sentencing date?  Mr. Christopher, I'm going to set

8   November 6th, 2009, at 9:00 for your sentencing.  That's 9:00

9   a.m. November 6, 2009, here in this courtroom.

10          Meanwhile, the probation office is going to prepare a

11   presentence investigation report on you.  Now, this report will

12   be very important because I'm going to use this report to

13   determine what the appropriate sentence should be.  This report

14   will include a history of your life, matters pertaining to this

15   charge, any matters that deal with mental or physical health,

16   your financial statements, family, schooling, et cetera.  And I

17   will use this report to determine what the appropriate sentence

18   should be.  I will either at sentencing proceed under the

19   statute to sentence or under the guidelines.

20          You were in court earlier when I addressed another

21   matter concerning another defendant, were you not?

22          THE DEFENDANT:  Yes.

23          THE COURT:  I think you heard me talk about this whole

24   matter of the court's choice between employing the statutory

25   maximum as opposed to the sentencing guidelines.  Do you recall

1    that?

2                   THE DEFENDANT:  Yes.

3                   THE COURT:  So in this case it will be the same thing.

4    This court has that same option, and I will look at the

5    presentence investigation report.

6                   Now, the probation officer will need to talk to you

7    and ask you a number of questions.  And you have a right to

8    have your lawyer present with you the entire time.  So if you

9    should feel that some question is inappropriate or that it

10   violates some rights of yous, then you need not answer the

11   question.  Do you understand that?

12                  THE DEFENDANT:  Yes.

13                  THE COURT:  Otherwise, I'll expect that you would

14   fully and completely cooperate with the probation officer

15   because I'd like to have as large a picture I can before the

16   court imposes any type of sentence.  So then I ask that you

17   cooperate with the probation officer to that degree.

18                  You are now convicted of or will be convicted of a

19   felony.  Do you understand that you cannot possess a firearm?

20                  THE DEFENDANT:  Sure do.

21                  THE COURT:  Any type of firearm?

22                  THE DEFENDANT:  I never did before.  It won't bother

23   me.

24                  THE COURT:  Okay.  Not a pistol, rifle, shotgun.  And

25   use would not matter.  You couldn't possess a firearm for

1    hunting.  You couldn't possess it for gun collecting.  You

2    couldn't possess it even for self-defense.  There's no reason

3    allowable under the law for the possession of a firearm or

4    ammunition, which is also thrown in under the statute.  Did you

5    understand that?

6         THE DEFENDANT:  Yeah.

7         THE COURT:  So then you told me you have no objection

8    to anything the government stated.  I ask you then how do you

9    plead to the single count in the indictment of threatening the

10   president?  Guilty or not guilty?

11        THE DEFENDANT:  Guilty.

12        THE COURT:  All right.  Mr. Christopher, because you

13   understand the gravamen of the offense, since you have

14   discussed with the court all of the basic factors that pertain

15   to the rendering of a guilty plea, because you are entering a

16   plea of guilty voluntarily and under your own willpower, then

17   the court finds that you are guilty as charged under the single

18   count of the indictment.  The court, thereby, finds you guilty

19   as charged.

20        Now, I said earlier what the sentencing date would be,

21   and that will be the sentencing date.  I took it a bit out of

22   turn.  I gave you the sentencing date before I accept your

23   plea.  So I am now accepting your plea and reaffirming the

24   sentencing day.  All right?

25        THE DEFENDANT:  Okay.

 1                THE COURT:  Now, Mr. Jupiter, your client is

 2    incarcerated?

 3                MR. JUPITER:  He is, Your Honor.

 4                THE COURT:  He's had a detention hearing, didn't he?

 5                MR. JUPITER:  He's had a detention hearing.  Judge

 6    Sumner ordered him detained without bond.  We asked the judge

 7    to reconsider that and asked for another hearing, and that

 8    motion was denied.  He's been incarcerated for a total of eight

 9    months now, including the time he spent at Miami on his mental

10    health evaluation.

11                We filed a motion to ask that the court revoke his

12    detention order.  His parents have traveled from Illinois.

13    Although they reside in Arizona, they traveled to come here

14    today.  I asked the government whether or not they would be

15    willing to agree to have a short hearing on that today, and

16    they have indicated that they are ready to proceed on that.

17    I'm ready to proceed on that, if the court would entertain that

18    matter so that -- and to take some brief testimony from

19    Mr. Christopher's father.

20                THE COURT:  He will be the only witness testifying?

21                MS. WALL:  Yes, Your Honor.  His mother is here as

22    well.  Let me just point out -- yes, Your Honor, to answer your

23    question.

24                THE COURT:  Since they are here, then let me hear from

25    Mr. Christopher.

1            MR. JUPITER:  Mr. Ciummo.

2            THE COURT:  I'm sorry.  What's --

3            MR. JUPITER:  I believe it's Ciummo.

4            THE COURT:  Spell it.

5            MR. JUPITER:  C-I-U-M-M-O.

6            THE COURT:  C-I-U-M-M-O?

7            MR. JUPITER:  Yes, Your Honor.

8            THE COURT:  Okay.  Got it.  All right.

9   Mr. Christopher, you can have a seat.

10           MR. JUPITER:  Your Honor, I want to point out to the

11   court right now Mr. Ciummo has explained to me that he has a

12   hearing problem.  Sometimes he does hear something.  I've asked

13   him to let me know, and I did tell him that there are some

14   aides.  Would that assist you, Mr. Ciummo?

15           THE COURT:  We'll get one for him.  It will assist

16   him.  One second.

17                        VICTOR CIUMMO,

18     Having first been duly sworn, testified as follows:

19                      DIRECT EXAMINATION

20   BY MR. JUPITER:

21   Q.  Could you agree that you'll let me know if you don't hear

22   something?

23   A.  Yes, sir.

24   Q.  All right.  Please tell us your name and make sure that I

25   spelled it correctly.

1   A.  My name is Victor Ciummo C-I-U-M-M-O.

2   Q.  Ciummo?

3   A.  Ciummo.

4   Q.  And, sir, where do you live?  Where do you reside?

5   A.  I live in Fountain Hills, Arizona.  It's a suburb of

6   Scottdale.

7   Q.  Outside of Scottdale.  That's close to like a suburb of

8   Phoenix?

9   A.  Yes.

10  Q.  But where have you -- your wife is here with you today.

11  Correct?

12  A.  Yes, right there.

13  Q.  What's your relationship to Steven Christopher?

14  A.  I'm his father.

15  Q.  He grew up in a household with you?

16  A.  Correct.

17  Q.  In Illinois?

18  A.  Correct.

19  Q.  Where do you -- I think I asked you this.  Where have

20  your -- you have family in Illinois.  Correct?

21  A.  Yes, I do.  Two more children there.

22  Q.  Tell us everyone in your family, your kids.

23  A.  Yes.  My first son, Victor, who teaches in high school.

24  He's a math teacher.  Then Steven who's a graphic artist.  And

25  then there's Mark, who's a mechanic.  And my daughter Pamela is

1    a pharmacist at Wal-Mart.

2    Q.  And you're in touch with all of your children?

3    A.  All the time, yes.

4    Q.  You visit them frequently because you're retired now?

5    A.  Yes, I do.

6    Q.  What was your profession?

7    A.  I was an architect.

8    Q.  Do you still do any --

9    A.  Yes, I do occasionally for friends and on a part-time

10   basis.

11   Q.  Okay.  Steven grew up in the household with you and your

12   wife and his siblings?

13   A.  Yes.

14   Q.  Where can he attend college?

15   A.  University of Illinois.

16   Q.  Did he go there on scholarship or did you pay for it?

17   A.  Both.  He went primarily on scholarship.  I did help a

18   little.

19   Q.  You are aware of the crimes that he just pled guilty -- the

20   crime that he just pled guilty to?

21   A.  Yes, I am.

22   Q.  He has lived with you before?

23   A.  Yes.

24   Q.  Where?

25   A.  Primarily in Illinois and different towns around Chicago.

1  Q.  So that would be like some inside -- outside of Chicago?

2  A.  Outside of Chicago, northwest side area primarily.

3  Q.  At some point he married and had some children?

4  A.  Yes.

5  Q.  When was that?

6  A.  I believe it was about 20 years ago.

7  Q.  All right.  How many children does he have?

8  A.  He had three children.

9  Q.  All right.  And that was not a good marriage.  Is that

10  correct?

11  A.  No, it was a very, very bad marriage.

12  Q.  Were you aware of certain mental health issues that came

13  up?

14  A.  Yes.  It all came from the marriage.  His wife was a mental

15  problem, I think she was.  And he tried to kind of reform her

16  and didn't succeed.  She succeeded in playing in his mind

17  actually.  She took off with the kids many times for a time on

18  hand and wouldn't tell her when she was gone.  That kind of

19  affected his mind a little.  But he graduated with honors at

20  the University of Illinois, and did some work and never been in

21  trouble, never got in a fight with anybody, never been in

22  trouble with the law.  And I'm sure whatever he did that at the

23  time he was under enormous stress and agitation and he said

24  what he said.  But you know --

25  Q.  You and I -- when you say he's never been in trouble with

1   the law, you mean before?

2   A.   Before the marriage.

3   Q.   Before the marriage.   You and I have briefly talked about

4   some incidences that he has had with the law.   Do you recall

5   that?

6   A.   After that marriage.

7   Q.   After that marriage.   And that was when he was not with

8   you, of course.   Correct?

9   A.   He was with me and was on me, but he never had a problem

10  with the law until after he got married.

11  Q.   Okay.   You are aware now that he has some mental health

12  issues that need to be addressed.

13  A.   Yes, I am.

14  Q.   Are you willing to have him live with you and your wife in

15  Arizona?

16  A.   I'm willing to have him live with me, provide all the help

17  that he needs, whether it be going to a psychiatrist or going

18  to a mental doctor or loving care, whatever he needs.   We have

19  facilities for him, and we are there to take care of him 100

20  hundred percent of the way.

21  Q.   Have you participated in that before?

22  A.   Yes, I have.

23  Q.   Have you monitored, for instance, his mental health issues?

24  A.   Yes, I have.

25  Q.   Okay.   Was -- did he do any of that type of acting out,

1   being violent or anything while living with you?

2   A.  No, no, not really.

3   Q.  Okay.  Anything that would -- that you could indicate to

4   the court that would -- that you would see that it would be

5   difficult to manage him?

6   A.  I wouldn't have any problems whatsoever.  We have got a

7   great relationship, we've got lots of love to give to him, and

8   whatever help he needs.  We just got along just fine.  I don't

9   see any problem there.

10  Q.  Okay.  You understand that this is a pretty serious

11  incident that occurred?

12  A.  I do, unfortunately.

13  Q.  You understand the gravity of the situation right now.

14  A.  Yes, I do.

15  Q.  Okay.  This is the first time that you've been able to see

16  him since he's been incarcerated?

17  A.  Correct.

18  Q.  Okay.  Do you notice any changes in his condition since his

19  incarceration?

20  A.  No.

21  Q.  Is there anything else that you'd like to let the court

22  know about your son?  Let me ask you this.  You've seen him

23  work in various different jobs.

24  A.  Yes.

25  Q.  Okay.  And has he had any problems getting employment in

1    the past?

2    A.  Never.

3          MR. JUPITER:  I tender the witness, Your Honor.

4          THE COURT:  Cross-examine.

5          MS. WALL:  Thank you, Your Honor.

6                       CROSS-EXAMINATION

7    BY MS. WALL:

8    Q.  Mr. Ciummo, I have a few questions about -- first of all,

9    did you say you lived in Phoenix?

10   A.  Scottsdale area in a town called Fountain Hills just

11   outside Scottsdale.

12   Q.  Do you remember being contacted on January 26th of this

13   year by agents from the Secret Service?

14   A.  Yes, I did.

15   Q.  And is it true at the time that you told them you were very

16   frustrated with your son's legal issues and refused to provide

17   any information?

18   A.  I really didn't believe that.  I couldn't really connect

19   this together, you know, what could they do for him.  He didn't

20   live with me.  I couldn't help him.

21   Q.  You also refused --

22          THE COURT:  You need to finish.  That was a two-part

23   question that you asked that he had met with agents, and then

24   you asked did he refuse to furnish information.  I don't know

25   if we had an answer to the second part of your question.

```
1    A.  I did provide the gentleman with some information, told him
2    that he had mental problems and he was at various institutions
3    and hospitals for his problems.  That's all he asked me.
4    Q.  Is it true that you provided no further investigative leads
5    concerning this defendant?
6    A.  I'm sorry?
7    Q.  You provided no further information on family members about
8    this defendant, Mr. Christopher?
9    A.  I didn't feel it was necessary.
10   Q.  And you would agree that Mr. Christopher has been
11   prescribed antipsychotic medication in the past?
12   A.  Yes.
13   Q.  And there was some period of time where you had no contact
14   with the defendant.  Isn't that true?
15   A.  Yes.
16   Q.  When was that?
17   A.  About three years ago, three or four years ago.
18            MS. WALL:  That's all I have, Your Honor.
19            THE COURT:  Let me understand, sir, share with me your
20   contact with your son over the last five years.
21            THE WITNESS:  We've been getting along just fine.
22            THE COURT:  Let's start five years ago.
23            THE WITNESS:  Five years ago.
24            THE COURT:  Five years ago.  Let's say in '04.  Did
25   you have contact with him then?
```

1              THE WITNESS:  '04, yes, I did.

2              THE COURT:  Where about?

3              THE WITNESS:  He lived in a town outside of Chicago .I

4      think it was Lincoln Hills or Concord area.

5              THE COURT:  Did he visit you in '0q4.

6              THE WITNESS:  Yes.

7              THE COURT:  He did?

8              THE WITNESS:  I'm sorry?

9              THE COURT:  Did he visit with you in '04.

10             THE WITNESS:  Did he live with me?

11             THE COURT:  Yes.

12             THE WITNESS:  No, he did not live with me.  He lived

13     with his wife.

14             THE COURT:  Did he come visit you?

15             THE WITNESS:  He come to visit me, yes.

16             THE COURT:  '05.

17             THE WITNESS:  '05.  I don't recall it was '05 if he

18     visited me.  He probably did.  I think the last couple of three

19     years is when he had this problem like '06, '07 primarily

20     started having problems mental.

21             THE COURT:  Okay.  And '07?

22             THE WITNESS:  '07, yes, sir.

23             THE COURT:  That he came to visit?

24             THE WITNESS:  I don't know if he came to visit.  I'm

25     not sure.  Yes, he did.  Yes, he did.  He came to Arizona to

```
 1   visit.

 2            THE COURT:  '08.

 3            THE WITNESS:  '08 I don't think so, no.

 4            THE COURT:  Okay.  And then early this year?

 5            THE WITNESS:  Early this year, no.

 6            THE COURT:  Okay.  You know what he's charged with?

 7            THE WITNESS:  Yes, I know what he's charged with.

 8            THE COURT:  He made a tape that was on youtube.  Did

 9   you ever see that.

10            THE WITNESS:  No, I didn't.

11            THE COURT:  You did not?

12            THE WITNESS:  It was up on the --

13            THE COURT:  I was just on youtube.

14            THE WITNESS:  Yes.

15            THE COURT:  You saw it?

16            THE WITNESS:  I didn't see it at first, and my wife

17   showed it to me a few months later.

18            THE COURT:  Did you discuss his views with him?

19            THE WITNESS:  No.  I haven't seen him since the

20   incident when I talked to him.

21            THE COURT:  Okay.  All right.  Is there anything else

22   you want to say?

23            THE WITNESS:  No, just that I want to reinforce the

24   fact that he is a very good kid and never been in trouble in

25   the law until he got married to this woman and she led him on.
```

 1              THE COURT:  Now, have you also stated everything your

 2    wife would like to say?

 3              THE WITNESS:  I would think so.

 4              THE COURT:  Okay.  All right then.  I know she won't

 5    hesitate to tell you.

 6              THE WITNESS:  Thank you.

 7              THE COURT:  All right, then.  Any other questions?

 8              MR. JUPITER:  No, Your Honor.

 9              THE COURT:  All right.

10              MS. WALL:  No, Your Honor.

11              THE COURT:  You can step down.  Thank you.  Any other

12    questions or any other witnesses?

13              MR. JUPITER:  No other witness for the defense, Your

14    Honor.

15              THE COURT:  Okay.  Government, any witnesses?

16              MS. WALL:  Your Honor, we do have provided to me by

17    the Secret Service agents packets of police reports dating from

18    2004 until 2008, and I know that probation has done a pre-- a

19    report for the court concerning his criminal history, and we

20    would just like the court to be aware, and I would provide a

21    copy to the court for you to consider the prior arrests of the

22    defendant starting in 2002.

23              THE COURT:  Okay.  You've given a copy to the defense?

24    Mr. Jupiter, do you have a copy?

25              MR. JUPITER:  I believe I have all of those, Your

1    Honor.

2              THE COURT:  Why don't you look at it.

3              MR. JUPITER:  Yes.  Actually, Your Honor, these are

4    more extensive than the reports I previously had.  I would like

5    a minute to review them.

6              THE COURT:  Go ahead.

7         (Short Pause)

8              THE COURT:  I've read the reports, Your Honor.  Is

9    there any objection to it?

10             MR. JUPITER:  No, Your Honor.  I mean, it's hearsay

11   but hearsay is admissible at this hearing so there's no

12   objection to their admission.

13             THE COURT:  It will be accepted.  Anything else from

14   the government?

15             MS. WALL:  No witnesses, Your Honor.  Just brief

16   argument.

17             THE COURT:  Make your argument.

18             MS. WALL:  Today we sit in a posture where the

19   defendant has pled guilty to a violent crime, and 18 USC 8711

20   is considered a violent crime under 18 USC 16.  And in order

21   for the defendant to be released, since we're in this posture,

22   it is only if the defendant can show by a clear and convincing

23   evidence that the person is not likely to flee or pose a danger

24   to any person or the community.

25             We would argue that the contrary is true and that

1    what's been presented to the court, the prior criminal history

2    highlighted in the pretrial services report where the defendant

3    has a history of bail jumping, we would argue that there is

4    clear and convincing evidence he is likely to flee, and he does

5    pose a danger to other persons in the community, and that's our

6    argument.

7              THE COURT:  Mr. Jupiter.

8              MR. JUPITER:  Based on the testimony of

9    Mr. Christopher's father, there is an alternative to consider

10   here, and we did meet the burden that the government has

11   correctly stated with regard to whether or not Mr. Christopher

12   should either be released or at this point whether he should

13   remain incarcerated.

14             This does not take away from the seriousness of this

15   case, but I don't think that it's clear that -- the parents

16   recognize that he has some mental health issues.  I think those

17   mental health issues are best dealt with in the community.

18   These incidences that the government has submitted while the

19   words that were uttered and the words uttered in this case are

20   very serious, it also is recognize by every mental health

21   professional that these things need to be addressed.  I think

22   they need to be address in the community.  They are not being

23   added at the Madison County jail.

24             He can be placed on house arrest.  The court has a

25   number of conditions that he could place on the defendant,

1   including that he is to go and attend mental health treatment,

2   that he be supervised by the office of probation in Phoenix --

3   in that district in Arizona and that he remain with his parents

4   and that he attend mental health counseling and whatever

5   conditions would follow from that.

6          So it's an issue of -- I think it's an issue at this

7   point of whether or not there are resources in the community

8   available to him to monitor his movement, to monitor his

9   treatment and to monitor him, and that is available to the

10  court.  He's been incarcerated now for approximately nine

11  months, and I think that that -- his continued incarceration,

12  in fact, is just going to deteriorate his mental health

13  condition.

14         The court heard extensively from him at a prior

15  hearing in this case, and I'm sure the court has a lot of

16  concerns about him, but he understands the severity.  He's

17  never been incarcerated for this length of time.  He's had

18  times where he's gone to mental health facilities, but he's

19  been released from those facilities.  And now with the

20  assistance of his parents, probation office and mental health

21  professionals, this is a time when he should be released into

22  the community to deal with this problem and that way the court

23  can be able to appropriately assess what is the correct

24  sentence in this case.

25         But he's admitted to his wrongdoing.  He has

1   admitted -- he's acceptable to getting an evaluation on an

2   outpatient basis when that has already been done on an

3   inpatient basis.  Thank you.

4        THE COURT:  Thank you.  The defendant is presently

5   incarcerated where he can receive treatment, also where he can

6   be monitored relative to any such treatment and also where he

7   does not form a danger or provide a danger to society since

8   he's incarcerated.

9        I appreciate the testimony of his father, but I just

10  have too many questions that aren't answered by the testimony.

11  Who will provide any mental health treatment if necessary?

12  Under what conditions would he exist there at the house?  What

13  is the relationship with his mother and father relative to

14  disciplinary or obedience standards?  I don't know the answers

15  to all those.  Too many questions just occur to me to allow him

16  to be released under those circumstances.  So then I have to

17  affirm the previous order of detention upon the grounds

18  enunciated by the government.  Is there anything else from the

19  government?

20        MS. WALL:  Nothing from the government, Your Honor.

21        THE COURT:  Mr. Jupiter, anything else?

22        MR. JUPITER:  Nothing further, Your Honor.

23        THE COURT:  The government will provide the court a

24  short order on this matter of detention, and I've already set

25  the date for sentencing.  And I expect then the defendant and

1  counsel to review the presentence investigation report; and if

2  they have objections, to make those objections known and I will

3  sentence on the date provided unless I'm shown some reason why

4  I should go earlier.

5          Anything else, Mr. Jupiter?

6          MR. JUPITER:  No, Your Honor.

7          THE COURT:  All right.  You all can be excused.  Thank

8  you so much.

1                        CERTIFICATE OF REPORTER

2

3          I, CHERIE GALLASPY BOND, Official Court Reporter, United

4    States District Court, Southern District of Mississippi, do

5    hereby certify that the above and foregoing pages contain a

6    full, true and correct transcript of the proceedings had in the

7    aforenamed case at the time and place indicated, which

8    proceedings were recorded by me to the best of my skill and

9    ability.

10         I certify that the transcript fees and format comply

11   with those prescribed by the Court and Judicial Conference of

12   the United States.

13

14         This the 2nd day of February, 2010

15

16              s/ *Cherie G. Bond*
                Cherie G. Bond
17              Court Reporter

18

19

20

21

22

23

24

25